AGREEMENT

Between

KING SOOPERS INC.,
A DIVISION OF DILLON COMPANIES, INC.

and

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7,
DENVER, COLORADO
Chartered by the
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO


Denver, Colorado  **(Meat)**

TERM:  September 12, 2004 through May 9, 2009



EXHIBIT
**A**

# TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---|---|---|
| 1 | Recognition and Exclusions | 3 |
| 2 | Service in Meat-Delicatessen Departments, Plant | 4 |
| 3 | Union Security and Conditions | 7 |
| 4 | Check-Off | 7 |
| 5 | New Employees, Transferred Employees, Promoted or Demoted | 8 |
| 6 | Rights of Management | 8 |
| 7 | Definitions of Classifications | 8 |
| 8 | Rates of Pay | 11 |
| 9 | Temporary Assignments | 11 |
| 10 | No Reduction in Pay | 12 |
| 11 | Workweek | 12 |
| 12 | Overtime | 13 |
| 13 | Sunday Premium | 13 |
| 14 | Travel Pay | 14 |
| 15 | Night Premium | 14 |
| 16 | Holidays | 14 |
| 17 | Vacations | 16 |
| 18 | Schedule Posting | 18 |
| 19 | Reporting Pay/Minimum Daily Schedule | 19 |
| 20 | Minimum Weekly Schedule | 19 |
| 21 | Timekeeping | 19 |
| 22 | Split Shifts | 19 |
| 23 | Store Meetings | 20 |
| 24 | Lunch Breaks | 20 |
| 25 | Relief Periods | 20 |
| 26 | Probationary Period | 20 |
| 27 | Seniority | 21 |
| 28 | Available Hours | 22 |
| 29 | Scheduling Shifts | 25 |
| 30 | Underscheduled Overtime | 25 |
| 31 | Reduction of Hours | 26 |

# TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---|---|---|
| 32 | Layoffs | 27 |
| 33 | Transfer from Store to Store | 28 |
| 34 | New Store Opening | 28 |
| 35 | Leave of Absence | 29 |
| 36 | Funeral Leave | 31 |
| 37 | Jury Duty | 31 |
| 38 | Sick Leave | 32 |
| 39 | Injury on the Job | 33 |
| 40 | Health Benefits Plan | 33 |
| 41 | Non-Duplication of Benefits | 38 |
| 42 | Pension Fund | 38 |
| 43 | Health & Welfare or Pension Delinquencies | 40 |
| 44 | No Discrimination | 41 |
| 45 | Union Representation Visitation | 41 |
| 46 | Joint Labor Management committees | 42 |
| 47 | Union Steward | 42 |
| 48 | Grievance and Arbitration Procedure | 43 |
| 49 | No Strike – No Lockout | 44 |
| 50 | Store or Plant Closing | 45 |
| 51 | Bulletin Board | 46 |
| 52 | Union Store Card | 46 |
| 53 | Uniforms/Equipment | 47 |
| 54 | Savings Clause | 47 |
| 55 | Master Safety Committee | 48 |
| 56 | Term of Agreement | 48 |
| | Cost of Living Allowance | 49 |
| | Appendix "A" | 50 |
| | Letter of Understanding – Employee Buyout | 54 |
| | Letters of Agreement | 55 |

## AGREEMENT

### Between

### KING SOOPERS, INC.
### A DIVISION OF DILLON COMPANIES, INC.

### and

### UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7
### Chartered by the
### UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO

### TERM:

### Denver, Colorado (Meat):
### September 12, 2004 through May 9, 2009

THIS AGREEMENT has been made and entered into by and between KING SOOPERS, INC., a Division of Dillon Companies, Inc., hereinafter referred to as the "Employer," and UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7, chartered by the United Food and Commercial Workers International Union, AFL-CIO, hereinafter referred to as the "Union".

### WITNESSETH:

That for and in consideration of the mutual promises and conditions hereinafter set forth, and in order to assure and secure the benefits intended to be derived by the employees and the Employer under these Articles of Agreement herein, it is hereby expressly understood and agreed as follows:

### ARTICLE 1

### RECOGNITION AND EXCLUSIONS

**Section 1.** The Employer recognizes the Union as the sole collective bargaining representative for all meat cutters, apprentices, wrappers, butcher block sales persons and delicatessen employees, clean-up personnel, including part-time workers who work regularly one (1) day or more a week, employed by the Employer in the meat market or markets owned or operated by the Employer in the metropolitan area of Denver, Colorado (as such area as is shown on the map attached hereto and by this reference made a part hereof) but excluding all store managers, courtesy clerks, office and clerical employees, janitors, parking lot attendants, food clerks, warehouse employees, watchmen, guards and professional employees and supervisors as defined in the National Labor Relations Act, as amended, and all other employees. Within the

geographical jurisdiction of this Agreement, any new stores opened by the Employer shall be accreted and shall be covered by the terms of this Agreement.

Store Managers and Assistant Store Managers can perform all duties in the store.

## ARTICLE 2
## SERVICE IN MEAT-DELICATESSEN DEPARTMENTS, PLANTS

**Section 2.**  All work performed in the meat, delicatessen and seafood department(s) will be done by members of the bargaining unit, except Store Managers, Assistant Store Managers, and Field Merchandisers may perform all duties in the meat department without restriction.  For the purpose of this agreement, the meat department is defined as the area occupied by the meat storage rooms, the meat preparation rooms and the service and/or self-service display cases where fresh, smoked, cooked and frozen meats, poultry, fish and seafood are offered for retail sale, with the exception of poultry products, the pricing of all meat products shall be done on the premises except as provided herein.  Notwithstanding, the Employer may have specialized sanitation work, such as cleaning of ceiling tiles, grease traps, drains, walls, etc., performed by personnel outside the bargaining unit.

**Section 2 A.**  Bargaining unit employees shall perform the work of cutting or preparation of meats that are cut, processed or prepared on the Employer's premises for immediate consumption.

All fresh, cured, smoked or frozen meat, refrigerated luncheon meats, fish, poultry and rabbits shall be handled by employees within the bargaining unit.  Nothing in this agreement shall be construed to prevent non-bargaining unit employees from selecting customer purchases from the sales floor throughout the entire store, including the storage and retrieval thereof.

No one other than employees covered by this agreement shall be permitted to perform the cutting or preparation of meat in the meat departments, meat markets, seafood or delicatessen departments on the employer's premises, except as set forth below:

1)  This does not include the transaction of the checkstand.

2)  No representative of management above the level of head meat cutter (except for owners, partners and/or officers of the Employers) shall perform the work customarily assigned to employees in the bargaining unit except:  (a) when a bargaining unit employee who has been scheduled to work fails to report to work as scheduled; (b) in connection with the instruction or training of an employee or employees; or (c) in connection with the first thirty days of the opening of a new or remodeled market; or (d) in connection with simple straightening of display cases; or (e) in connection with the removal of outdated, distressed or damaged

merchandise from display cases; or (f) in connection with floor maintenance work performed by a member of the retail clerks bargaining unit in connection with work related to the meat, delicatessen and seafood departments; or (g) in response to a specific customer request.

**Section 2 B.   Vendor Work.**   Direct store vendors who deliver the product categories of beverages (including juice sold in produce/deli departments), cookies and crackers, bakery, pizza, ice cream, specialty/gourmet/natural foods and chips, shall be allowed to perform all work in connection with the sale of their products directly delivered to the store. For purposes of this provision, the product categories as used herein shall be interpreted to include all products delivered by such vendor. Additionally, all vendors shall be allowed to stock and otherwise maintain any J-Hook or Clip strip program. Additionally, all vendors may perform:  any work in connection with promotional and seasonal displays; facing in connection with the service of product; rotation of product; cleaning of product, shelves and racks; affixing coupons and other promotional materials to products; vendors shall be permitted to perform three (3) major resets per store, per section, per calendar year.   Additionally, vendors may perform work, as necessary to accommodate the introduction of new items, or removal of discontinued items, from the set; checking of code dates and removal of out-dated product; and any work in connection with the opening of a new store and the two (2) week period thereafter, or during the two (2) weeks before and after a store remodel.

**Section 2 C.**  A Journeyman Meat Cutter shall be on duty in each store a minimum of eight (8) hours per calendar day.  Hours scheduled in the classifications of Head Meat Cutter and 1st Cutter may be used to satisfy this obligation.  The Employer agrees not to layoff a Journeyman Meat cutter hired and assigned to a retail store position on or before March 5, 2005 as the direct result of this section.

**Section 2 D.**  Retail Clerks may assist in meat department clean up work, provided such assignments do not conflict with applicable child labor and/or health and safety regulations.

**Section 3.**  It is understood that the cutting or preparation of meats that are cut, processed or prepared on the Employer's premises for immediate human consumption will continue to be performed in the market located on the Employer's premises, unless the Employer transfers said work, in which case the following paragraph will be applicable:  If the Employer transfers the cutting and fabricating of retail cuts of fresh meats performed in its retail store or stores covered by this agreement to a location or locations outside of said retail store or stores, the  Employer will continue to recognize the Union as the bargaining agent for the meat cutters, apprentices and wrappers employed by the Employer in the cutting and fabricating of retail cuts of fresh meat, and the seniority rights provided in this agreement shall continue to apply throughout the bargaining unit, including said new location or locations of the Employer.

**Section 3 A.**  Notwithstanding anything contained herein to the contrary, the Employer shall not be restricted in, or prohibited from, obtaining and offering for sale

fresh, smoked, cured, cooked and frozen meats, poultry, fish or seafood which have been cut, prepared, processed, packaged, weighed and/or priced off the Employer's premises and it is expressly understood and agreed that such shall not constitute a violation of this agreement. Notwithstanding the preceding sentence, the Employer agrees that no head meat cutter, first cutter, journeyman meat cutter or apprentice meat cutter assigned to one of the aforementioned classification by the Employer on or before May 11, 1996 shall be laid off or reduced in scheduled hours. The Employer shall have the right to transfer and/or schedule meat cutters in more than one (1) store within the bargaining unit and/or adjacent bargaining unit (s) as may be necessary to fulfill this obligation, except that the Employer shall not schedule such employees for split shifts.

The Employer shall continue to have the right to layoff employees in accordance with the provisions of this agreement, provided that the layoff of any meat wrapper, butcher block, seafood clerk or delicatessen clerk assigned to such classification on or before May 11, 1996, is for reasons other than the Employers utilization of the products set forth in Section 3A above. It is understood and agreed that in meeting the job guarantees contained herein the Employer shall have the right to assign any higher classified employee to perform work in a lower classification.

In the event of a store closure, or plant closure, resulting in the layoff of any head meat cutter, first cutter, journeyman meat cutter, apprentice meat cutter or meat wrapper, such affected employee (s) shall be permitted to exercise his seniority to displace the least senior meat cutter or meat wrapper in the involved bargaining unit as provided for herein, or, at the affected employee's discretion, the least senior meat cutter or meat wrapper in the State of Colorado. Such least senior meat cutter or meat wrapper affected by the exercise of the most senior meat cutter's or meat wrapper's seniority shall be laid-off. It is understood that in applying this provisions meat cutters may displace only meat cutters and meat wrappers may displace only meat wrappers.

**Section 4.** In the event of the closure of the King Soopers Meat Plant, meat cutters and meat wrappers assigned to the Retail Cut Line on the date of closure who elect to receive severance, as provided for in this agreement, in lieu of exercising their seniority rights contained in this agreement shall be paid a severance supplemental payment equal to fifty percent (50%) of the severance amount such employee is eligible to receive under the store and plant closing provision of this agreement. It is understood and agreed that in the event a retail cut line meat cutter or meat wrapper covered under this provision elects to bump into a store, the affected store employee subject to layoff shall be eligible for the plant closing severance pay as provided herein. For all other plant classifications impacted by a plant closure, the Employer agrees to discuss with the Union the effects of such decision.

**Section 5.** No retail employee shall be required to maintain restrooms.

# ARTICLE 3
## UNION SECURITY AND CONDITIONS

**Section 6.** Provided the parties to this Agreement have complied with all State and Federal statutes concerning Union security matters, the provisions of these Sections 6, 7 and 8 shall be applicable.

**Section 7.  Union Shop.**  All present employees of the Employer who fall within the bargaining unit, as set forth in Section 1 hereof, shall as a condition of continued employment, be or become members of Local No. 7, UFCW, AFL-CIO, between the thirty-first (31st) and thirty-fifth (35th) day following the date of the signing of this Agreement, and shall remain members of the Union in good standing during the life of this Agreement.

**Section 8.**  All employees hired after the date of the signing of this Agreement, who fall within the bargaining unit as set forth in Section 1, shall as a condition of continued employment, become members of the Union between the thirty-first (31st) and thirty-fifth (35th) day following the date of their last employment and shall remain members of the Union in good standing during the life of this Agreement.

**Section 9.**  "Good standing" is interpreted to mean the payment or tendering of initiation fees and periodic Union dues to an authorized agent of the Union.

Whenever the Union requires the Employer to discharge any employee for failure to join or to maintain his membership in the Union in good standing in accord with the terms of this Article, the Union agrees to furnish the Employer an itemized copy of the delinquent's account with the Union together with a written request for discharge.  The Employer will discharge any employee who falls within the bargaining unit as described in Section 1 hereof within ten (10) days after the receipt of said written request for discharge, unless within said ten (10) day period the delinquent employee pays or tenders his delinquent initiation fee and/or delinquent Union dues to an authorized agent of the Union.

# ARTICLE 4
## CHECK-OFF

**Section 10.**  The Employer agrees to deduct the weekly dues, legal rejoining fees and uniform assessments, (including initiation fees for new employees) from the net amount due each employee in the bargaining unit as described in Section 1 hereof who has furnished the Employer (either directly or through the Union) with an individual written authorization for making such deductions on a form mutually agreed upon between the Employer and the Union.  It is understood that the check-off authorization is to be entirely voluntary upon the part of each such individual employee and that any such employee may revoke his individual check-off authorization upon giving thirty (30)

days written notice to the Employer and the Union. The Employer agrees to remit all such deductions to the Chief Executive Officer of the Local Union no later than the twentieth (20th) day of each month.

**Section 11.** The Employer agrees to deduct amounts designated by employees for the Active Ballot Club when the Employer has been furnished an individual written authorization for making such deductions on a form mutually agreed upon between the Employer and the Union. It is agreed that the ABC authorization is to be entirely voluntary upon the part of each individual employee and that any such employee may revoke his ABC checkoff authorization upon giving thirty (30) days written notice to the Employer and the Union.

## ARTICLE 5

## NEW EMPLOYEES, TRANSFERRED EMPLOYEES, PROMOTED OR DEMOTED

**Section 12.** When an employee is hired for a job, or transferred or promoted or demoted into a bargaining unit job as described in Section 1 hereof, the Employer agrees within three (3) days to fill out a mutually agreeable form in triplicate, which advises the employee of his obligation to join the Union. One (1) copy of this form will be given the employee and one (1) copy will be mailed to the Union in a stamped, addressed envelope provided by the Union.

## ARTICLE 6

## RIGHTS OF MANAGEMENT

**Section 13.** The Employer retains the right to manage its business, to establish reasonable standard of dress, to direct the working forces and to make necessary rules and regulations for the conduct of the business, providing that said rules and regulations are not in conflict with the terms of this Agreement in any way.

## ARTICLE 7

## DEFINITIONS OF CLASSIFICATIONS

**Section 14. Head Meat Cutter.** Shall be considered the employee responsible for the operation of the market and the Union will not recognize any employee as Head Meat Cutter who is not employed full-time in any store covered by this Agreement.

**Section 15. Apprentice Meat Cutter.** If, in the opinion of management (management means higher management than the Head Meat Cutter) an apprentice is fully qualified to perform the duties of a Journeyman Meat Cutter prior to three (3) years of service with a minimum of six thousand two hundred forty (6,240) hours of actual work experience on the job, the Employer may advance such apprentice to the duties and pay of a Journeyman Meat Cutter.

When apprentices have worked three (3) years, and the equivalent hours as set forth above, they automatically become Journeymen and shall be paid as such.

During an apprentice's three (3) years training period, he shall be assigned from time to time to all jobs normally done in the particular market.

One (1) apprentice shall be allowed to every two (2) Journeymen or a fraction thereof in each market, and one (1) additional apprentice to every two (2) additional Journeymen in said market. This limitation on apprentices may be relaxed during emergency periods when the Union is unable to furnish qualified Journeymen to the Employer.

**Section 16.  First Cutter.** A First Cutter may be designated at the discretion of the Employer and is not a required classification.

**Section 17.  Wrappers.** The work allotted to employees falling in the classification of "wrappers" shall be strictly confined to wrapping, weighing, pricing and tagging the packages and clean-up work in this particular department as well as cleaning cases and pans, traying of rewraps, ordering of merchandise, receiving, checking and putting away loads. Wrappers may also be required to stock and rotate cases with fresh meat, cooked and smoked meats and frozen food. Nothing herein shall be construed to limit "Wrappers" from giving service to customers provided such service does not include the sawing or cutting of merchandise. Additionally, Meat Wrappers may use the tools of the trade, except the band saw, to perform work in response to a specific customer request.

**Section 18.  Clean-up Personnel.** Employees assigned as "Clean-up Personnel" shall clean all work areas of the meat and delicatessen departments, including walls, freezer, walk-in box, hold box, cutting room and wrapping area, as well as cleaning blocks, meat and delicatessen cases and disassembled power tools and equipment.

Clean-up personnel shall not disassemble or reassemble power tools or equipment nor handle meat or delicatessen products in display cases.

If a Clean-up employee is found to be doing any work other than set forth above, all hours so spent shall be paid for at the starting apprentice rate.

The Employer retains the right to schedule such employees for a minimum of two (2) hours per day.

**Section 19.  Assistant Delicatessen Manager.** Assistant Deli Managers may be designated at the discretion of Management and is not a required classification.

**Section 20.  Delicatessen Employees.** The work allotted to employees falling in the classification of "Deli Employee" shall be strictly confined to packaging, preparing,

selling and pricing all items offered for sale in this department. Such work shall also include use of tools of the trade and such clean-up and other work associated with the practical operation of the department.

Delicatessen Department employees may operate a cash register in the Delicatessen Department. Nothing in this section shall be construed to prevent delicatessen employees from ringing incidental sales from other departments of the store.

**Section 21.** Delicatessen Clerks and Department Managers will be considered as a separate group for the purpose of applying the Seniority provisions of Articles 27, 28, 30, 31, 32, 33 and 46.

**Section 22. Butcher Block Sales Clerks** Butcher Block sales persons shall be allowed to perform all work in connection with the processing and sale of product in a specialty meat or seafood department. It is further understood that a Butcher Block Sales Clerk may perform all duties of a meat wrapper. Butcher Block Sales person assigned to a separate Seafood Department (within a store) may prepare all seafood items for said department. It is further understood that Butcher Block Sales Clerks may perform all work necessary for the handling and sale of product in their department including the cutting and processing of all meat and, and in response to a specific customer request.

Butcher Block sales persons will be considered as a separate group for the purpose of applying the seniority provisions of Article 27, 28, 30, 31, 32, 33 and 46.

**Section 23. Snack Bar Clerks.** The duties of the Snack Bar Clerk shall be relegated specifically to the handling, preparation and/or sale of "snack" items, including, but not restricted to, hot dogs, pretzels, ice cream, popcorn and pizza. The maintenance of the equipment used to sell the above items shall also be the responsibility of the Snack Bar Clerk. In addition, duties enumerated under Section 18 (Clean-up Personnel) may be assigned.

Snack Bar Clerks shall not be temporarily assigned duties in higher classifications.

**Section 24. New Classification.** When a new job is created by the Employer, the Union shall be notified immediately, and a new wage rate for such job shall be determined by the Employer and the Union.

**Section 25. Work Between Classifications.** It is understood that employees may perform incidental work in another classification without violating this Agreement.

# ARTICLE 8
## RATES OF PAY

**Section 26.** The classifications, wages, and special conditions applicable to employees are set forth in Appendix "A," attached hereto, and, by this reference made a part hereof

**Section 27.** The salary of superannuated members of the Union to be employed by the Employer shall be decided upon between the Employer, the superannuated employee and a representative of the Union.

**Prior Experience:** In applying Section 26 of Article 8 of this Agreement to any newly hired employee, the Employer will give recognition to the verified number of hours of actual work experience on a comparable job which said newly hired employee may have performed within the previous five (5) years for any other employer in a similar retail grocery operation.

Any grievance over recognition given an employee for comparable work experience at the time of his employment must be filed pursuant to the terms and conditions of the grievance procedure of this Agreement (excluding the employee's trial period).

Any employee shall receive, upon request to his employer or former employer, the following information: Date of hire, date of termination, total hours worked in retail store unless such hours worked shall exceed six thousand five hundred (6,500) and then such fact shall be stated. The employee must show evidence of employment in the grocery industry before making such request.

**Section 28.** During the life of this Agreement, the Employer shall not raise or lower hourly rates of pay except as dictated by the wage scales set forth elsewhere in this Agreement.

# ARTICLE 9
## TEMPORARY ASSIGNMENTS

**Section 29.** When an employee is required to perform work in a higher classification, he shall receive the higher rate, based on his experience; but, if required to perform work in a lower classification, he shall retain his regular rate, except in the case of actual demotion, when the employee shall receive pay according to his classification.

Before an employee is scheduled work in a higher classification, all employees who have requested additional hours in that classification in that store shall have their hours maximized.

**Section 30.** When a Delicatessen Clerk is assigned by the Employer to assume the duties and responsibilities of the Delicatessen Manager for a continuous period of one (1) week or more, such employee shall be paid the Delicatessen Manager rate of pay for all hours worked while so assigned.

**Section 31.** When a Journeyman relieves a Head Meat Cutter for one (1) week or longer, he shall be paid the contract rate of pay for Head Meat Cutter for such time spent in relief.

## ARTICLE 10

## NO REDUCTION IN PAY

**Section 32.** No employee shall have his hourly wage reduced who may now be receiving more than the minimum wage called for in this Agreement, nor shall his hours be lengthened unless he is properly compensated therefore in accord with the terms of this Agreement, and employees shall not be reclassified to defeat the purpose of this Agreement unless otherwise agreed between the parties. No employee shall be asked to make any verbal or written agreement that shall conflict with this Agreement in anyway.

## ARTICLE 11

## WORKWEEK

**Section 33.** The workweek shall coincide with the calendar week.

Forty (40) hours to be worked in any five (5) eight (8) hour days shall be the basic workweek for regular full-time employees. Regular full-time employees shall be scheduled for at least forty (40) hours of work to be performed in five (5) days unless reduced in accordance with seniority. Regular full-time employees shall be scheduled for at least thirty-two (32) hours of work to be performed in four (4) days (exclusive of the holiday) during a week in which a holiday occurs, unless reduced in accordance with seniority.

Upon mutual agreement between the Employer and the employee, a regular full-time employee may work four (4) ten (10) hour days to make up the standard workweek, except in holiday or daily vacation weeks when the standard workweek, at the Employer's discretion, may be five (5) eight (8) hour days or four (4) eight (8) hour days. Unless modified herein, the provisions of this Agreement shall apply to such standard workweeks.

1. Overtime to be paid for all time worked in excess of ten (10) hours in any one (1) day.

2. Payment for funeral leave shall not exceed the straight-time hours scheduled per day missed up to a maximum of twenty-four (24) hours pay.

3. After eight (8) hours of work, the employee shall be entitled to a third fifteen (15) minute break.

4. Payment for jury duty shall not exceed eight (8) hours pay per day missed, less what he is paid for serving on the jury. The Employer may reschedule employees required to serve on jury duty, including but not limited to, scheduling them five (5) eight (8) hour days.

5. Sick leave pay will be paid, if eligible and following the full work day absence if such applies, not to exceed the number of hours scheduled on the day missed.

6. Management shall determine the number of four (4) ten (10) hour schedules during any one (1) week.

## ARTICLE 12
## OVERTIME

**Section 34.** Overtime compensation at the rate of time and one-half (1-1/2x) the employee's base hourly rate of pay shall be paid under the following conditions:

a. For all time worked in excess of eight (8) hours in any one (1) day.

b. For all time worked in excess of forty (40) hours in any one (1) workweek as described in Article 11.

Employees scheduled and working more than five (5) days in a workweek will receive time and one-half (1-1/2x) for the day on which the least number of hours was worked.

**Section 35.** It is understood and agreed that overtime compensation shall not be paid twice for the same hours of overtime work.

## ARTICLE 13
## SUNDAY PREMIUM

**Section 36.** The premium rate for work performed on Sunday as such shall be one and one-fourth times (1-1/4x) the employee's regular straight-time rate of pay. The Sunday premium, for hours worked up to eight (8), shall in no instance be offset against any weekly overtime which may be due under subparagraph (b) of Section 34 because of the fact that the employee worked over forty (40) hours in the particular workweek. The Sunday premium shall not be averaged into the employee's straight-time rate for

the purpose of determining the rate upon which daily or weekly overtime is based in any workweek under Section 34. Employees hired on or after March 6, 2005 shall not be eligible for Sunday Premium.

## ARTICLE 14

## TRAVEL PAY

**Section 37.** When an employee is transferred from one store to another store during his workday, reasonable time spent in traveling between said stores shall be considered as time worked. Assigned travel between stores in the employee's personal vehicle shall be reimbursed in the amount established by the Employer for reimbursement to its non-bargaining unit employees (but not less than the IRS rate), exclusive of travel to and from the employee's home. Before an employee is permitted to use his personal vehicle for company business, the Employer shall have the employee sign a statement acknowledging his risk and certifying possession of a valid drivers license and insurance coverage.

## ARTICLE 15

## NIGHT PREMIUM

**Section 38.** A premium of fifty cents (50¢) per hour shall be paid for all work performed between the hours of 12:00 midnight and 6:00 a.m. to all employees. Employees whose shifts are scheduled to end at 12:00 midnight need not be paid any premium under this Section, even where it is necessary for them to remain on the job for a short period in order to complete their work, provided that such additional period does not exceed fifteen (15) minutes.

Night premiums shall not apply where an employee is working at overtime or on a holiday.

## ARTICLE 16

## HOLIDAYS

**Section 39.** All employees hired on or before March 5, 2005 who have completed their probationary period shall be paid for the following holidays whether or not they fall on what would normally be a workday for the employees involved: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day. Such employees shall be entitled to two (2) personal holidays, which must be requested two (2) weeks in advance and approved by the Store Manager.

All employees hired on or after March 6, 2005 who have completed their probationary period shall be paid for the following holidays whether or not they fall on what would normally be a workday for the employees involved: Thanksgiving Day and Christmas Day. Such employees shall be entitled to one (1) personal holiday after two

years of service, two (2) personal holidays after three (3) years of service, and three (3) personal holidays after four years of service. Such holidays must be requested two (2) weeks in advance and approved by the Store Manager.

**Section 40.** The Employer may operate its stores at its sole discretion on any of the holidays recognized by this Agreement.

**Section 41. Personal Holidays.** To be eligible for personal holidays during each calendar year, an employee must be on the payroll as of January 1 of each year. Such holidays must be taken during the respective calendar year. An employee whose employment terminates prior to having taken his personal holiday or who fails to take his personal holiday in the calendar year shall not be entitled to holiday pay. In the event an employee fails to schedule his personal holiday by October 1 of the calendar year, the Employer will select a date and schedule such employee for his remaining personal holidays for that year.

**Section 42.** When a holiday falls on Sunday, the following day shall be observed.

**Section 43. Holiday Pay for Full-Time.** As pay for an unworked holiday, regular full-time employees will be paid at straight-time for the number of hours they would normally have worked on the day in question, but not to exceed eight (8) hours. If the holiday falls on a day which would normally have been such employee's scheduled day off, he shall be paid eight (8) hours at straight-time as pay for the unworked holiday.

**Section 44. Holiday pay for Part-Time.** Holiday pay for part-time employees who have completed their probationary period, and who otherwise qualify shall be based on the number of hours worked in the calendar week immediately prior to the week in which the holiday occurs, divided by five (5). Provided the employee actually performs work in the calendar week immediately prior to the holiday week (unless on vacation, or receiving sick pay for time not worked during such week, or during the first thirty (30) days of an absence for which an employee is receiving Workmen's Compensation), the employee shall not receive less than three (3) hours holiday pay.

**Section 45. Qualifications for unworked holiday pay.** In order to qualify for pay for an unworked holiday an employee, otherwise eligible for such pay under the terms of this Article, must work his regularly scheduled day immediately preceding the holiday, the holiday if scheduled and his regularly scheduled day immediately following the holiday unless he has been previously excused from such work by the Employer or unless he was prevented from so working due to a bona fide illness. No employee on leave of absence shall be eligible for holiday pay.

An unworked holiday, even though paid for under the terms of this Article, shall not be counted as a day worked for the purpose of computing overtime pay in a holiday workweek.

**Section 46.** For employees hired on or before March 5, 2005, when a holiday is worked, the employee shall be paid one and one-half (1½) times his/her normal hourly rate of pay, in addition to the holiday pay provided herein. For employees hired on or after March 6, 2005, when a holiday (as defined above for such employee) is worked, the employee shall be paid one dollar ($1.00) per hour worked.

**Section 47. Holiday scheduling.** No later than the second Wednesday prior to the beginning of the week in which a holiday observed hereunder occurs (exclusive of personal holidays), the Employer shall post in each store a holiday volunteer work list. An employee desirous of working the upcoming holiday, in the job assignment which he normally performs, shall sign such list no later than the Tuesday prior to the holiday week. Signing of another employee's name on such list shall be cause for disciplinary action.

The Employer will not reschedule the hours of work in the workweek immediately prior to the workweek in which the holidays occur in order to defeat the purpose of this Agreement.

The Employer will select the necessary employees from this list in accordance with seniority and ability, within each store and department, and provided the employee normally performs the work required. Should the Employer not be able to staff his schedule requirements through this procedure, qualified employees shall be assigned to the remaining available schedules by reverse seniority and ability within their respective classifications within each department and store. Nothing herein shall be construed to require pay for time not worked.

# ARTICLE 17

# VACATIONS

**Section 48.** All regular full-time employees, and all part-time employees, who were hired on or before March 5, 2005 and who have worked eight hundred and thirty two (832) or more hours in their anniversary year, covered by this agreement, shall receive one (1) week's paid vacation after one (1) year's service, two (2) weeks' paid vacation after two (2) years' service, three (3) weeks' paid vacation after five (5) years' continuous service, four (4) weeks' paid vacation after twelve (12) years' continuous service and five (5) weeks' paid vacation after twenty (20) years continuous service.

All regular full-time employees, and all part-time employees, who were hired on or after March 6, 2005 and who have worked one thousand forty (1,040) or more hours in their anniversary year, covered by this agreement, shall receive one (1) week's paid vacation after one (1) year's service, two (2) weeks' paid vacation after three (3) years' service and three (3) weeks' paid vacation after eight (8) years' continuous service.

Such vacation shall be paid at straight-time rates. The number of hours for which such employees shall be paid for a vacation week shall be the average number of

weekly hours worked during the twelve (12) months immediately preceding the employee's anniversary date of employment, not to exceed 40 hours pay for each week of vacation. Hours paid for vacations, holidays and sick leave shall be considered as hours worked for the purpose of computing vacation amounts. No pro-rata vacation will be paid at termination.

**Section 49.** Effective the first Sunday following execution of this Agreement, the Employer will convert the employees' weekly vacation allotment to a daily vacation allotment by multiplying the number of weeks of vacation due by five (5). The hours paid for each day of vacation will be based on the average weekly hours of vacation, as calculated in Section 48, divided by five (5). Employees may be allowed to take vacation one day at a time, subject to approval by the Employer and based on the following requirements:

1. Daily vacation may not be scheduled through the annual sign-up procedure.

2. Daily vacation must be requested of the store manager in writing by Tuesday prior to the posting of the schedule for the week in which time off is requested.

3. Employees may not receive more than five (5) days vacation pay in any calendar week.

4. Not more than one (1) week (five (5) days) may be taken one (1) day at a time per anniversary year. Any employee with fifteen (15) years or more shall be able to take ten (10) single days of vacation per year.

5. Weekly vacation requests shall take preference over daily vacation requests. Daily vacation requests shall take preference over any other request of a single day off except a personal day, regardless of seniority.

If one of the holidays listed elsewhere herein falls during an employee's vacation, the employee shall receive an extra day of vacation pay because of it. In the event a regular full-time employee covered by this Agreement, who has been employed for two (2) years or longer, voluntarily quits or is discharged for reasons other than dishonesty or drunkenness or being under the influence of illegal narcotics, such employee shall be paid pro rata vacation pay earned up to the time the employment relationship is severed.

**Section 50.** The Employer shall pay the employee the vacation pay accrued during the employee's anniversary year prior to the taking of the vacation (if requested in writing at least two (2) weeks in advance of vacation).

**Section 51. Vacation Scheduling.** The employer retains the right to determine the number of employees who may be on vacation at any given time, but the Employer will not block out any week(s) during the year and the Employer agrees that it will permit the maximum number of employee vacations each week, consistent with the staffing levels

in the vacation relief/floater pool and business volume. If a dispute develops between employees as to vacation preference, seniority shall govern within the department, the classification and store. Any vacation weeks that become available after the posting of such roster shall be offered by seniority within the classification and store.

The Employer will post a notice December 1 of the prior calendar year, and the employees will sign the roster as to their choice of vacation. This list will remain posted for selection until January 31 of each calendar year.

Any employee who fails to sign such roster prior to January 31 will be permitted to take vacation at a time that will not interfere with the other employees' established vacation period(s).

When the vacation dates have been established, they will not be changed unless mutually agreeable between the employee and Employer.

Notwithstanding the above, employees who voluntarily transfer to another store or department after their vacation has been selected are subject to having their vacation rescheduled.

On a basis agreeable to both the Employer and employee, employees shall be allowed to schedule vacations from mid-week to mid-week. For purposes of this provision, mid-week shall be defined as a vacation starting and stopping Tuesday, Wednesday or Thursday. An employee shall be considered to have met the minimum scheduling requirements of this Article if the total of the hours worked and paid for vacation (and unworked holiday if applicable) for the two workweeks involved is equal to eighty (80) for a full-time employee, forty (40) or more for a part-time employee.

## ARTICLE 18
## SCHEDULING POSTING

**Section 52.** The Head Meat Cutter will post the work schedule in ink for the following week in each market not later than 9:00 a.m. on Friday. This schedule shall include the employee's first initial and last name. This work schedule will not be changed by Management for that particular workweek except where the change is predicted on circumstances beyond the control of Management such as, but not limited to, sickness, injury, wide fluctuations in volume, Acts of God. Such up-to-date work schedules are to be posted weekly. This clause shall not be construed as preventing Management from calling in employees for extra work outside of the posted schedule, from requiring overtime work outside of the posted schedule or from bringing in additional employees where it appears advisable in the opinion of Management.

Any changes in the work schedule will be reflected on the posted schedule at the time the change is made.

The Employer shall designate the starting time for employees. The employee shall be dressed and ready to go to work at this starting time.

Regular full-time employees called in on their scheduled day off shall not have the balance of their scheduled workweek altered as a result of such call-in.

## ARTICLE 19

## REPORTING PAY/MINIMUM DAILY SCHEDULE

**Section 53.** An employee called in or scheduled for work shall be guaranteed four (4) hours of pay at the applicable rate, with the understanding that an employee may be called in or scheduled for less than four (4) hours if he is unavailable for the full four (4) hours.

## ARTICLE 20

## MINIMUM WEEKLY SCHEDULE

**Section 54.** No regular employee shall be scheduled for less than twenty (20) hours in a workweek, if the employee is available.

## ARTICLE 21

## TIMEKEEPING

**Section 55.** Each employee is required to record his own time, using the system provided by the Employer, prior to starting work and upon completion of work and before and after lunch periods. No employee shall have the right to record any other employee's time. Any employee violating these provisions, working off the clock or giving free time may be discharged.

**Section 56.** Employees shall receive their pay each week. In case of discharge from employment of any employee, upon request, the final paycheck will be made available within seventy-two (72) hours after the discharge.

## ARTICLE 22

## SPLIT SHIFTS

**Section 57.** There shall be no daily split shifts.

## ARTICLE 23
## STORE MEETINGS

**Section 58.** All time spent by an employee actually attending any store meeting where his attendance is required by the Employer shall be counted as time worked with a minimum of two (2) hours at the applicable rate of pay when an employee is called back for such a meeting. In the event the employee is required to attend more than two (2) meetings per calendar year, the call-in provisions of Article 19, Section 53 shall apply.

## ARTICLE 24
## LUNCH BREAKS

**Section 59. Lunch Periods.** Each employee who is scheduled to work in excess of five (5) hours in a day shall receive, on his own time, a one (1) hour lunch period, or, upon mutual agreement between the employee and the Employer, a one-half (1/2) hour lunch period at approximately the middle of his workday.

Individual employee's change of lunch period from one (1) hour to one-half (½) hour, or vice versa, shall occur only at the beginning of a new work schedule.

Employee's scheduled lunch periods will be set forth on the schedule, but the parties recognize it may be necessary to alter the lunch period schedule due to the needs of the business.

## ARTICLE 25
## RELIEF PERIODS

**Section 60.** The Employer will give employees a break period of fifteen (15) minutes in their shift before the meal period and in their shift after the meal period.

## ARTICLE 26
## PROBATIONARY PERIOD

**Section 61.** New employees shall be on probation for a period of thirty (30) calendar days, during which time they may be discharged by the Employer for any reason whatsoever, and during this probationary period, they shall not acquire any seniority status. If an employee is retained in the employ of the Employer after said thirty (30) calendar days, his seniority shall then date back to the first (1st) day of said thirty (30) calendar day probationary period. This probationary period may be extended an additional thirty (30) calendar days by mutual agreement between the Employer and the Union.

## ARTICLE 27

## SENIORITY

**Section 62.**  Length of continuous service in the employ of the Employer shall govern in layoffs and rehires within a particular classification in the bargaining unit as described in Article 1, Section 1, whenever the ability of the employees involved is substantially equal.

**Section 63.  Termination of Seniority.**  Seniority shall terminate for any of the following reasons:

a. Voluntary quitting.
b. Overstaying a granted leave of absence or vacation.
c. Failure to report for work upon recall after a layoff within five (5) days after mailing of recall notice sent by registered letter to the last address furnished in writing to the Employer by the employee.
d. Discharge for just cause.
e. Continuous layoff for a period in excess of twelve (12) months.

**Section 64.  Seniority Lists.**  Bargaining unit seniority lists shall be provided to the Union on no more than two (2) occasions during the calendar year, upon request by the Union.

**Section 65.  Seniority of Transferred Employees.**  Employees transferring into the bargaining unit shall have no seniority rights during the thirty (30) calendar-day period immediately following such transfer.  Upon completion of such calendar thirty (30) day period, all seniority acquired since the most recent hire date of the employee while in the employ of the Company, shall be fully restored to the employee to be used for whatever purpose of rights he or she is otherwise entitled.

**Section 66.  Definition of Full-Time Employee.**  A regular full-time employee is defined as an employee who has been hired as such or works forty (40) or more hours per week for at least four (4) consecutive weeks, in his home store, except for assignment to a forty (40) hour per week schedule as a result of the employee receiving any hours caused by other employees' absence for any reason.  Scheduled hours of work voluntarily vacated by an employee (such as trading of hours) shall not be used for purpose of advancing an employee to full-time status.  An employee who fails to maintain full-time status as a result of working less than forty (40) hours per week for reasons other than absence due to an approved leave of absence, or a reduced schedule resulting from an on-the-job injury for twelve (12) consecutive weeks shall be designated as a part-time employee.

BARGAINING NOTE:  It is understood that for purposes of this provision, the definition of "absence" shall include such things as absence from work due to vacation, holiday, vacated shift, unexcused absence, funeral leave, jury duty, leave of absence and illness.

**Section 67.  Voluntary Reduction to Part-Time.**  A Full-Time employee who has requested and has been assigned a Part-Time schedule shall immediately be classified as Part-Time.

**Section 68. Promotions.**  The Employer agrees to make promotions to non-management jobs to the most senior qualified employee.  The employee shall make such desire known to the Employer in writing and shall state the stores to which the employee would be willing to be promoted.  Seniority shall prevail throughout the entire number of stores of the Employer in the area covered by this Agreement.

Nothing herein shall be construed to prohibit the Employer from hiring into a Journeyman or top rate position should the Employer deem it necessary.

1.  A promotion is an assignment to a classification which has a higher top rate than the classification being vacated.

2.  If the promotion list is exhausted for the opening in question, the Employer will post a notice of the opening within the store where the opening exists for seventy-two (72) hours and will offer the promotion to the senior qualified employee of the store in the bargaining unit who signs the notice, before hiring off the street.

**Section 69.   Probationary Period for Promotions.**  When any employee is promoted to a higher classification, he shall be on probation for a period of thirty (30) days.  An employee disqualified during the probationary period shall be returned to his old classification.

**Section 70.  Demotions for Just Cause.**  Except under the layoff provisions, no employee shall be demoted from a higher classification within the bargaining unit without just cause, which includes business need.

Whenever a member of the bargaining unit is demoted, whether voluntary or involuntary, such employee may be returned to the classification and status (i.e., full-time/part-time) held when he/she accepted the current classification being vacated, or the employee may exercise his/her seniority to claim a position in accordance with the current Full-Time or Promotion Request lists.

## ARTICLE 28

## AVAILABLE HOURS

**Section 71.**  The scheduling of part-time employees or full-time employees working reduced hours shall be by seniority within their department and store schedules up to eight (8) hours per day or forty (40) hours per week.  The Employer shall maximize the straight-time daily and weekly work schedules (including Sunday) of each employee

based on the hours as determined and scheduled by management, so long as such schedules would not reduce any employee's schedule below the daily or weekly minimum, except to zero. If an employee is zeroed out, he shall have the right to exercise lay off options; however, any bump to another store shall be delayed for one (1) week. The only exception to this would be when a more senior part-time employee has requested to work less hours than their seniority entitles them. This request must be submitted to the department manager in writing. The average of all meat department part-time employees by store and classification shall not be less than twenty (20) scheduled work hours per week (including paid holidays, sick pay, jury pay and funeral pay) exclusive of part-time employees whose availability temporarily limits them to less than the minimum hours as provided above. It is understood that the twenty (20) hours average shall apply only to markets employing two (2) or more part-time employees in any classification.

**Section 72.** Full-time scheduled vacancies shall be filled as defined elsewhere in this Agreement.

**Section 73.** The Employer agrees not to schedule two (2) part-time employees in the same classification back to back each day in their weekly schedules within an individual market or delicatessen where it is possible to combine their total posted weekly schedules so that one (1) full-time employee can be used.

**Section 74.** Employees who have requested additional hours or full-time status, in writing, as set forth above, shall have until noon on the Saturday following posting of the schedule to take issue with that schedule or his right to take issue shall be waived. Should he raise such issue in timely fashion and should it not be resolved, it shall be subject to the grievance procedure set forth elsewhere in this Agreement. It shall be the responsibility of each employee to make himself aware of the schedule and any changes made therein.

**Section 75.** In the event of errors in the making of schedules, scheduling of additional hours or reductions in hours, the employee must call the error to the attention of management by noon Saturday following the posting of the schedule. Failure by the employee to point out the violation by noon Saturday will limit the remedy to scheduling the affected employee, on the next week's schedule, the number of hours lost. These hours shall not have any effect on the normal schedule for that week.

FLOATERS: See Letter of Understanding

**Section 76. Additional Hours.** Additional hours are those created by increased schedules, terminations or transfers within the classification which the Employer deems necessary to fill.

When it is necessary to work additional hours, the additional hours shall be assigned to employees in the same classification in the store who are scheduled for less than forty (40) hours in the week, in the order of seniority, provided the employee possesses

the ability and skill to perform the work required and provided the employee is available to work the necessary hours and has notified the Department Head in writing of his desire for additional hours. Such written notification shall be furnished to the Department Head no later than the close of business on Wednesday to be implemented on the following week's schedule. Nothing herein shall be construed to require the scheduling of additional hours for any employee which will provide him more than forty (40) hours in a week, or five (5) days of work.

The employee being assigned the additional hours shall not have the right to accept such hours in part, but shall be obliged to accept the entire weekly schedule as written. It is understood, however, each employee who has made written request for additional hours may revoke such request by written notice to the Department Head no later than the close of business on Wednesday of the week preceding the week involved.

Written requests shall remain in effect until forty (40) hours is achieved or such request is revoked. Written requests are not transferable from store to store.

It is understood and agreed the Employer retains the right to require hours of work even though an employee has not requested additional hours.

**Section 77.** The Employer will send the Union a copy of the "full-time request" list, no later than March 1st and September 1st of each calendar year.

**Section 78. Assignment to Full-time Status**. When a full-time vacancy, other than a four (4) week at forty (40) hour opening defined in Section 68, occurs and the Employer determines that such vacancy shall be filled by a full-time employee, the job vacancy for non-management positions shall be filled by the assignment of the most senior qualified employee of the classification who has signed the current full-time request list as provided for in this Agreement. Should management be unable to fill such vacancy from the list, then such vacancy shall be posted within the affected store for seventy-two (72) hours and management shall offer the full-time assignment to the senior qualified employee of the store and classification who signed the posting before hiring off-the-street.

Four (4) week at forty (40) hour openings shall be filled by the most senior employee within the store and affected classification who has signed the full-time request list as set forth in this Agreement. Should management be unable to fill such vacancy from the list, then such vacancy shall be posted within the affected store for seventy-two (72) hours and management shall offer the full-time assignment to the senior qualified employee of the store and classification who signed the posting before hiring off-the-street.

Notwithstanding the above, the Employer may transfer a full-time employee from another store to fill a vacancy in lieu of advancing an employee to full-time status under this Article.

Employees with three (3) or more years of service may sign the full-time request list during the first fifteen (15) days of January and the first fifteen (15) days of July to be considered for advancement to full-time effective with the first workweek in February and August respectively. Such request shall state the specific store(s) in the bargaining unit the employee desires assignment to. The Employer will send the Union a copy of the new full-time request list.

If an employee is offered assignment to full-time status and accepts or declines the same, his/her request shall be voided.

The Employer shall not make assignments of full-time status to a probationary employee or to an employee on leave of absence.

## ARTICLE 29
## SCHEDULING OF SHIFTS

**Section 79.** Each week, the Employer will alternate the schedules within a classification within each store after 6:00 p.m., so that such work may be evenly divided as far as it may be practical. The above shall not apply to employees who, of their own volition, want to work the hours after 6:00 p.m.

**Section 80. Sunday Work.** Sunday Scheduling shall be on a voluntary basis. Should the Employer be unable to obtain enough volunteers, employees in the reverse order of seniority within the job assignment shall be required to work.

## ARTICLE 30
## UNSCHEDULED OVERTIME

**Section 81. Unscheduled Overtime Hours.** Daily overtime not previously scheduled shall be offered in seniority order within the department, the classification, and the store to the employees present when the need for overtime arises. Nothing herein shall be construed to require the scheduling of overtime when another employee's scheduled hours can be extended, or part-time employees may be called in without overtime penalty. Hours unclaimed under this procedure may be assigned in reverse order of seniority among those employees within the department within the classification within the store present when the need for overtime arises.

Overtime assignments of four (4) hours or more may be filled by calling in employees, in seniority order, within the classification and the department on their non-scheduled day without violating this Section.

## ARTICLE 31

## REDUCTION OF HOURS

**Section 82.** **Full-time employees:** Management shall not write a schedule of shifts that would result in a full-time employee being unable to work a forty (40) hour schedule (thirty-two (32) hours in a holiday week) unless the average scheduled hours (including hours scheduled and paid for vacation, unworked holiday, jury, sick, and funeral pay) of all part-time employees within the classification and department is twenty-four (24) hours or less for the involved workweek. A full-time employee who is not scheduled a forty (40) hours schedule, shall in their second consecutive week of such reduced hours, be allowed to exercise his/her seniority to claim the schedule of the least senior full-time employee in the classification within the bargaining unit who is working a forty (40) hour schedule. It is understood that the employee may exercise his\her seniority to bump any time between the second and eleventh week of reduction. The employee whose schedule is claimed under this procedure shall immediately be assigned the schedule of the claiming employee, or be allowed to step-down to part-time status and displace the least senior part-time employee in their store.

The parties agree that no employee assigned as full-time on May 11, 1996, shall have his hours reduced to less than forty (40) hours as the result of this provision, unless all part-time employees in the classification have had their scheduled hours reduced to twenty-four (24) hours or less. Such full-time employee shall have his hours reduced to twenty-four (24) or less before any other full-time employee protected under this paragraph is reduced.

Full-time employees-Competitive openings: During the first sixty (60) days following a competitive opening, management may elect, in lieu of reducing hours as provided above, to layoff full-time employees to maintain the same proportion of full-time employees to part-time employees the store averaged in the month prior to the competitive opening. In the event of a layoff, the displaced employee shall be given the following options:

1. Displace the least senior full-time employee in the bargaining unit, or

2. Step-down to part-time and displace the least senior part-time employee within the classification and store.

Employees displaced by the full-time reduction under this procedure shall be given their layoff options pursuant to the layoff language of this Agreement.

It is understood that the provisions of this section shall apply only to those classifications impacted by a competitive opening.

## ARTICLE 32

## LAYOFFS

**Section 83.  Layoff Procedure.**  When a reduction in the work force is necessary, as opposed to a reduction in hours, the following procedure shall be used:

1. A regular full-time employee being laid off may displace the shortest service regular full-time employee within his classification within the bargaining unit.  The regular full-time employee so displaced may displace the shortest service part-time employee in the same classification in the bargaining unit.  In the event there is no less senior employee performing work in the same classification, this displaced employee may displace the least senior employee in a lower classification in which he previously performed three (3) months of service in the classification for the Employer.

2. A part-time employee being laid off may displace the shortest service part-time employee within his classification within the bargaining unit.

3. Any employee with displacement rights under the procedures above shall be allowed to take a layoff in lieu of displacing any employee.

4. It is understood that, in any event, only a more senior employee can displace another employee under the procedure.

5. No retail store employee shall displace any employee in the meat plant unless such employee has at least six (6) months experience in that meat plant classification with King Soopers.

6. It is understood that seafood and specialty meat employees subject to the layoff procedures, as set forth in Section(s) one (1) through five (5) above may exercise their seniority rights only within their department, unless such employee is assigned to a combination department in which event such employee may exercise his seniority over the least senior employee within the butcher block classification.

Laid off employees, and employees who accept a job in a lower classification in lieu of layoff, shall be recalled as needed, in order of seniority, to jobs they are qualified to perform.  The Employer shall not hire a new employee or promote an existing employee into a position for which a laid off employee or employee who accepts a job in a lower classification is qualified and available to perform.  Journeymen and apprentice meat cutters will be considered one classification for the purpose of layoff.

An employee accepting a layoff rather than accepting a job in a lower classification may inform the Employer in writing at the time of the layoff of his desire to be recalled to

a lower classification which was not available at the time of his layoff, and such notification shall be honored when a vacancy occurs. The notice shall specify the lower classification to which the employee desires recall. It is understood that any employee on layoff from the classification where the vacancy occurs shall have preferential rights to such vacancy.

**Section 84. Recall Procedure.** Laid off employees shall be recalled as needed, in the order of seniority, to jobs in the classification from which they were laid off. The Employer shall not hire a new employee into a classification in which there are laid off employees at that time. The Employer shall offer recall to a job in the classification from which an employee was laid off prior to promoting another employee into that classification.

A full-time employee accepting recall to a part-time position shall immediately be reclassified to part-time status. Similarly, a part-time employee recalled to a full-time position shall be reclassified to full-time status.

## ARTICLE 33

## TRANSFER FROM STORE TO STORE

**Section 85.** Transfers from store to store shall not be made or denied for capricious, arbitrary or discriminatory reasons. Full-time employees desiring a transfer to another store within the bargaining unit in order to be nearer their residence may indicate their desire for transfer in writing to the person designated by the Employer. Such transfer requests will be considered at the time an opening occurs within their classification and status.

## ARTICLE 34

## NEW STORE OPENING

**Section 86.** In the event of the opening of a new store within the bargaining unit (not a replacement of an existing store) the following procedure shall apply:

1. At least four (4) weeks prior to the opening of a new store, the Employer will post a sheet in each location for interested employees to sign if desirous of a transfer to the new location. The sheet shall remain posted for at least ten (10) days.

2. Job openings either at the new store or created by transferring employees at their former store shall first be filled by employees on layoff in the classification of the vacancy before any new employees are hired or current employees are promoted.

3. Employees who have signed the new store transfer request sheet shall be given consideration based on their qualifications and the requirements of the store. It is understood that the Employer may move employees from its own competitive

stores which may be impacted by the new store opening before consideration of other employee desires.

4. In the event the Employer opens new stores within the geographical area of this Agreement, as set forth in Article 1, not less than sixty (60) percent of the initial staffing of the new store shall be made by employees covered by this bargaining agreement, if available.

## ARTICLE 35
## LEAVES OF ABSENCE

**Section 87.  Sickness, Injury, or Pregnancy.**  Leaves of absence shall be granted for up to eighteen (18) months without pay when an employee with three (3) months of continuous service is unable to work because of bona fide sickness, accident, disability, or pregnancy.  However, in the event such an employee is unable to return to work at the end of eighteen (18) months of leave, he shall be entitled to an additional leave of six (6) months if he submits satisfactory medical evidence that he will be able to return to duties within his classification within the said additional period.

**Section 88.  Personal Leaves of Absence.**  Leaves of absence without pay for reasonable periods not to exceed thirty (30) days may be granted by the Employer to employees who have completed one (1) year of service for other reasons mutually agreed to between the Employer and the employee.  The thirty (30) day period may be extended by an additional thirty (30) days by mutual agreement between the Employer and employee.

**Section 89.  Military Leave.**  All seniority granted employees under the terms of this Agreement shall be subject to the rights granted by law to the employees volunteering, called or conscripted for active military service under the National Guard Act of 1940 and the Selective Service Act of 1942, and any additions or amendments thereto, or rulings and interpretations thereof by any authorized court of agency.

**Section 90.  Union Leave.**  Leaves of absence without pay for Union business not to exceed six (6) months may be granted by the Employer to employees who have completed one (1) year of service.   The six (6) months may be extended by an additional six (6) months by mutual agreement between the Employer and employee.

**Section 91.  Leave of Absence for Care of Newborn or Adopted Child.**  For employees with one (1) year of continuous service in the bargaining unit, a Leave of Absence for either parent shall be granted without pay for a period of up to twelve (12) months for the purpose of Newborn or Adopted Child Care.  The employee shall be guaranteed reinstatement in accordance with their seniority.  An employee who wishes to change his or her date of return to work shall notify the Store Manager two (2) weeks in advance and shall be returned to work as set forth above.  The Leave of Absence for either parent must end no later than twelve (12) months from the date of birth or date of

adoption. The Employer may require verification of the parent relationship to the newborn or to the adopted child.

**Section 92. Leave of Absence for Family Care.** A family care leave, without pay, shall be granted, upon request by an employee for a total of up to six (6) consecutive months within a two (2) year period. The employee requesting the leave must have a minimum of one (1) year's continuous service in the bargaining unit at the time of the request. The employee shall be guaranteed reinstatement in accordance with their seniority at the end of their leave. Any employee who wishes to change his or her date to return to work shall notify the Store Manager two (2) weeks in advance of the date they intend to return. The purpose of this leave shall be to care for seriously ill family members. For the purpose of this leave, "family members" shall be:

1. Spouse and parents of the employee.

2. Biological or adopted unmarried children under nineteen (19) years of age and full-time students up to age 23.

3. A child of any age who is incapable of self-support.

4. Any relative residing in the employee's home and dependent upon the employee for care.

The employee shall be required to present satisfactory evidence of serious illness of the family member, the expected duration of the absence and the reason for the employee's involvement.

**Section 93. Request for Leave of Absence.** All leaves of absence must be requested in writing to the person designated by the Employer, unless the employee is physically disabled to the extent that such advance request is not possible, and shall state: (1) the reasons, (2) date leave is to begin, and (3) expected date of return to work. Leaves of absence shall be granted in writing in advance, and a copy shall be given to the employee.

**Section 94. Returning From a Leave of Absence.** The employee must be qualified to resume his regular duties upon return to work from an approved leave of absence. A doctor's certificate verifying that the employee is able to resume his normal duties may be required. The employee shall be returned to the job previously held, or to a job comparable with regard to rate of pay no later than on the first weekly schedule made up after the department designated by the Employer has received notice in writing of the employee's availability, provided the Employer received such notice no later than Wednesday immediately prior to the Friday scheduling.

## ARTICLE 36
## FUNERAL LEAVE

**Section 95.** Upon request an employee covered by this Agreement shall be granted the necessary time off with pay at his regular straight-time rate of pay in order to make arrangements for and/or attend a funeral, and/or for grieving, occasioned by a death in his immediate family. Such time off with pay shall in no event exceed three (3) regularly scheduled working days, and the amount of such paid time off actually granted shall normally depend upon the distance involved. The immediate family is defined as the employee's father, mother, spouse, children, step-child, father-in-law, mother-in-law, brother, sister, step-parents, grandparents or grandchildren. Payments shall not be made hereunder where the relative's death occurs while the employee is on vacation or on a leave of absence.

Additional time, without pay, shall be granted as is needed by the employee up to 7 days.

If an employee is notified of the death of his spouse, parent, child or grandchild while at work, he shall be granted the remainder of the day off and paid for scheduled work hours that day. This shall not be counted as part of the above three (3) days. Employees must attend the funeral in order to qualify for pay, and the Employer may require satisfactory evidence confirming the relationship to the deceased person.

No schedule shall be changed for the express purpose of making the employee's day off replace a day that otherwise would have been paid for under these provisions.

## ARTICLE 37
## JURY DUTY

**Section 96.** Whenever any employee covered by this Agreement is required to serve on a petit jury during his regular working hours, the Employer agrees to pay such employee the difference between what he is paid for serving on the jury and what he would have received from the Employer in straight-time pay had said jury duty not prevented him from being at work. On any scheduled work day, the employee shall promptly report to complete any remaining hours of his scheduled work day; provided, no employee shall be required to so report for work on any day on which he has served and been compensated by the Court for at least eight (8) hours' jury duty, nor shall any employee who reports back to work under this Section be required to work more than ten (10) hours, less the number of hours for which served and was compensated for jury duty by the Court on that day.

When the Employer requests an employee to appear in Court, he shall be compensated at his regular straight-time hourly rate of pay for such time.

The Employer may require a statement from the Court Clerk certifying attendance.

## ARTICLE 38

## SICK LEAVE

**Section 97.** **A.** Full-time employees covered by this Agreement who, in their first anniversary year, work two thousand (2,000) hours or more (including vacation and holiday) and who have been continuously employed by their Employer for a period of one (1) year, shall be credited with forty-eight (48) hours of sick leave pay. Employees who in their first (1st) anniversary year work one thousand two hundred and forty-eight (1,248) hours or more (but less than two thousand (2,000) hours) and who have been continuously employed by their Employer for a period of one (1) year, shall be credited with hours of sick leave with pay on the basis of the total hours worked in their anniversary year divided by two thousand eighty (2,080) hours times forty-eight (48) hours. It is understood that employees shall not be credited with more than forty-eight (48) hours of sick leave credit per anniversary year. Hours worked includes vacation hours.

**B.** Unused sick leave shall be cumulative, and after the first (1st) year of continuous employment, full-time employees shall accumulate unused sick leave at the rate of four (4) hours for each month of continuous employment in which they work one hundred sixty (160) hours in a four (4) week month and two hundred (200) hours in a five (5) week month. Employees who work at least one hundred four (104) hours (but less than one hundred sixty (160) hours in a four (4) week month and less than two hundred (200) hours in a five (5) week month) shall accumulate unused sick leave for each month of continuous employment on the basis of total hours worked during the preceding month divided by one hundred sixty (160) hours in a four (4) week month and two hundred (200) hours in a five (5) week month times four (4). Said monthly credit shall not exceed four (4) hours for each month. Unused sick leave shall not exceed a maximum accumulation of six hundred (600) hours. Hours worked includes vacation hours.

**C.** A doctor's certificate or other authoritative verification of illness may be required by the Employer. Upon request from the employee, said sick leave is to commence with the second (2nd) day of absence due to sickness or injury (except in the case of occupational injury in which event sick leave shall commence on the first (1st) day following injury which the employee would have worked had the injury not occurred) and shall be paid at the rate of one (1) day of pay until such sick benefit allowance is used up. An employee who has accumulated two hundred and forty (240) hours of unused sick leave shall also be entitled to sick leave on the first day of absence due to sickness or injury.

**D.** For the purpose of this Article one (1) day of pay shall mean eight (8) hours of pay at the employee's regular classification rate for those days which the employee would have worked had the disability not occurred, calculated at straight-time. No employee shall receive pay, under any combination of sick leave and Worker's

Compensation or Weekly Indemnity which exceeds the lesser of his regular pay or eight (8) hours per day or forty (40) hours per week at his straight-time hourly rate of pay. The waiting period herein provided before sick pay commences, shall apply for each illness or injury in case the sick benefit allowance has not been used up in previous illnesses.

**E.** Sick leave accrued shall be paid to part-time employees based on hours lost, less waiting days (as set forth in paragraph c) from the most recent work schedule in effect when the absence commenced.

**F.** Sick leave benefits are not convertible to cash.

**Section 98. Employees hired on or after March 6, 2005.** Employees hired on or after March 6, 2005 who have completed (3) consecutive years of employment shall accumulate sick leave credit of up to (2) hours for each month that such employee works at least (112) hours in a four week month or (140) hours in a five-week month. Such credit shall be determined by diving the actual hours worked for such month by (160) hours (in a four week month) or (200) hours in a five week month times (2). Unused sick leave shall not exceed a maximum accumulation of (60) hours. Sick leave shall be paid as provided in the preceding section, except leave shall not commence until the third (3rd) full workday's absence. There shall be no first (1st) or second (2nd) day sick leave for these employees.

## ARTICLE 39

## INJURY ON THE JOB

**Section 99.** When an employee is injured on the job, there shall be no deduction from the employee's pay for the day in which the employee was injured and reported for medical care. In no case shall the Employer's obligation exceed eight (8) hours, and there shall be no payment for any overtime hours missed because of the injury.

## ARTICLE 40

## HEALTH BENEFITS PLAN

**Section 100. Trust Fund.** The Rocky Mountain UFCW Unions and Employers Health Benefit Trust ("Health Benefit Trust") is a trust fund jointly administered by an equal number of Trustees representing the Employer and the Union. All contributions provided for in this Article will be paid into the Health Benefit Trust. The Trust Fund is to be jointly administered by an equal number of Trustees representing the Employer and the Union. There shall be three (3) Plans of benefits, Plan A, Plan B and Plan C with contributions as provided herein. As a condition of receiving the contributions provided above, the Trustees of the plan will:

1. Establish Plan(s) of benefits, which can be supported by the contributions provided in the Agreement, and

2. Maintain the Trust in a fully funded status as provided herein and in the Trust Agreement

The Trustees shall establish a separate accounting of income and expenses for participants of the Fund who agree in their collective bargaining Agreements to a fixed contribution rate. The Trustees are expressly prohibited from using the contributions of the Employer's contributing on fixed contribution rate basis to pay benefits for participants of other employer's who have not adopted these fixed contributions.

**Employer Contributions and Benefit Levels.** The Employer agrees to contribute the following amounts per month for each eligible employee.

### Employees hired on or before March 5, 2005

|                              | PLAN A    | PLAN B    |
| ---------------------------- | --------- | --------- |
| Effective September 12, 2004 | $779.00   | $623.20   |
| Effective January 1, 2005    | $599.67   | $479.73   |
| Effective January 1, 2006    | $647.65   | $518.11   |
| Effective January 1, 2007    | $699.46   | $559.57   |
| Effective January 1, 2008    | $755.42   | $604.33   |

### Employees hired on or after March 6, 2005

|                           | PLAN A    | PLAN B    | PLAN C    |
| ------------------------- | --------- | --------- | --------- |
| Effective January 1, 2005 | N/A       | $412.69   | N/A       |
| Effective January 1, 2006 | N/A       | $445.71   | $239.60   |
| Effective January 1, 2007 | $601.70   | $481.37   | $303.25   |
| Effective January 1, 2008 | $649.84   | $519.88   | $327.51   |

**Employee Co-Premiums.** Employees who are eligible to participate and enroll in the Health Plan shall as a condition of such participation make a monthly co-premium payment equal to $5.00 per week if enrolled in employee only coverage $10.00 per week if enrolled as employee plus spouse or employee plus children and $15.00 per week if enrolled in family coverage. Such co-premiums shall be made by payroll deduction and forwarded to the Trust Fund on a monthly basis by the Employer.

**Enrollment and Eligibility.** Effective at the earliest possible date but not later than June 1, 2005, the Plan shall conduct an annual enrollment. To remain enrolled as a participant eligible for plan coverage, each employee who is currently enrolled, or who initially enrolls during the term of the collective bargaining agreement, must re-enroll prior to the start of each succeeding plan year. Employees must make a positive

election to enroll in the Plan. Enrollment is for the entire plan of benefits for the Plan and an employee's failure to make a positive enrollment into the Plan shall result in such employee being ineligible for all benefits of the Plan for the remainder of the calendar year or until there has been a qualifying life event, as defined herein, whichever occurs first. During the first enrollment, the Plan will allow a 30-day grace period to allow an employee to enroll who missed the deadline for enrollment.

The administrator of the fund will use the enrollment data in order to establish the eligibility of employees and their dependents for participation in plan coverage. None other than those employees contained on the enrollment report shall receive benefits from the Trust without the express authorization of the Trustees. The administrator will promptly notify the Trustees in writing of any instances where coverage has been provided to persons who are not included in the enrollment data, or where a claim for payment has been submitted by or on behalf of such person.

The Fund will audit its enrollment and claims records as least once within each 24 month period to ensure that no employees of the Employer, or the dependents of such employees, are participating in plan coverage for which they are not eligible and to ascertain that claims and other plan expenses are being paid in accordance with the Plan's provisions.

**Initial Eligibility** – Part-time employees hired before March 6, 2005 who on March 5, 2005 have met the initial eligibility requirement for benefits under the Trust will continue to be eligible for coverage provided the employee enrolls in the Plan beginning in 2005, and further provided the employee has made the required employee co-premium payment. Such employees shall continue to be eligible for Plan A is such employee was eligible for Plan A on March 5, 2005. Employee's who were eligible for and were participating in Plan B on March 5, 2005, shall participate in Plan B until such employee has been covered under such Plan B for 24 months. Thereafter, such employee may advance to Plan A provided they continue to enroll and meet the eligibility requirements of the Plan. Employees hired on or before March 5, 2005, who are not eligible for coverage as of March 5, 2005 shall be required to meet initial eligibility for Plan B, and subsequent eligibility to begin participation in Plan A, as provided in the predecessor agreement which terminated in 2004.

All part-time employees hired on or after March 6, 2005 shall, beginning the first of the month following 12 calendar months of employment, be eligible to enroll and participate in the Health Plan, on an employee only basis for the first 12 months of coverage, under the Health Plan C. Upon completion of the first (36) months of eligibility under Plan C, such employee and their eligible dependents may enroll in Plan B. for the next (36) months of eligibility under Plan B. Thereafter, provided the employee continues to maintain eligibility, such employee and their eligible dependents may enroll and participate in Plan A.

Full-time employees shall on the first of the month following 3 months of employment, be eligible to enroll with their eligible dependents in Plan B, and after (36)

months of eligibility under Plan B, shall be allowed to enroll with their eligible dependents in Plan A.

**On-going Eligibility** – After satisfying initial eligibility requirement provisions and enrollment in the Health Plan, the employee must continue to meet the monthly on-going eligibility requirements as a condition of continued participation in the Health Plan. Enrolled employees who work (80) hours in a (4) week month or (100) hours in a (5) week month shall be eligible for coverage on a lag month basis. For the purpose of this Article, hours worked shall include hours paid directly by the Company for holiday and vacation.

Employees shall continue to be eligible for benefits provided they enroll for coverage in accordance with this Article. In any event, all employees must continue to meet all eligibility requirements of the Plan as a condition of continued eligibility.

**Trust Plan Changes** – The Trustees at the earliest possible date but not later than June 1, 2005 shall revise the plan of benefits to include:

- The Plan's current coordination of benefits provision and credit balance system shall be replaced with a coordination of benefit provision that limits payment to the maximum payable under the Plan.

- The Plan shall adopt a fee of $100 per month for a spouse of a covered employee who is eligible to enroll in health coverage at their employer, but fails to do so, as a condition of enrollment in this Plan.

- Adopt the long term funding policy contained herein.

- The Parties agree to adopt true managed care approaches to providing mental/nervous and physical benefits under the Plan. The Plan Administrator should not perform such managed care.

- The Parties will adopt cost control measures that will aid the Fund in managing costs within the contributions provided by the Employers and Participants to this Plan.

- The Parties agree to withdraw all of their respective deadlocked motions.

- The Trustees agree to re-bid the Fund Administrator. In the event the Trustees deadlock over a replacement Administrator, the Trustees agree to submit such dispute to expedited arbitration within 60 days following the deadlock. Such arbitrator will be limited to giving a bench decision in the case.

- Adopt the attached schedule of benefits

- The Parties agree to adopt the CIGNA health plan network at the earliest possible date, but not later than June 1, 2005.

## Long Term Funding Policy

1. The parties recommend to the trustees that a Minimum Reserve Requirement be established equal to IBNR reserves plus a lag month reserve. The Fund consultants shall calculate the IBNR and lag month reserve requirement at least once every twelve months beginning on (date) and report these amounts to the Trustees at their next regularly scheduled meeting. Any withdrawing employer shall reimburse the Fund for their participants claims run off.

2. If the market value of the assets at any twelve-month review point is ever below the calculated minimum reserve requirement level as calculated by the Fund consultants, then the Fund consultants shall prepare recommendations for benefit plan redesign and/or employee co-premium contributions such that the dollar amount of any such deficiency will be fully recovered by the end of the 12-month period beginning after the trustee meeting in which the deficiency is first projected.

3. No changes are permitted that would violate any contractual agreement between the Fund and any third party vendor.

4. If the Fund consultants cannot agree on a recommended plan of benefit redesign and/or employee co-premium contributions, and the Trustees cannot agree to a corrective action plan, by virtue of deadlock motions, then the trustees must act to adopt the recommended corrective action plan that has the least adverse impact on plan participants, however, one set of Trustees may exercise the Fund's dispute resolution procedure on an expedited basis to determine if other corrective actions must be taken.

5. The minimum reserve target defined above is solely meant to be a "floor". It is not also a "ceiling". That is, no Trustee action is required or expected in the event that reserve levels are above the minimum reserve target.

Effective January 1, 2009, the Employer shall make available up to an amount equal to 8% of the Employer's December 2008 contribution to the Fund times 4 in lump sum contributions to the Fund to cover projected funding deficiencies as described herein provided that in prior years the Trustees have taken action as required by the Policy to ensure that the Plan was fully funded for that calendar plan year and further provided that Trustees have not improved benefits during the term of this Agreement. Such lump sum shall only be required to fund the minimum reserve requirement.

**Extended Benefits.** An employee who has been eligible for benefits for six (6) months or more immediately prior to becoming physically disabled and thereby unable to work, shall continue to be eligible for benefits during his continuing period of disability, up to a maximum of six (6) months.

**Retiree's Benefits.** The Employer will contribute eighteen dollars and thirty-four cents ($18.34) per month per eligible active bargaining unit employee, covered under

this Agreement, in the Health Plan to subsidize the self pay costs of providing Health and Welfare benefits to eligible retirees under the Rocky Mountain UFCW Unions and Employers Health Benefit Plan (the "Retiree's Health Plan").

Effective for employees who retire on or after October 1, 1996, the eligibility requirements for participation in Retiree's Health Plan shall be:

Employees retiring on or after October 1, 1996, must have a combined total of 15 years of service and have attained age 50, or be totally disabled, at the time of his termination of employment.

## ARTICLE 41
## NON-DUPLICATION OF BENEFITS

**Section 101.** In the event any law or governmental regulation requires any payment from the Employer for benefits which would replace, supplement or modify the Medical, Surgical and Hospital Service, Dental Plan, Pension Plan, Prescription Plan, Vision Plan or other benefit provided under this Agreement, the amount of such payments shall be deducted from the contributions for such benefits required under the terms and conditions of this Agreement.

## ARTICLE 42
## PENSION FUND

**Section 102. Employer Contributions.** For all employees hired before March 6, 2005, covered by this Agreement, the Employer shall pay one dollar and thirty six cents ($1.36) per hour for straight time hours worked (including paid holidays and vacations) into a Employer-Union pension fund which shall be jointly administered by the Union and the Employer as set forth in the trust agreement establishing such Pension Fund.

For all employees hired after March 5, 2005, contributions shall be at a rate of forty-eight cents ($0.48) per hour for all hours worked at straight time (including hours worked on Sunday, vacation and holiday hours paid).

The Trustees agree to re-bid the Fund Administrator. In the event the Trustees deadlock over a replacement Administrator, the Trustees agree to submit such dispute to expedited arbitration within 60 days following the deadlock. Such arbitrator will be limited to giving a bench decision in the case.

**Funding Policy. Long-Term Funding Policy.**

1. The trustees shall, no later than April 1, 2005, adopt the following Long Term Funding Policy. Such Long Term Funding Policy shall be applicable for plan

year 2005 and subsequent plan years. Effective with the January 2005 contribution payment, the employers will increase the hourly contribution by $0.15 per hour from $1.36 to $1.51 for employees hired before ratification.

This $0.15 per hour increase in contribution is a "supplemental: contribution dedicated solely to improving the funding of the pension plan, will not be used to increase benefits and will be discontinued at the times set forth in paragraph 2.

2. This supplemental contribution shall continue to be made until the earlier of such time the Plan reaches a financial state whereby either: (i) the funding ratio of the Plant (actuarial value of assets over actuarial liability) is at least 100%; or any contribution of the employers would not be deductible for federal income tax purposes in the year in which it is required to be made. However, unless changes are needed to support contribution deductibility, no changes shall be made when the Plan has withdrawal liability.

3. If as of any valuation date commencing with the 01/01/06 valuation, a funding deficiency is projected to occur in less than 5 years, the Trustees will reduce benefits such that a projected funding deficiency will not occur within any of the 8 years following the valuation date. The parties agree to apply for section 412(e) relief if available before the benefit reductions are enacted. It is understood that application for section 412(e) requires the parties to reduce benefits as a condition of the application. Such section 412(e) application, if approved, must cure the funding deficiency as prescribed above.

If the section 412(e) application is not approved, or not acted on, within 18 months of the valuation date (for example 01/01/06 valuation), then the Trustees will immediately enact benefit reductions to cure the funding deficiency as prescribed above.

4. In no event will benefit reductions be delayed to or beyond a time that would expose the employers to liability beyond the supplemental contribution including but not limited to liability for the payment of excise taxes or additional contributions. Any deadlocked issue over the enactment of benefit reductions and/or the application of this policy shall be submitted to expedited arbitration ahead of any other matter pending arbitration. Such expedited arbitration shall occur within 60 days of the request for arbitration and the arbitrator shall render his decision within 60 days following the close of the hearing in the matter.

5. The parties authorize and direct the Trustees of the Plan to develop Maintenance of Equity Policy for employers that do not adopt this agreement upon renewal of the collective bargaining agreement (or for new agreements).

6. If the Plan experiences a minimum funding deficiency, any excise tax that is levied against the employers will be allocated amongst such employers in a way that first makes all employers not contributing the full amount of the supplemental contribution responsible for fully paying any accumulated

missed supplemental contributions with interest. Thereafter, the balance of any excise tax remaining will be allocated to all employers in proportion to their non-supplemental contribution rate. Finally, for any employer not adopting this agreement, future benefits will be based on the assumption that $0.15 of the current rate being contributed is deemed to be supplemental.

7. The parties recognize there is a possibility of merger of the Denver Area Meatcutters Pension Fund with the Rocky Mountain UFCW Union and Employers Pension Plan and give full authority to effectuate such merger to the Board of Trustees of the two pension plans without further approval of the parties of this Agreement.

**Section 103.** Said Pension Fund shall be used to provide benefit pensions for eligible employees of the Employer as provided in a Pension Plan, the terms and provisions of which are to be agreed upon by the parties hereto; said Pension Plan shall, among other things, provide that all benefits under the Plan and costs, charges and expenses of administering the Plan and all taxes levied or assessed upon or in respect of said Plan or Trust or any income there from shall be paid out of the Pension Fund.

**Section 104.** Said Pension Plan and the Trust Agreement establishing the Pension Fund have been submitted to the United States Treasury Department and the United States Department of Labor for the approval and rulings satisfactory to the Employer, that said Plan is qualified under I.R.C. Section 401, et seq. and that no part of such payments shall be included in the regular rate of pay of any employee.

**Section 105.** If for any reason, the United States Treasury Department and the United States Department of Labor withholds approval and rulings satisfactory to the Employer, the parties to this Agreement hereto agree to negotiate other fringe benefits or wage increases in the amount equal to the cents per hour provided for in this Article for all hours worked at straight-time in lieu of payments into the Pension Fund

**Section 106.** The Employer shall be represented by its employees, or some other representative on the Board of Trustees administering such Pension Plan. A copy of the Trust Agreement and any amendments thereto shall be made a part hereto as if herein at length set forth, when adopted.

## ARTICLE 43

## HEALTH AND WELFARE OR PENSION DELINQUENCIES

**Section 107.** If the Employer fails to make monthly health and welfare or pension contributions, as set forth herein, he shall be notified by Certified or Registered Mail of his delinquency, either by the Health and Welfare Administrator or the Pension Plan Administrator, and if said remittance is not paid within ten (10) days, notwithstanding any provision of this Agreement, the Union, without the necessity of giving any other or

further notice shall have the right to strike or to take such action as it shall deem necessary until such delinquent payments are made. The Employer hereby waives the requirement of any other notice or notices being given by the Health and Welfare Administrator or the Pension Plan Administrator or by the Union to him or to anyone else other than such notice or notices expressly provided for in this Article.

## ARTICLE 44

## NO DISCRIMINATION

**Section 108.** No employee shall be discharged without just and sufficient cause.

**Section 109.** No employee shall be discharged or threatened for refusing to cross or work behind any primary picket line established by any labor organization at the Employer's premises, nor shall the Union be deemed to be in violation of this Agreement if its members choose to honor any such picket line.

The Employer and the Union agree that each will fully comply with applicable laws and regulations regarding discrimination against any employee, or applicant for employment, because of such person's race, religion, color, national origin, sex or age.

The Employer hereby agrees not to discriminate against any employee or discharge him because of membership in the Union and/or for upholding Union principles.

No employee who because of his religion has conscientious objections to working on his Sabbath will be required to work his Sabbath as a condition of employment. If the rights of the employees under this paragraph operate in conflict with the seniority provisions contained elsewhere in this Agreement, the right of seniority shall prevail.

**Section 110.** Wherever the masculine gender is used in this Agreement, it shall be deemed to include the feminine gender.

**Section 111.** It is recognized that the Employer may sponsor donations to worthy charitable organizations of a non-political nature. However, no employee shall be required to make contributions, nor shall any employee be told a specific amount he must contribute. There shall be no compulsion with regard to contribution.

## ARTICLE 45

## UNION REPRESENTATIVE VISITATION

**Section 112.** The Chief Executive Officer of the Union, the Deputy Secretary, or the Business Representative, thereof shall have the right of entering the premises of the Employer for the purpose of interviewing employees in such a way as to not interfere with the service of the Employer. The said representatives shall make their presence known to the supervisory person in charge upon entering the premises. The Employer

shall, upon the request of an authorized Union representative, furnish satisfactory evidence to ascertain whether employees are being paid in accordance with the terms of this Agreement. The Chief Executive Officer, or his Deputy, may inspect the dues books of employees during working hours.

## ARTICLE 46

## JOINT LABOR MANAGEMENT COMMITTEES

**Section 113.** There shall be established in each store a joint Labor Management Committee whose purpose shall be to investigate, study and discuss mutual solutions to problems affecting Labor-Management relations in the store in a sincere attempt to improve the parties' basic relationship. The Committee in each store shall be made up of an equal number of Union and Employer representatives and shall develop its own guidelines as determined by the participants in the store and as approved by the Union and the Employer. The Committee shall not have the authority to modify this Agreement.

## ARTICLE 47

## UNION STEWARD

**Section 114.** The Union shall have the right to designate one (1) Steward per store who shall perform their Steward duties in such a way as not to interfere with the service of the Employer. Such stewards shall have top seniority for the purpose of layoff within their classification in that store. The designated representative of the Employer must be advised in writing by the Union of the name of the steward in the store before the employee will be recognized as a steward.

The Employer agrees to allow the Stewards to be scheduled off two (2) days, without pay, to attend the Steward's Conference, which will be unscheduled days of work. It is expressly understood and agreed that the Stewards will be scheduled their normal hours during such week.

Where store operations are not adversely affected, the appointed Steward will not be scheduled to work later than 6:00 p.m. on the night (not more than one (1) per month) of the regular Local Union meeting. The Steward must notify his Store Manager in writing by Wednesday prior to the posting of the schedule for the week in which the meeting occurs.

**Section 115. Employees Rights to Union Representation.** When an employee is involved in a disciplinary interview where the probable result of such interview will be the imposition of disciplinary action, the Employer shall have Union Representation of the employee's choice if present.

## ARTICLE 48

## GRIEVANCE AND ARBITRATION PROCEDURE

**Section 116.** Should any dispute or complaint arise over the interpretation or application of this Agreement, there shall be an earnest effort on the part of the parties to settle such promptly through the following steps, and failure to follow the procedures set forth below shall result in forfeiture of the grievance.

Step 1.    By conference during scheduled working hours between the Steward, if requested by the employee, the Employer, and/or the Union's Business Representative and/or the aggrieved employee and the designated Employer representative.

Step 2.    If the grievance cannot be satisfactorily resolved under Step 1 above, the grievance shall be reduced to writing and submitted to the representative designated by the Employer to handle such matters. Such submission shall be made within twenty (20) days of the date of the occurrence of the event which gives rise to the grievance and shall clearly set forth the issues and contentions of the aggrieved party or parties and must reasonably allege a specific violation of an express provision of this Agreement. (In the case of a discharge the time limits shall be fourteen (14) days.) The Employer designee and the Union Business Representative shall meet within ten (10) days after receipt of written notice of the grievance and attempt to resolve the grievance. In the event the Employer designee assigned to handle grievance does not have an office in the area where the grievance arises, this meeting may be discussed by phone; furthermore, the time limits on this meeting may be postponed by mutual agreement of the parties.

In an instance where an employee feels he has not been paid in accordance with the wage progression scales set forth herein, such employee shall have an obligation to bring this to the attention of the Store Manager as soon as the employee first has knowledge of such alleged error. In the event the employee has been improperly paid, said payment error shall be corrected on a retroactive basis but not beyond ninety (90) days prior to the date on which the grievance is presented in writing.

Step 3A.    If the grievance is not satisfactorily adjusted in Step 2, either party may, with reasonable promptness, but in no event later than thirty (30) days from the date of the Step 2 meeting, in writing, request arbitration and the other party shall be obliged to proceed with arbitration in the manner hereinafter provided. The parties shall forthwith attempt to agree upon an impartial arbitrator.

Step 3B.    In the event the parties are unable to reach agreement upon the selection of an arbitrator within fifteen (15) days of the written request for arbitration, the party requesting arbitration may, with reasonable promptness, request a

panel of five (5) arbitrators from the Federal Mediation and Conciliation Service. From this panel of five (5) names, each party shall alternately strike two (2) names, the moving party striking first. The remaining arbitrator from the list shall be the impartial arbitrator. A finding or award of the arbitrator shall be final and conclusive upon the parties hereto.

Step 3C. The arbitrator shall have all the rights, power and duties herein given, granted and imposed upon him; but his award shall not change, alter or modify any of the terms and conditions set forth in this Agreement. The expenses of the impartial arbitrator shall be shared equally by the parties. The arbitrator will issue his decision within thirty (30) calendar days after the close of the proceedings. This thirty (30) day calendar time limit may be extended by mutual agreement between both parties.

Step 3D. In the event either party refuses to arbitrate on demand of the other party and an order compelling arbitration is obtained in Federal Court on the basis contended by the moving party, the refusing party will pay to the moving party reasonable legal fees incurred, up to two hundred dollars ($200.00). Similarly, if the moving party fails to prevail in such an issue, the moving party will pay reasonable legal fees incurred up to two hundred dollars ($200.00) to the refusing party.

**Section 117. Remedies for Errors.** If an error is made by management in the application of the provisions of this Agreement resulting in a lost work opportunity for the aggrieved employee such as vendor stocking, scheduling and assignment of hours disputes, classification issues, and work jurisdiction matters and the affected employee immediately files a grievance, the employee shall be made whole by being permitted to work the number of hours lost. Such hours shall be above and beyond the posted schedule. The employee shall advise management anytime after the next schedule is finalized for the workweek of their desire to exercise their right to work the hours due during the workweek on the date and time determined by the employee. An aggrieved employee may not demand such remedy on an overtime or premium-pay basis if the alleged violation occurred on what would have been a straight-time day for such employee. The employee must exercise this right to work within four (4) weeks of the settlement of error with the employee or such right shall be forfeited and no further remedy shall be required.

## ARTICLE 49

### NO STRIKE - NO LOCKOUT

**Section 118.** During the life of this Agreement, there shall be no lockout, strike, picketing, boycotting, stoppage of work, anti-company publicity or other economic action of whatsoever nature, against the company.

It is understood that it shall be a violation of this Agreement for the Union or its agents to require its members to observe picket lines set up by any labor organization at the premises of the Employer.

## ARTICLE 50
## STORE OR PLANT CLOSING

**Section 119.** In the event the Employer closes or sells a store or plant and employees are terminated as a result thereof, such employees are entitled to pay equal to one (1) week's pay for each year of continuous service commencing with the third (3rd) year of continuous service up to, but not to exceed eight (8) weeks' pay at their regular rate. However, those employees who have an incomplete year of continuous service as an employee will receive pro rata severance pay for that year as follows:

0-3 months equals twenty-five percent (25%) of a week's pay.
3-6 months equals fifty percent (50%) of a week's pay.
6-9 months equal seventy-five percent (75%) of a week's pay.
Over 9 months equal one week's pay.

Severance pay shall be computed on the average hours worked per week for the fifty-two (52) weeks preceding a voluntary layoff or termination.

The Employer shall continue contributions to the Pension and Health and Welfare Trust Funds for three (3) full months following termination on an hourly basis in direct relationship to the severance pay received for those employees who secure employment with a contributing Employer in the Pension and Health and Welfare Trust Funds.

All monies due employees, including severance pay, shall be paid in a lump sum upon termination.

An employee who is terminated and who is eligible for severance pay, and accepts severance pay, forfeits his seniority and has no recall rights. However, an employee may elect to accept a voluntary layoff not to exceed ninety (90) days. At the end of the ninety (90) day period, if he has not been recalled, he will be paid severance pay and forfeit his seniority. Any extensions of this ninety (90) day period must be agreed upon in writing and signed by the employee, a representative of the Union and the Employer. In no case will such extension exceed a total of six (6) months from the date the employee accepted the layoff.

If an employee is offered a transfer to other employment with the Employer within forty (40) miles of the store or plant in which he was last working and he refuses to accept the transfer or other employment with the Employer he forfeits his rights to severance pay and Pension and Health and Welfare contributions.

If a store or plant is sold and the successor Employer offers employment to an employee who is otherwise eligible for severance pay under the terms of this Article and the new job is comparable, then no provisions of this Article shall apply.

The Employer agrees to give to the employees and the Union four (4) weeks' notice in advance of a store or plant closing or sale. When such notice is given, an employee shall remain with the Employer until the plant or store closes, or forfeit his rights under this Article, unless mutually agreed to by the employee, Employer and Union.

No benefits shall accrue under the terms of this Article unless the Employer makes a business decision to close or sell a store or plant. If a store or plant closing is caused by fire, flood, storm, land condemnation or remodeling, then this Article shall not apply.

In the event of a store or plant closing, employees shall be allowed to exercise their seniority under their respective layoff procedures. Employees may exercise their seniority rights to bump the least senior employee in their classification in the bargaining unit closest to their home, provided all stores in the effected bargaining unit have closed; however, if they exercise such seniority rights, the provisions of this Article shall be null, void and not applicable.

## ARTICLE 51

## BULLETIN BOARD

**Section 120.** The Employer agrees to furnish a bulletin board for the use of the Union within each store. Material placed upon the bulletin board shall be restricted to the following types of notices:

a. Notices of Union recreational and social affairs.

b. Notices of Union elections, Union appointments, and the results of Union elections.

c. Notice of Union meetings.

The bulletin board is not to be used by the Union or its members for disseminating propaganda of any kind whatsoever, and among other things, it shall not be used for the posting of material of a political or controversial nature or for advertising purposes. Any document placed on the bulletin board must be signed by an officer or official representative of the Union.

## ARTICLE 52

## UNION STORE CARD

**Section 121.** The Union Shop Card is the property of the United Food and Commercial Workers, International Union, AFL-CIO, and is loaned to the Employers for

display who sign and abide by this Agreement. The Shop Card may be removed from any market by the Chief Executive Officer of Local No. 7 or his deputy for any violation of this Agreement.

## ARTICLE 53

## UNIFORMS/EQUIPMENT

**Section 122.**  The Employer agrees to furnish all linens or uniforms required by the Employer for use in the markets and delicatessen and to launder same, except for drip dry garments. It is further provided that all hand saw frames and hand saw blades shall be furnished by the Employer. The Employer will also furnish an oil stone in each market for the use of employees in sharpening all hand tools.

Notwithstanding the above, the employee shall be required to meet the dress requirements, at the employee's expense unless otherwise specified, as detailed in the Letter of Understanding, "Dress Requirements," attached to this Agreement.

All Sanitation Chemicals - Employer shall provide proper training in use of chemicals and shall provide proper equipment for use of chemicals as provided by manufacturer. All equipment provided shall be provided to each bargaining unit employee as needed. Copies of MSDS Chemical books shall be in all departments effected.

## ARTICLE 54

## SAVINGS CLAUSE

**Section 123.**  If, during the term of this Agreement, or during any renewal or extension of the same, any Federal or State Law is enacted, or any rule or regulation is issued under any Federal or State Law, which would make compliance by the Union, the Employer, employees, or any of them, with the terms provisions or conditions of this Agreement a violation of any said laws, rules or regulations, then such terms, provisions or conditions shall become inoperative and of no effect from the effective date of any such law, regulation or rule. The remainder of this Agreement not in conflict with any of said laws, rules or regulations shall continue in full force and effect.

In the event of any such terms, provisions or conditions becoming inoperative and of no effect, either party to this Agreement may open the same for bargaining only as to substitute provisions, if any, for those provisions made inoperative upon a thirty (30) day written notice to the other party.

It is specifically understood that the no-strike and no-lock out provision set forth elsewhere in this Agreement shall remain in effect throughout the term of this Agreement.

## ARTICLE 55
## MASTER SAFETY COMMITTEE

**Section 124.** The Employer and the Union will jointly set up a Master Safety Committee to discuss and work towards resolving safety issues in the workplace. The Master Safety Committee shall include at least two (2) Employer officials and at least two (2) Union officials as well as up to five (5) employee participants.

The Employer and the Union agree to seek information relative to ergonomic stresses common in the workplace. The Master Safety Committee will meet periodically to review the information obtained. The parties will discuss and work toward resolving ergonomic safety issues found to be prevalent in the workplace.

The Employer shall pay employee participants their regular hourly rate of pay for all time so spent and mileage for Company authorized joint meetings.

## ARTICLE 56
## TERM OF AGREEMENT

**Section 125.** The parties acknowledge that during the negotiations which resulted in this Agreement each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject matter referred to or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Agreement.

THIS AGREEMENT shall be in full force and effect from September 12, 2004, and shall remain in full force and effect until midnight May 9, 2009, and shall automatically be renewed from year to year thereafter unless either party desires change or termination at the expiration of said Agreement. In such event the party desiring such change or termination shall notify the other party in writing sixty (60) days prior to the expiration date.

IN WITNESS WHEREOF, the parties above-named have signed their names and/or affixed the signatures of their authorized representatives this _9th_ day of _November_, 2005

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL #7

KING SOOPERS, INC.

BY: _Kevin R. Schneider_

BY: _Stanley McClune_

DATE: _1-31-06_

DATE: _Nov. 9, 2005_

## COST OF LIVING

**Section 126.** Effective May 4, 1986, there shall be a cost of living allowance based on the increase in the revised Consumer Price Index for Urban Wage Earners and Clerical workers, published by the Bureau of Labor Statistics, U.S. Department of Labor (1967 = 100) between March, 1985 and March, 1986. For hourly rated employees covered by this Agreement, there shall be a one cent (1¢) per hour adjustment for every full .4 point increase in that index which exceeds an increase of 5.5% in the Index during the period between March, 1985 and March, 1986. It is understood that if the rates of pay for the classification are less than the Journeyman Meat Cutter rate, such classification shall receive the same percentage increase in the cost of living as the Journeyman Meat Cutter.

## APPENDIX "A"
## ALL KING SOOPERS MEAT BARGAINING UNITS

The minimum hourly rate of pay for the indicated classifications shall be as set forth below on the dates indicated. The Employer may hire any employee at any rate in the progression schedule at its sole discretion.

### Rate determination

Employees hired before March 6, 2005 who remain in their classification after commencement of this Agreement shall be paid in accordance with the "hired and assigned in the bargaining unit prior to March 6, 2005" wage schedule while they remain in that classification.

**Demotions, Step Downs and layoffs:** An employee who is demoted, steps down, or who is laid off in accordance with this Agreement, shall be placed back into the same wage schedule in which the employee was working immediately prior to their assignment into management or promotion into the classification from which they are being demoted, stepping down or laid off. In determining the proper progression level for an employee demoted, stepping down, or laid off from a classification with a higher "thereafter" hourly rate to a classification with a lower "thereafter" hourly rate, such affected employee shall be placed in the appropriate progression level in the rate schedule referenced in this paragraph based on their experience in the newly assigned classification, regardless of whether such assigned rate results in a reduction in hourly rate. In determining prior experience hereunder, the Employer will give recognition to the verified number of hours of actual work experience in the same classification which said employee may have performed for the Employer and the verified number of hours actual work experience on a comparable job which said employee may have performed within the previous five (5) years for any other employer in a similar retail grocery operation.

**Rate Determination – Promotions, new hires and new entrants into the bargaining unit:** Employees hired into, or assigned to, or promoted to a different classification, the bargaining unit on or after March 5, 2005 shall be assigned to the "EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005" wage scale. Employees who are promoted to a different classification after March 5, 2005 shall not receive a reduction in their hourly rate of pay if when promoted to such classification they are being paid an hourly rate of pay greater than the minimum, unless they are above the "thereafter" hourly rate in which case they will immediately be paid the "thereafter" hourly rate. When such employee is paid less than the "thereafter" hourly rate, prior to receiving an increase in their hourly rate of pay, they must work 1, 040 hours at their current rate before promotion to the hourly rate in the new classification that would give them an increase in their hourly rate of pay.

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | | EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|---|---|
| MEAT DEPARTMENT MANAGER | $18.58 | MEAT DEPARTMENT MANAGER | $18.58 |
| ASSISTANT MEAT DEPARTMENT MANAGER | $17.78 | ASSISTANT MEAT DEPARTMENT MANAGER | $17.78 |
| BUTCHER BLOCK MANAGER | $17.65 | BUTCHER BLOCK MANAGER | $17.65 |
| MEAT CUTTERS | | MEAT CUTTERS | |
| | | 1ST 1040 hours worked | $10.65 |
| | | Next 1040 hours worked | $11.15 |
| FIRST 1040 HOURS (64%) | $11.30 | Next 1040 hours worked | $11.30 |
| SECOND 1040 HOURS (70%) | $12.36 | Next 1040 hours worked | $12.36 |
| THIRD 1040 HOURS (75%) | $13.23 | Next 1040 hours worked | $13.23 |
| FOURTH 1040 HOURS (80%) | $14.12 | Next 1040 hours worked | $14.12 |
| FIFTH 1040 HOURS (85%) | $15.01 | Next 1040 hours worked | $15.01 |
| SIXTH 1040 HOURS (90%) | $15.89 | Next 520 hours worked | $15.89 |
| JOURNEYMAN | $17.65 | Thereafter | $17.65 |
| BUTCHER BLOCK CLERK | | BUTCHER BLOCK CLERK | |
| FIRST 960 HOURS | $8.39 | 1ST 1040 hours worked | $8.39 |
| SECOND 960 HOURS | $8.64 | Next 1040 hours worked | $8.64 |
| | | Next 1040 hours worked | $8.89 |
| | | Next 1040 hours worked | $9.14 |
| | | Next 1040 hours worked | $9.39 |
| THIRD 960 HOURS | $9.45 | Next 1040 hours worked | $9.69 |
| FOURTH 960 HOURS | $10.91 | Next 1040 hours worked | $10.13 |
| FIFTH 960 HOURS | $12.36 | Next 520 hours worked | $12.36 |
| THEREAFTER | $14.54 | Thereafter | $14.54 |

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | |
|---|---|
| **MEAT WRAPPER** | |
| FIRST 1040 HOURS (55%) | $8.64 |
| | |
| | |
| SECOND 1040 HOURS (65%) | $9.45 |
| | |
| THIRD 1040 HOURS (75%) | $10.91 |
| FOURTH 1040 HOURS (85%) | $12.36 |
| THEREAFTER | $14.54 |
| | |
| **SUSHI BAR CHEF** | $16.04 |
| | |
| **SNACK BAR/MEAT CLEAN-UP** | |
| FIRST 520 HOURS OF WORK | $6.90 |
| SECOND 520 HOURS OF WORK | $7.38 |
| THEREAFTER | $7.64 |

| EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|
| **MEAT WRAPPER** | |
| 1ST 1040 hours worked | $8.39 |
| Next 1040 hours worked | $8.64 |
| Next 1040 hours worked | $8.89 |
| Next 1040 hours worked | $9.14 |
| Next 1040 hours worked | $9.39 |
| Next 1040 hours worked | $9.69 |
| Next 1040 hours worked | $10.13 |
| Next 520 hours worked | $12.36 |
| Thereafter | $14.54 |
| | |
| **SUSHI BAR CHEF** | $16.04 |
| | |
| **SNACK BAR/MEAT CLEAN-UP** | |
| FIRST 520 HOURS OF WORK | $6.90 |
| SECOND 520 HOURS OF WORK | $7.38 |
| THEREAFTER | $7.64 |

## ALL MEAT BARGAINING UNITS EXCEPT – LOVELAND, GREELEY, BROOMFIELD AND STORE 86

| | |
|---|---|
| **DELI DEPARTMENT MANAGER** | $17.65 |
| | |
| **DELI DEPARTMENT MANAGER** (ASSIGNED TO MANAGE A DELI/INTERNATIONAL KITCHEN AS DETERMINED BY MANAGEMENT) | $18.58 |
| | |
| **ASSISTANT DELI DEPARTMENT MANAGER** | $16.06 |
| | |
| **CATERING CAPTAIN** | $13.03 |
| | |
| | |
| | |

| | |
|---|---|
| **DELI DEPARTMENT MANAGER** | $17.65 |
| | |
| **DELI DEPARTMENT MANAGER** (ASSIGNED TO MANAGE A DELI/INTERNATIONAL KITCHEN AS DETERMINED BY MANAGEMENT) | $18.58 |
| | |
| **ASSISTANT DELI DEPARTMENT MANAGER** | $16.06 |
| | |
| **CATERING CAPTAIN** | $13.03 |
| | |
| | |
| | |

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | | EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|---|---|
| **DELI CLERK** | | **DELI CLERK** | |
| FIRST 1040 HOURS (53.8%) | $7.14 | 1ST 1040 hours worked | $8.09 |
| | | Next 1040 hours worked | $8.39 |
| | | Next 1040 hours worked | $8.64 |
| SECOND 1040 HOURS (65%) | $8.62 | Next 1040 hours worked | $8.89 |
| | | Next 1040 hours worked | $9.14 |
| THIRD 1040 HOURS (75%) | $9.96 | Next 1040 hours worked | $9.69 |
| | | Next 1040 hours worked | $10.13 |
| FOURTH 1040 HOURS (85%) | $11.28 | Next 520 hours worked | $11.28 |
| THEREAFTER | $13.27 | Thereafter | $13.27 |
| | | | |
| **DELI AND RESTAURANT CHEFS** | $13.84 | **DELI AND RESTAURANT CHEFS** | $13.84 |
| | | | |
| **CATERING CLERK** | | **CATERING CLERK** | |
| FIRST 1040 HOURS OF WORK | $7.74 | FIRST 1040 HOURS OF WORK | $7.74 |
| SECOND 1040 HOURS OF WORK | $8.55 | SECOND 1040 HOURS OF WORK | $8.55 |
| THEREAFTER | $9.56 | THEREAFTER | $9.56 |

Annual Lump Sum Bonus: Effective the second Sunday following ratification and acceptance of this Agreement and effective the first Sunday of September 2005, respectively, employees who were hired on or before March 5, 2005, except courtesy clerks, who have been continuously employed during the trailing one year period of each of these Sunday effective dates and who are actively employed on each of these effective dates and who are, on the effective date of this bonus, at the top rate for their classification, shall be paid a lump-sum bonus equal to thirty cents ($0.30) per hour times their total paid vacation hours, paid holiday hours, and hours worked during the trailing one year period. Such bonuses shall not be paid to any employee hired on or after March 6, 2005.

Effective September 10, 2006 and September 9, 2007, respectively, only the "Thereafter rates, except courtesy clerks, shall be increased by thirty cents ($0.30).

## LETTER OF UNDERSTANDING
## EMPLOYEE BUYOUT

The Employer, at its discretion, may establish a buyout program as follows:

1. Employees with ten (10) or more years of service who elect his buyout by a date determined by the Employer and who work through their release date.

   - $500 per year of service – Par-time employees
   - $1,000 per year of service – Full-time employees

2. Employer retains the right upon notification to the Union to:

   - establish offer dates and release dates
   - terminate or extend the program
   - require employees to sign a waiver and release
   - limit the maximum payout under this program to any employee to 20 years of service

3. The employer may limit, by bargaining unit, the number of employees who can take this buyout at each store or facility. If more employees elect than permitted – Go by seniority.

4. Program not subject to Grievance and Arbitration Procedure

UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL #7

KING SOOPERS, INC.

BY: _Kevin R. Schneider_

BY: _____

DATED: _1-31-06_

DATED: _11/9/05_

# LETTERS OF AGREEMENT

The Letters of Understanding, which are carried over into the new 5-year Agreement, are as follows; all others are deemed null and void.

1. Discovery In Customer Complaints.  Dated 5/4/84.

2. Posting Official Union Notice Arbitration.  Dated 5/14/84

3. Deli Clerk Doing Butcher Block Work. Dated 7/15/86.

4. Sick Pay.  Dated 12/22/87.

5. Sick Pay Accumulation. Dated 1/6/88.

6. Grievances Resolved At Store Level By Stewards.  Dated 1/6/88.

7. Grievance Of Ivan Saindon.  Dated 7/14/89.

8. Retail Meat Floater Pool.  Dated 8/8/90.

9. Assistant Deli Manager/Deli Manager/Deli Chef.  Dated 8/9/90.

10. Catering Purchases and Production.  Dated 10/10/90.

11. Personal Beepers/Pagers; Union Case No.858-91.  Dated 2/17/92.

12. Catering Supplement. Delete Appendix A and Incentive Plan.  Dated October 1990

13. King Soopers Store #8 – Boulder Floater Pool.  Dated 2/8/94.

14. Assignment of Overtime to Meat Cutters.  Dated 11/17/94.

15. Amend Letter of Understanding on Seafood/Sushi Bar.  Delete second sentence of (1).  Replace with "The Employer may carry pre-processed and packaged sushi." Dated 9/14/94.

16. Meat Wrapper Floater Pool. Dated 11/2/95.

17. King Soopers #8 Meat Department Utilization of Northern Denver Meat Floater Pool. Dated 1/27/94.

18. Retail Meat Contract, Store #42 in Longmont. Dated 11/18/93.

19. King Soopers and UFCW Local 7 Letter regarding Layoffs, Reduction in Hours, and Seniority.  Dated 6/22/95.

20. The Restaurant Letter of Agreement contained within the Collective Bargaining Agreement except delete the third paragraph. Add: Dishes shall be considered equipment for the purposes of the Agreement. Dated 6/21/91

21. Dress Requirements. Dated 4/1/97

22. Deli Scheduling Procedures. Dated July 1996

23. Meat Wrapper Rates. Dated 8/6/01

24. Amend Seafood/Sushi Bar. Dated 8/18/05

25. Culinary Head Clerk Classification. Dated 10/6/05

26. Operation of Starbucks Coffee Shop. Dated 10/6/05


UNITED FOOD AND COMMERCIAL WORKERS, LOCAL #7

KING SOOPERS, INC.

BY: _Kevin R. Schneider_

BY: _____

DATE: _1-31-06_

DATE: _11/9/05_

# LETTER OF AGREEMENT
## #1
## DISCOVERY IN CUSTOMER COMPLAINTS.  DATED 5/4/84

**between**
**King Soopers, Inc.**
**and**
**United Food and Commercial Workers, Local Union No. 7**

King Soopers, Inc. (hereinafter the "Employer") and United Food and Commercial Workers, Local Union No. 7 (hereinafter the "Union"), hereby agree to settle the allegations set forth in the Charge Against Employer in Case No. 27-CA-8665 on the following basis:

1.  The Union hereby releases, remises and forever discharges the Employer from all matters asserted in the Charge Against Employer or Complaint and Notice of Hearing in Case No. 27-CA-8665 now pending before the National Labor Relations Board, which charge the Union agrees to withdraw with prejudice and the Union agrees to take all procedural steps necessary to accomplish the dismissal of the Complaint therein.

2.  The Employer denies that it has engaged in any unfair labor practices and the Employer's concurrence in this agreement shall not constitute an admission of any unfair labor practice.

3.  If an employee is disciplined or discharged as a result of a customer alleging misconduct and a grievance is filed protesting the discipline or discharge which is presented to arbitration, upon request, the attorney representing to Union will be provided the name and telephone number of the complaining customer. The attorney will contact the customer by telephone, if contact is desired. If the customer agrees to a meeting in person during the telephone conversation, the Employer will provide the Union with the customer's address. If the customer does not have a telephone at home or at work, the Employer will provide the attorney representing the Union with the customer's address.

4.  The Union's attorney shall keep the customer's name telephone number and/or address confidential to himself or herself, except in the case of the Union's law firm the name, telephone number, and/or address may be provided to a law clerk.

5.  The Union's attorney shall not intimidate, threaten or otherwise harass the customer, but shall conduct themselves in a professional manner.

**The original document was signed by Steven Niven and Charles Mercer on 5/4/84 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT

## #2

## POSTING OFFICIAL UNION NOTICE ARBITRATION. DATED 5/14/84

May 14, 1984

Michael G. Severns, Esq.
Mountain States Employers Council
1790 Logan Street
Box 539
Denver, Colorado 80201

Re:    UFCW - 7 v. King Soopers (Posting Official Union Notice Arbitration)

Dear Mike:

This letter will confirm that we have orally reached and agreement to settle this case on Thursday, May 10. Enclosed with this letter is a draft of the language which we have discussed over the telephone which is part of the settlement.

Outside of the settlement, we have made some other agreements or exchanged ideas. First, it is agreed that the August 29, 1983 notice which caused this grievance to be filed, would be considered proper under the attached language. Second, with respect to management reviewing the notice, we have agreed that such a review cannot unreasonably interfere with the timing of the notice i.e., if it is important that the notice be posted immediately because its content needs to be known before a date arising in the immediate future, it would not be proper for Kings to unreasonably insist that a particular individual review the notice who is not then available. If, however, there is no particular time crunch involved, there is a fair amount of flexibility in terms of who reviews the notice and when.

Finally, with respect to the word inflammatory which is included in the settlement, we discussed two different sets of circumstances, one of which we would agree is inflammatory and one of which we would agree is not inflammatory. We recognize that there may be a fine line between the two and hope that all parties will act reasonably in interpreting the language in the facts of each case. With respect to what is inflammatory, it would be improper for the union in a notice to encourage members to file numerous and multiple grievances in an effort to harass King Soopers. It would not be inflammatory for the union to explain rights and to inform the employees that if they have problems or beliefs that these rights are being violated to discuss the matter with their steward or business agent.

I believe that this settlement is fair and reasonable for all sides and that the problem probably arose because of the heat of the moment. To my knowledge, there had never been any problems in the past with posting of notices and it is my firm hope that there will be none in the future. I appreciate your cooperation in helping reach a prompt and reasonable resolution to this matter. If you have any questions about the language, please feel free to call.

**The original document was signed by Thomas Buescher on 5/14/84 and is on file at the King Soopers Labor Relations Department.**

## LETTER OF AGREEMENT
## #3
## DELI CLERKS DOING BUTCHER BLOCK WORK.  DATED 7/15/86

### GRIEVANCES OF DELI CLERKS DOING BUTCHER BLOCK WORK
### INVOLVING CHARLIE AMES #43, CASE # 154-86,
### AND VIC JENSON #61, CASE # 113-86

King Soopers, Inc. and UFCW Local No. 7 hereby agree to resolve the above-referenced grievances as follows:

1.    For those stores that do not have a separate specialty meat department, that the preparation, display, handling and sale of case ready items normally offered for sale in the specialty meat/seafood department may be done by deli clerks.  For those stores with a separate specialty meat department, then the preparation of such items will be performed by butcher block clerks, but the items may be displayed, handled and sold in the deli by deli clerks.

2.    Nothing in this agreement precludes the Company from selling the final product in other areas of the meat department.

3.    The Company agrees to pay to Vic Jensen, KS #61, $75.00, and to Charlie Ames, KS #43, $75.00.

**The original document was signed by Steve DiCroce and Gary Hakes on 7/15/86 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #4
## SICK PAY.  DATED 12/22/87

The United Food & Commercial Workers' Local No. 7 (hereinafter "the Union") and King Soopers, Inc. (hereinafter "the Employer") hereby agree to resolve the grievance in Case No. 52-84 as follows:

1.  The Employer may require employees to complete its sick pay request forms in accordance with the following:

    a.  Part I of the form must be completed for all absences for which the employee is requesting sick pay.

    b.  Part IV of the form may be required to be completed for absences of three or more scheduled work days.

    c.  Completion of Part IV of the form may be requested prior to three scheduled work days if there are suspicious circumstance indicating malingering by the involved employee. Additionally, the Employer may require completion of Part IV where the employee's absenteeism record is excessive. Under the above circumstances, the employee will be notified by a Company representative, while still absent, that the employee will be required to have Part IV completed.

    d.  In lieu of completing Part IV, where necessary, the employee may submit the following, which shall constitute "other authoritative verification", only if date of disability and diagnosis are indicated.

        (1)  Hospital bills

        (2)  Worker Compensation Information

        (3)  Health and Welfare trust fund information

2.  The Employer will make every reasonable effort to insure that payments will be received in a timely manner.

3.  The Employer will not refuse to allow employees returning from sick leave to report for work because the employee has not completed the sick pay request form or provided other verification of illness. The only exception would be where the employee does not appear physically capable of performing the work or where the illness could remain contagious and therefore dangerous to either product, customers or employees. Where the request for sick leave is denied, the Union may grieve and pursue the same.

4. For absences of one calendar week or more, employees will be required to request a leave of absence in writing.

5. Completion of the sick pay request form will not be required by employees who are not eligible for, or are not requesting sick pay.

**The original document was signed by Ed Behlke on 11/17/87 and Charles Mercer on 12/22/87 and is on file at the King Soopers Labor Relations Department.**

between

**KING SOOPERS, INC.**

and

**UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 7**


**RE: Sick Pay Accumulation**


Whereas, during the negotiations for the current contract, the parties agreed that part-time employees would accrue sick pay on a pro-rata basis;

Whereas, a dispute has arisen as to how full time employees would continue to accrue sick pay;

Whereas, resolution of such an issue was not contemplated nor discussed during said negotiations;

Therefore, in order to resolve the dispute, the parties named above hereby agree as follows:

Employees classified as full time shall continue to receive 4 hours sick pay credit per month, provided said employee works the <u>minimum</u> hours set forth in the Meat and Clerk Agreement.

This agreement shall apply to all collective bargaining agreements between the parties, which have the above-described language and shall be in effect during the terms of said Agreements.


**The original document was signed by Steve DiCroce and Gary Hakes on 1/6/88 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT

## #6

## GRIEVANCES RESOLVED AT STORE LEVEL BY STEWARDS. DATED 1/6/88

**between**

**KING SOOPERS, INC.**

**and**

**UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 7**

### RE: Grievances Resolved at Store Level by Stewards

To encourage prompt and equitable resolution of grievances, the parties set forth above agree to the following:

All grievances resolved at the store level between Management and the Union appointed Shop Steward shall be entered into on a non-precedent setting basis.

**The original document was signed by Steve DiCroce and Gary Hakes on 1/6/88 and is on file at the King Soopers Labor Relation Department.**

# LETTER OF AGREEMENT
## #7
## GRIEVANCE OF IVAN SAINDON.  DATED 7/14/89

July 14, 1989

Mr. Dwayne Adkins
Secretary-Treasurer
UFCW Local No. 7
7760 West 38th Avenue, Suite 400
Wheat Ridge, Colorado 80033

RE:    GRIEVANCE OF IVAN SAINDON #569-89

Dear Dwayne:

In response to our most recent discussion of the above referenced grievance, the Company will accept the Union's offer to resolve the grievance on the following basis:

That during the first two weeks of employment for any employee of the meat plant, the company shall retain the right to restrict the employee from exercising his seniority to move to another job, or prohibit another employee from bumping the newly hired employee out of his position. It is further understood, that during this two week period senior employees may be forced to take work assignments in another area of the plant as a result of this agreement.

As we discussed, in the event that at the end of the probationary period management desires to extend an employees probationary period that such extension will be considered by the union as provided in the collective bargaining agreement.

If this resolution reflects our understanding, please execute both copies of this letter and return one to me.

**The original document was signed by Steve DiCroce and Dwayne Adkins on 7/14/89 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #8
## RETAIL MEAT FLOATER POOL.  DATED 8/9/90
### between
### King Soopers, Inc.
### and
### United Food and Commercial Workers Union, Local No. 7

### Re: Retail Meat Floater Pool

WHEREAS, during the negotiations for the current meat contract, the parties agreed to language establishing a floater pool for the retail meat department; and

WHEREAS, several matters have arisen which were not contemplated or discussed during said negations;

NOW, THEREFORE, in order to resolve these disputes, the parties named above agree as follows:

1. When a full-time, "based" meatcutter is affected by a reduction of hours, as set forth in Article 31, Section 87, the affected employee shall displace the least senior, full-time, "based" meatcutter in the district. The employee being displaced shall than be placed in the district's floater pool and scheduled in accordance with said letter of agreement.

2. In consideration of safety, job knowledge and to assure that first-year apprentices receive adequate training, a first-year apprentice shall be "based" in a store, regardless of seniority. However, they shall be scheduled hours in accordance with their seniority as if they were within the floater pool.

3. If a full-time opening becomes available as set forth in Article 27, Section 69, or Article28, Section 83, and the most senior, eligible employee is an apprentice, and if such appointment would violate the ratio required under Article 7, Section 15, then the eligible apprentice would be transferred and bump the least senior, full-time meatcutter in the district who would then be placed into the original full-time opening.

**The original document was signed by Steve DiCroce on 8/9/90 and Gary Hakes on 8/8/90 and is file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #9
## ASSISTANT DELI MANAGER/DELI MANAGER/DELI CHEF.  DATED 8/9/90
### between
### KING SOOPERS, INC.
### and
### UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 7
### Re: Assistant Deli Manager/Deli Manager/Deli Chef

The Parties named above agree to the following:

1.   Assistant Delicatessen Managers - Assistant deli managers may be designated at the discretion of management and is not a required classification. However, not more than one employee per store, per deli, may be designated as an assistant deli manager and shall not be scheduled similar shifts unless in training. Further, the assistant deli manager may continue to perform all duties within the deli as they have in the past.

2.   The employer agrees to delete all reference in App. "A" relating to "Deli Manager employed as a Delicatessen Manager after 5/20/77, and directing five (5) or less employees."  Whereas all deli managers would receive $12.80 an hour effective 8/12/90, $13.05 and hour effective 5/5/91 and $13.30 an hour effective 5/3/92 for Denver, Boulder and Broomfield; $12.80 and hour effective 8112/90, $13.05 an hour effective 7/7i'91 and $13.30 an hour effective 7/5/92 for Colorado Springs, Fort Collins and Greeley; $12.80 an hour effective 8/12/90, $13.05 an hour effective 6/16/91 and $13.30 an hour effective 6/21/91 for Longmont and Loveland; and $12.80 an hour effective 8/12/90, $13.05 an hour effective 8/11/91 and $13.30 an hour effective 8/9/92 for Pueblo.

3.   In accordance with Article 6, Section 24, <u>NEW CLASSIFICATIONS</u>, the parties have met and agreed as follows:

<u>Deli Chef</u> - Deli Chefs may be designated at the discretion of management and is not a required classification. However, not more than one employee per store, per deli, may be designated as a deli chef These employees will receive the same rate of pay as an assistant deli manager and will be considered a separate classification for the purposes of seniority-related issues, such as scheduling, promotions, layoffs, reduction of hours, vacations, etc.

**The original document was signed by Steve DiCroce on 8/9/90 and Gary Hakes on 8/8/90 and is on file at the King Soopers Labor Relations Department.**

<h1 style="text-align:center">LETTER OF AGREEMENT</h1>
<h1 style="text-align:center">#10</h1>
<h1 style="text-align:center">CATERING PURCHASES AND PRODUCTION.  DATED 10/10/90</h1>

King Soopers, Inc. and the UFCW hereby agree to the following understanding relative to the addition of catering as it impacts the meat collective bargaining agreements.

In exchange *for* the company's agreement to allow the work of catering clerks and captains to be accreted to the Denver Meat Bargaining unit, the Union understands and agrees that food products produced for consumption at a catered event may be produced and prepared by the meat bargaining unit personnel in addition to food produced or prepared in an outside facility by another manufacturer. For purposes of this agreement a catered event shall be considered any event for which food and related products are ordered and delivered to the customer that has been arranged through the consultation with the customer by a member of the catering sales or management staff.

It is further understood, that during the initial period of this program that the employer may employ "Deli Production personnel and assign such personnel to a store or stores for the purpose of preparing product to be sold at a catered event. Where such employees are employed the following understanding shall apply:

1) The Production employees shall fall under the terms and conditions of the Denver Meat agreement and shall be paid the production rates in effect for the Deli Kitchen.

2) The work performed by such employees may be transferred to an outside vendor.

3) Such Production employees may perform work in the deli that is incidental to their production tasks.

**The original document was signed by Steve DiCroce on 10/8/90 and Dwayne Adkins on 10/10/90 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #11
## PERSONAL BEEPERS/PAGERS; UNION CASE NO. 858-91. DATED 2/17/92

February 17, 1992

Ms. Susan Meader
Labor Relations Department
King Soopers, Inc.
P.O. Box 5567
Denver, Colorado. 80217
     -and-
Mr. John Bowen
Associate General Counsel
UFCW, Local #7
7760 West 38th Avenue
Wheat Ridge, Colorado 80033

RE:    Personal Beepers/Pagers; Union Case No. 858-91

Dear Ms. Meader and Mr. Bowen:

This letter sets forth the terms of the settlement which was agreed to between the parties in relation to the above referenced grievance during the Med/Arb session conducted on February 13, 1992, at Mountain States Employers Council.

The parties agree that bargaining unit employees may carry beepers/pagers on their persons on Company premises during working hours, but only if all of the following conditions are met:

1.    The employee notifies the Store Manager in writing that they have a personal beeper/pager and that they may be carrying it with them on Company premises during working hours.

2.    The beeper/pager must be set so that it does not emit any audible signal. In other words, it must not "beep". It may be set so that is signals the owner of an incoming call by vibrating.

3.    The beeper/pager must remain hidden from the view of customers at all times. In other words, it should be kept in a pocket out of sight or worn under a smock or other covering garment whenever an employee is in an area where any customers are.

4.    Service to customers is not to be interrupted. The employee may not look at the beeper/pager at any time while they are on the sales floor and they may only return calls while they are on authorized break periods.

The parties also agree that any violation of the above conditions by any employee may result in progressive discipline up to and including possible discharge in appropriate cases.

Finally, it is expressly understood that the Company may apply different rules in the case of any employee that it wants to wear a beeper/pager during working hours for its own business reasons. In other words, the four conditions set forth above apply only to bargaining unit employees who carry beepers/pagers for their own personal reasons.

As usual, it was a pleasure to work with the parties on this case and, if I can be of any further assistance in the future, please feel free to give me a call.

**The original document was ordered by arbitrator John F. Sass on 2/17/92 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #12
## CATERING SUPPLEMENT. DATED OCTOBER 1990

### KING SOOPERS, INC.
### CATERING
### SUPPLEMENTAL AGREEMENT

KING SOOPERS, INC. (Denver, Colorado) A division of Dillon Company, Inc. hereinafter referred to as the "Employer" and the UNITED FOOD & COMMERCIAL WORKERS UNION, LOCAL #7, hereinafter referred to as the "Union" are parties to a Labor Agreement having as its term June 30, 1996 to July 10, 1999. Said agreement, hereinafter referred to as the "Principal Agreement" covers the Meat and Deli operations of the Employer's stores and Plants in the metropolitan Denver Area.

This Supplemental Agreement which has as its term one year from date of execution amends, modifies or changes certain identified portions of the Principal Agreement as set forth below. Where there is no reference to an Article or Section then such Article or Section shall be deemed to not have been included in this Supplemental Agreement. Thirty days prior to the expiration of this Agreement the parties shall meet and discuss any concerns experienced through the operation of the catering department and negotiate resolution of the same. Failure by either party to re-open this agreement as described above shall automatically continue this agreement through July 10, 1999.

### ARTICLE 1
### RECOGNITION AND EXCLUSIONS

**Section 1.**   Amend language of this Principal Agreement as follows: Additions: Catering Clerks, Catering Captains and On-Call employees. Exclusion Additions: Non-bargaining unit employees and contractors.

### ARTICLE 2
### SERVICE IN MEAT-DELICATESSEN DEPARTMENTS, PLANTS

**Section 2.**   Re-write language of the Principal Agreement as follows:

All work and services performed in the bargaining unit connected with catering to the public shall be performed by bargaining unit members except as provided below. Supervisors, bargaining unit and non-bargaining unit employees, bar tenders and contract laborers may perform work covered under this Supplemental Agreement.

### ARTICLE 3
### UNION SECURITY AND CONDITIONS

**All Sections.** Same as Principal Agreement.

## ARTICLE 4
## CHECK-OFF

**All Sections.** Same as Principal Agreement.

## ARTICLE 5
## NEW EMPLOYEES, TRANSFERRED EMPLOYEES, PROMOTED OR DEMOTED

**All Sections.** Same as Principal Agreement.

## ARTICLE 6
## RIGHTS OF MANAGEMENT

**Section 13.** Add 2nd paragraph to Principal Agreement:

Nothing in this agreement requires the employment of full-time 1~r regular part-time employees in the catering operation. It is further understood that the employer may employ on-call employees to work on a sporadic, as needed basis. The Employer will endeavor to create as many regular full-time and part-time jobs as is feasible. Notwithstanding the above, the Employer reserves the right to utilize any of its employees in the capacity of Catering Clerks and Catering Captains.

## ARTICLE 7
## DEFINITIONS OF CLASSIFICATIONS

**New Section 20 (a).** Add to the new Section 20 (a) the following definitions:

1) <u>Catering Clerks</u>. A catering clerk is an employee whose job consists of assisting in the preparation of food to be served at the catered event, pick up and delivery of the food and other essential items to the catered event, the set-up, service and clean-up at the catered event and other related duties as may be necessary.

2) <u>Catering Captain</u>. A catering captain is an employee who has been assigned by management the responsibility to coordinate, assist and supervise the work of catering clerks and to manage service at the catered event. This section shall not be construed as requiring the Employer to have a catering captain. It is understood that the Employer's supervisors may perform work in this capacity without violating the collective bargaining agreement.

3) <u>On-Call Employees</u>. On-Call employees are hired and scheduled to work on an on-call basis and may perform any of the work covered under 20 (a) (1) above. Such employees shall not be subject to the minimum daily and weekly shift guarantees of this agreement.

4) <u>Contract Laborers</u>. If a catered event cannot be staffed from within the bargaining unit, the employer may subcontract and fill the additional needs to include special services (ice sculpting, etc.). Contract laborers may perform any duties of Section 20 (a) (1).

5)     **Bar Tenders.** Are contract employees involved in the handling and selling of beverages at a catered event.

6)     **Supervisors.** Supervisors may perform the duties of a Catering Clerk or Captain. It is agreed that absent special service requirements for a particular event that no more than four such supervisors will work at any event.

## ARTICLE 8
## RATES OF PAY

**All Sections.** Same as Principal Agreement.

## ARTICLE 9
## TEMPORARY ASSIGNMENTS

**Section 28**. Re-write second paragraph of Principal Agreement to read:

In lieu of hiring catering clerks or to provide additional help for the catering department, the Employer may offer other employees of the bargaining unit, or employees of the clerks bargaining unit, the opportunity to work a catered event. In this event, the Employer shall have sole discretion in the selection and scheduling of such employees.

## ARTICLE 10
## NO REDUCTION IN PAY

**Section 31**. Same as Principal Agreement.

## ARTICLE 11
## WORK WEEK

**All Sections.** Same as Principal Agreement.

## ARTICLE 12
## OVERTIME

**All Sections.** Same as Principal Agreement.

## ARTICLE 13
## SUNDAY PREMIUM

**All Sections.** Same as Principal Agreement.

## ARTICLE 14
## TRAVEL PAY

**All Sections.** Same as Principal Agreement, except add the following new paragraph:

Any employee whose driving record shows a pattern of continuous and repetitive disregard for traffic laws, public safety and the employers interest, may be subject to progressive discipline.

## ARTICLE 15
## NIGHTPREMIUM

**All Sections.** Same **as Principal Agreement.**

## ARTICLE 16
## HOLIDAYS

**All Sections.** Same as Principal Agreement, except that on-call employees shall not be entitled to worked or unworked holiday pay unless such employee is scheduled for sixteen (16) or more hours in the workweek preceding the holiday and the holiday workweek.

## ARTICLE 17
## VACATIONS

**All Sections.** Same as Principal Agreement.

## ARTICLE 18
## SCHEDULE POSTING

**All Sections.** Same as Principal Agreement.

## ARTICLE 19
## MINIMUM DAILY SCHEDULE

**All Sections.** Same as Principal Agreement.

## ARTICLE 20
## MINIMUM WEEKLY SCHEDULE

**All Sections.** Same as Principal Agreement.

## ARTICLE 21
## TIMEKEEPING

**All Sections.** Same as Principal Agreement.

## ARTICLE 22
## SPLIT SHIFTS

**All Sections**. Same as Principal Agreement.

## ARTICLE 23
## STORE MEETINGS

**All Sections**. Same as Principal Agreement.

## ARTICLE 24
## LUNCH BREAKS

**All Sections**. Same as Principal Agreement.

## ARTICLE 25
## RELIEF PERIODS

**All Sections**. Same as Principal Agreement.

## ARTICLE 26
## PROBATIONARY PERIOD

**All Sections**. Same as Principal Agreement.

## ARTICLE 27
## SENIORITY

**Section 65**. Add new paragraph to the Principal Agreement to read as follows:

Catering Clerks and Catering Captains shall have separate seniority for all applications of the collective bargaining agreement.

**Section 66-72**. Same as Principal Agreement.

**Section 73**. Add to language of Principal Agreement:

3.  Notwithstanding the above, an employee classified as a Catering Clerk shall be eligible for promotion to a higher classification provided the employee has worked a minimum of two (2) years in the catering clerk classification.

4.  It is understood and agreed that the position of Catering Clerk is not subject to bid under the provisions of Section 73.

5.  The Employer retains the right to hire Catering Clerks and Captains directly off-the-street. It is further understood that the Employer retains the right to select current employees at its discretion for Catering Clerk and Captain positions.

**Sections 74-75**.  Same as Principal Agreement.

**ARTICLE 28**
**AVAILABLE HOURS**

**Sections 77-83**.  Same as Principal Agreement.

**ARTICLE 30**
**UNSCHEDULED OVERTIME**

**All Sections**.  Same as Principal Agreement.

**ARTICLE 31**
**REDUCTION IN HOURS**

**All Sections**.  Same as Principal Agreement.

**ARTICLE 32**
**LAYOFFS**

**Section 88.**  Add new last paragraph to current language to read:

It is understood and agreed that higher classified employees of the bargaining unit shall not have the right to displace Catering Clerks and Captains in the event of a layoff.

**Section 89.**  Same as Principal Agreement.

**ARTICLE 33**
**TRANSFER FROM STORE TO STORE**

**All Sections**.  Same as Principal Agreement.

**ARTICLE 34**
**NEW STORE LANGUAGE**

**All Sections**.  Same as Principal Agreement.

**ARTICLE 35**
**LEAVES OF ABSENCE**

**All Sections**.  Same as Principal Agreement.

**ARTICLE 36**
**FUNERAL LEAVE**

**All Sections**.  Same as Principal Agreement.

## ARTICLE 37
## JURY DUTY

**All Sections**. Same as Principal Agreement.

## ARTICLE 38
## SICK LEAVE

**All Sections**. Same as Principal Agreement.

## ARTICLE 39
## INJURY ON JOB

**All Sections**. Same as Principal Agreement.

## ARTICLE 40
## HEALTH AND WELFARE COVERAGE

**All Sections**. Same as Principal Agreement.

## ARTICLE 41
## NON-DUPLICATION OF BENEFITS

**All Sections**. Same as Principal Agreement.

## ARTICLE 42
## PENSION

**All Sections**. Same as Principal Agreement.

## ARTICLE 43
## HEALTH AND WELFARE OR PENSION DELINQUENCIES

**All Sections**. Same as Principal Agreement.

## ARTICLE 44
## NO DISCRIMINATION

**All Sections**. Same as Principal Agreement.

## ARTICLE 45
## UNION REPRESENTATION VISITATION

**All Sections**. Same as Principal Agreement.

## ARTICLE 46
## JOINT LABOR MANAGEMENT COMMITTEES

**All Sections**. Same as Principal Agreement.

## ARTICLE 47
## UNION STEWARDS

**All Sections**. Same as Principal Agreement.

## ARTICLE 48
## GRIEVANCE AND ARBITRATION PROCEDURE

**All Sections**. Same as Principal Agreement.

## ARTICLE 49
## NO STRIKE OR LOCKOUT

**All Sections**. Same as Principal Agreement.

## ARTICLE 50
## STORE AND PLANT CLOSING

**All Sections**. Same as Principal Agreement.

## ARTICLE 51
## BULLETIN BOARD

**All Sections**. Same as Principal Agreement.

## ARTICLE 52
## UNION STORE CARDS

**All Sections**. Same as Principal Agreement.

## ARTICLE 53
## UNIFORMS/EQUIPMENT

**All Sections**. Same as Principal Agreement.

## ARTICLE 54
## SAVINGS CLAUSE

**All Sections**. Same as Principal Agreement.

## ARTICLE 55
## TERM OF AGREEMENT

**All Sections**. Modify dates as agreed in the Principal Agreement.

## COST OF LIVING ALLOWANCE/
## LETTERS OF UNDERSTANDING

Same as Principal Agreement as is applicable.

## APPENDIX A
## DENVER-KING SOOPERS CLERKS AGREEMENT

| Classification | Job Code | Effective 06/30/96 | Effective 07/06/97 | Effective 07/05/98 |
|---|---|---|---|---|
| **Catering Clerk** | | | | |
| 1st 1040hours | CTO1 | $6.81 | $6.94 | $7.08 |
| 2nd 1040 hours | CTO2 | 7.53 | 7.67 | 7.82 |
| Thereafter | CTO9 | 8.42 | 8.59 | 8.75 |
| | | | | |
| **Catering Captains** | | | | |
| Thereafter | CT1O | $11.48 | $11.70 | $11.92 |

On-call employees shall receive the same pay rate as Catering Clerks.

## INCENTIVE PLAN

Effective the 4th Quarter of 1990, Catering Clerks and Captains shall begin to participate in the Incentive Plan contained in the Principal Agreement. Concurrent with such participation, such employees shall cease to participate in any other Incentive Plan.

# LETTER OF AGREEMENT

## #13

## KING SOOPERS #8 - BOULDER FLOATER POOL. DATED 2/8/94

1) Meat market at King Soopers #8 will be allowed to schedule for emergency situations out of the Boulder Bargaining Unit Floater Pool by seniority.

2) Floaters can only be scheduled at two (2) week intervals King Soopers #8.

3) Hours of work assigned to floaters shall be those of Meat Cutter's hours in King Soopers #8 which cannot be covered by Meat Cutters in King Soopers #8.

4) Overtime hours shall continue to be assigned as directed by the Broomfield Collective Bargaining Agreement.

**The original document was signed by Susan Meader on 2/8/94 and Alfonso Pacheco on 2/11/94 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #14
## ASSIGNMENT OF OVERTIME TO MEAT CUTTERS.  DATED 11/17/94

WHEREAS, the above parties entered into a Letter of Agreement Floater Pool in the contract negotiations of 1990 and agreed to continue this letter into the contract which has its term May 9, 1993 to May 11, 1996;

WHEREAS, there have been grievances filed and there is a dispute over the manner in which overtime hours as determined by management in excess of four (4) hours has been assigned;

THEREFORE, it is understood that the below listed procedure will be used in assignment of overtime as determined by management in excess of four (4) hours. Notwithstanding this agreement the Employer reserves the right to assign hours of work to Meat Cutters able to work at straight time before this procedure applies.

1. Overtime in excess of four (4) hours shall be first offered to employees in the Meat Cutter classification who are scheduled forty (40) hours in the location the overtime is needed the week in which the overtime is needed;

2. If no meat cutter in the store accepts such hours any employee classified as a "Meat Cutter" within the district who signs the overtime request list, shall be called in seniority order by the District scheduler or other designated employer representative to fill the needed hours. The district scheduler or other designated employer representative shall have the store schedules to determine which Meat Cutters are available for overtime. Bargaining units that do not have districts, shall be considered as one district for the purpose of this agreement.

   If no Meat Cutter's on the district overtime request list accept the overtime assignment, the district scheduler or other designated employer representative will fill the overtime assignment pursuant to Article 30, section 86 of the collective bargaining agreement.

   In the event the district scheduler or designated employer representative reaches a telephone recording device he/she is to leave a message that he/she was calling to offer overtime to the person, the time of the call and that he/she will: 1) continue calling until an employee willing to work the overtime is found, or 2) wait for a specified period of time before he/she continues calling the list.

3. The overtime request list shall contain the Meat Cutter's name, home telephone number, regularly scheduled store location and telephone number and locations where the meat cutter is willing to work within the assigned district. Meat Cutter's are responsible for updating the information on the overtime request list, in writing, whenever there is a change in the information.

4. A meat cutter may sign or remove his/her name from the overtime request list during the following time periods or under the following circumstances:

   a. During the first fifteen (15) days of January or the first fifteen (15) days of July (to become effective during the first workweek of February and August, respectively);

80

b. Within fifteen (15) days after the Meat Cutter is transferred (whether voluntary or involuntarily) between districts or bargaining units;

c. Within fifteen (15) days after the Meat Cutter is called back from a lay off or called back to a Meat Cutter's position from a lower classification.

The Meat Cutter's request shall be submitted in writing to the Meat Manager of the Store he/she is based or the District Scheduler. The request shall remain in effect until the Meat Cutter voluntarily removes his/her name from the overtime request list.

5. The above understanding resolves the issue of "Assignment of Overtime to Meat Cutters" and settles the language issues of grievances #831-91 and 832-91. The parties agree to submit the "Back-pay issue of the grievances to arbitration. It is understood that both parties reserve their right to the arguments and positions held throughout the grievance procedure, settlement meetings, and any other discussions or agreements on this issue in the matter of the "Back Pay" arbitration.

6. Either party may cancel this agreement, except for the provisions of #5 above, with 30 days advance written notice, anytime after May 1, 1995.

**The original document was signed by Susan Meader on 11/17/94 and Alfonso Pacheco on 11/29/94 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #15
## AMEND SEAFOOD/SUSHI BAR.  DATED 9/14/94

King Soopers and UFCW Local No. 7 hereby agree to the following understanding regarding the operation of Sushi Bar operations.

1) The Employer may open Sushi Bar operations which shall be a part of the Seafood Department.  The Employer may carry pre-processed and packaged sushi.

2) The Employer may employ a maximum of three (3) Sushi Bar chefs in each combined Seafood/Sushi Bar Department.  Fully qualified Sushi chefs shall be paid the following rate(s):

   | | |
   |---|---|
   | Effective 9/11/94: | $13.50 |
   | Effective 5/7/95: | $13.86 |

   In the event the Employer elects to advance, and qualify, a Butcher Block clerk to the position of Sushi Chef, such clerk shall continue to remain in the Butcher Block rates until such time the clerk becomes a fully qualified Sushi chef

3) Sushi Bar Chefs will be considered as a separate group for the purpose of applying the seniority provisions of Articles 27, 28, 30, 31, 32, 33, and 46, except that in operation, Sushi chefs shall be allowed to exercise their seniority, upon layoff, to bump into the Butcher Block classification.

4) The Employer may utilize, for a period not to exceed three (3) weeks from the date of opening a Sushi Bar, a trainer to assist in the training and development of Sushi Bar Chefs and Butcher Block clerks.  Such trainer shall be able to perform any work in the Sushi Bar during such training period.

5) In executing this agreement, neither party waives any right or position it has relative to the grievances filed and pending regarding seniority applications between classifications in the meat bargaining unit.

**The original document was signed by Steve DiCroce and Alfonso Pacheco on 9/14/94 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #16
## MEAT WRAPPER FLOATER POOL.  DATED 11/2/95

Effective the second Sunday following execution of this Agreement, the parties agree to add a Meat Wrapper Floater Pool in all bargaining units on the same basis as such pools operate under the Meat Cutter Floater Pool Letter of Understanding (Colorado Springs, Pueblo, & Denver).

**The original document was signed by Susan Meader and Gary Hakes on 11/2/95 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #17
## KING SOOPERS #8 MEAT DEPARTMENT UTILIZATION OF NORTHERN DENVER MEAT FLOATER POOL. DATED 1/27/94

It is mutually agreed between United Food and Commercial Workers Local No. 7 and King Soopers that King Soopers' store #8 Meat Department will be able to utilize the North Denver Meat Floater Pool for two weeks starting January 30, 1994 and ending February 12, 1994. This is temporary agreement pending the signing of a letter of understanding.

**The original document was signed by Gordon Mann and Al Pacheco on 1/27/94 and is on file at the King Soopers *Labor* Relations Department.**

# LETTER OF AGREEMENT
## #18
## RETAIL MEAT CONTRACT STORE #42 IN LONGMONT.  DATED 11/19/93

It is understood and agreed by the parties referenced above that notwithstanding the work that can be performed by non-bargaining unit personnel under the Principal Agreement that further use of non-bargaining unit employees in the delicatessen department is allowed under the following conditions:

I.  All Delicatessen Department employees have had their hours maximized.

2.  Work to be performed by non-bargaining unit members is of this nature:

   a)  For major or extensive cleaning of the department or department equipment or facilities.

   b)  For decoration of department for holidays or Employer promotions, including the hanging of signs, with our without prices.

   c)  For use in the Employer's marketing promotions of the delicatessen's products or services.

   d)  Extra-ordinary or emergency situations which are unplanned and failure to provide such assistance would result in an unsafe or compromising situation for either a King Soopers Guest or employee.

**The original document was signed by Susan Meader on 11/18/93 and Alfonso Pacheco on 11/19/93 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #19
## KING SOOPERS AND UFCW LOCAL NO. 7 LETTER REGARDING
## LAYOFFS, REDUCTION IN HOURS, AND SENIORITY.  DATED 6/22/95

Effective the first Sunday after ratification in all meat bargaining, King Soopers and the UFCW Local No. 7 hereby agree as follows:

The parties agree to modify the principal agreement (s) of each bargaining unit as follows:

1) Article 32 - Layoffs shall be amended as follows:

   5. The Employer shall prepare a combined seniority roster of all meat cutters and wrappers employed in all retail meat bargaining units. In the event a retail cutter or wrapper, is laid off and there is no less senior cutter or wrapper, at retail, within their current bargaining unit to displace, such cutter or wrapper, shall be allowed to displace the least senior employee in their same classification and status on the combined seniority roster. It is understood that it shall not be a violation of any of the meat agreements (s) for employees of other meat bargaining units to exercise their right to bump into another bargaining unit.

   6. In the event a retail cutter or wrapper is laid off and there is no less senior cutter or wrapper, at retail, within their current bargaining unit to displace, such cutter or wrapper, shall be allowed to displace the least senior employee in their same classification at the Meat Plant. It is understood that it shall not be a violation of the Denver Agreement for employees of other meat bargaining units to exercise their right to bump into the Meat Plant.

2) It is understood that recall from layoff shall be limited to vacancies within the bargaining unit the employee is employed.

3) Article 31 - Reduction in hours add the following paragraph to the end of Article 31:

   Full-Time employees who have been reduced to part-time and who are the least senior full-time employee in their bargaining unit shall, in their fifth *(5th)* consecutive week of such reduced hours, be allowed to exercise their seniority to claim the schedule of the least senior full-time employee on the combined all meat bargaining unit seniority list within the Retail Meat classification or of the least senior employee of the meat plant in their classification whose work they are qualified to perform. Such requests must be made to the store manager prior to the posting of the following week's schedule. It is understood that the employee may exercise this right between the fifth *(5th)* and eleventh (11th) week of reduction. The employee's 78 schedule claimed under this paragraph shall immediately be re-classified to part-time at that store or laid-off. It is understood that it shall not be a violation of the Denver Agreement for employees of other meat bargaining units to exercise their right to displace into the Meat Plant.

II.     The parties agree to modify the meat plant supplement as follows:

1)     Article 27 - Seniority: add to the list of departments:

8.     Retail Cut Line

2)     Article 27 - Seniority: re-write the second paragraph to lead:

An employee thus displaced from his classification in the Plant shall have the option of displacing the least senior person in the same classification in the stores in the Denver bargaining unit, or displacing the least senior employee in a lower classification in the plant whose job he is qualified to perform, provided any displaced employee has lesser seniority. In the event a plant cutter or wrapper is laid off and there is no less senior full-time cutter or wrapper, at retail in the Denver bargaining unit, such full-time cutter or wrapper, shall be allowed to displace the least senior employee in their same classification and status on the combined all meat bargaining unit seniority roster.

III.    The Union agrees to withdraw without prejudice grievance number (s): 1102-93, 1103-93, 159-93, 1160-93, 1292-93, 1301-93, 1368-93, 1369-93, 1370-93, 1371-93, 1372-93, 1373-93, 1374-93, 1375-93, 1377-93, 1378-93, 0071-94, 0093-94, 0249-94, 0261-94, 0262-94.

**The original document was signed by Steve DiCroce and Gary Hakes on 6/22/95 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #20
## RESTAURANT AGREEMENT.  DATED 7/3/91

The Employer may open Restaurants which shall be a part of the Delicatessen Department. The Restaurant shall be an area that is set-up and maintained as a traditional and/or fast food styled restaurant. Items sold in the restaurant will be for immediate human consumption. All work performed within the restaurant shall be performed by Delicatessen Department employees, which may include a maximum of two (2) restaurant Chefs per Restaurant. Chefs shall only perform work in the Restaurant connected with the cleaning of the Restaurant and preparation and selling of food prepared and sold in the Deli Department. The Employer retains the right to select Restaurants Chefs and to assign them shifts and days off. Nothing herein shall prevent Restaurant Chefs from using equipment or tools in the Deli Department necessary to the Restaurant operation. Restaurant Chefs will be considered as separate groups for the purpose of applying the seniority provisions of Articles 27, 28, 30, 32, 33, and 46.

The Employer may employ Restaurant Cooks in each Restaurant. Restaurant Cooks shall assist the Restaurant Chefs in the performance of their duties. The Employer retains the Tight to select five (5) such cooks at its discretion.  It is understood that all openings for cook positions in excess of five (5) shall be posted within the store and deli where the opening occurs. The Employer agrees to promote the senior qualified Deli Clerk to these cook position (s) and train if necessary. It is understood that in the event any of the original five (5) cooks leave their position, the Employer retains the right to replace such employees at its discretion Nothing herein shall prevent Restaurant Cooks from using equipment or tools in the Deli Department necessary to the Restaurant operation. Except for incidental service needs, cooks shall not be scheduled to wait on the counter, or be allowed to cover the counter for breaks and lunches. Restaurant Cook will be considered as separate groups for the purpose of applying the seniority provisions of Article 27, 28, 30, 32, 33 and 46.

No Restaurant employee shall be allowed to prepare fresh "case ready" meat as the term is used in the collective bargaining agreement.

It is understood and agreed that in Deli departments which operate a Restaurant, the Employer shall be allowed to employ one additional Assistant Deli Manager in the Deli Department for every 18 non-management employees employed in the Deli/Restaurant. Such Assistant Managers shall not be scheduled to work similar work shifts as the Deli Manager unless in training. (Overlap of shifts between the Assistant and Manager is recognized as long as they are not essentially working the same shift) No Deli is required to have an Assistant Manager.

Restaurant Chefs shall be paid at the Assistant Deli Manager rate of pay. Restaurant Cooks shall be paid at the third, fourth and Thereafter rate progressions of the Deli Clerk classification.

The Company agrees that when a Deli Clerk is assigned by the Employer to assume the duties and responsibilities of the Deli Chef for a continuous period of one (1) week or more, such employee shall be paid the Deli Chef rate of pay for all hours worked while so assigned. The Employer retains its right not to employ a Deli Chef in any of its stores. Dishes shall be considered equipment for the purpose of the agreement.

**The original document was signed by Steve DiCroce on 6/21/91 and Ernest L. Duran 7/3/91 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF UNDERSTAND

## #21

## KING SOOPERS, INC. AND UFCW LOCAL NO. 7 LETTER REGARDING DRESS REQUIREMENTS. DATED 4/1/97

Effective October 1, 1996, in addition to published grooming requirements, employees shall be expected to report to work as follows: White oxford (long or short sleeved) shirt. Sweatshirts are not permitted (except King Soopers employees may wear King Soopers Logo sweatshirts), but black or navy cardigan style sweaters are permitted, as are cardigan vests. Undershirts with printing, logos or designs that show through are *not* permitted. The Company provided name badge must be worn while on duty. Black (and/or Khaki at King Soopers) dress type pants of dress wool, cotton, knit, or black Non-faded denim material in good condition and repair, which shall be provided by the employee. "Dockers" type pants are acceptable, sweats, stirrup pants, stretch pants, spandex, etc. are prohibited. Shoes must be black or white, clean and in good condition. Open toe or open heel shoes are not permitted. Laces must be black. Socks or nylon hose must be worn with the shoes. Courtesy Clerks may wear shorts between May 1 through September 30 provided they are *of the* same material allowed above. The Company will provide one (1) necktie and two (2) aprons, which will be replaced by the Company if worn out or damaged as a consequence of normal wear and tear. Employees will be required to replace at their cost lost ties and aprons. Meat cutters and wrappers shall be provided smocks/coats in lieu of aprons or vests.

**The original document was signed by Steve DiCroce on 4/1/97 and Gary Hakes on 4/17/97 and is on file at the King Soopers Labor Relations Department.**

## DELI SCHEDULING PROCEDURES. DATED JULY 1996

King Soopers and UFCW Local No. 7 hereby agree to the following Letter of Understanding for Meat Bargaining Units in the State of Colorado. This letter shall remain in full force and effect unless the parties mutually agree to suspend its provisions and return to the current Agreement.

1) This letter is limited to employees of the Delicatessen Department. The following provisions shall supersede and replace the existing provisions of the Collective Bargaining Agreement as such provisions apply to Delicatessen Department employees.

Delete Article (5) 11 (Section 32), 16 (Section 46), 18, 19, 20, 28 (Sections 77, 78, 79, and 81) and 29. Re-write Article 28, Sections 76 to read:

**Section 76. Work Schedules and hours**. Management retains the right to determine the number of hours, and start and stop time of each shift, to be worked within each department and store. Daily scheduled shifts shall not be less than four (4) hours or more than eight (8) hours at straight-time. Not later than ten (10) days prior to the start of any workweek, management shall post a list of shifts for each department. Non-Management, employees shall be allowed to select their schedule from the posted list of shifts for which they are qualified to perform, in seniority order, within their department. Full-Time employees shall select first, followed by Part-Time employees. No employee shall be allowed to select a schedule that will result in overtime or other penalty provision, unless expressly authorized by management. The employee's selection shall be recorded on a master work schedule. Employees shall not be permitted to select a portion of a shift. Prior to the start of the selection process, management shall identify approved vacation requests on the schedule. Employees may request, subject to availability, to take not more than one (1) of their personal holidays per calendar year on a specific day to be scheduled prior to the selection of shifts by other employees.

Management may allow employees of one department to select shifts in another department. In this event, the employee must be qualified as defined herein, to perform the work of the other department. In addition, management reserves the right to assign, at its discretion, employees to, and designate the starting time of, any ordering shift.

Employees must immediately make their shift selections at the time directed by management. If an employee fails to promptly select, management shall select on behalf of the employee based on the employee's last written scheduling preference request. In this event, the employee waives all rights to grieve management's scheduling selection.

Unless otherwise approved, or as the result of a reduction in hours, no Full-Time employee shall select less than forty (40) hours and no Part-Time employee shall select less than twenty (20) hours per week. Management may require junior employees to select a specific number of shifts so as to facilitate the selection of all shifts from the list. In the event an employee is left with less than minimum hours, but has not been zeroed out, management may pull shifts in reverse seniority order from senior employees to get such employee to minimum hours, or management may elect to zero such employee out and assign any remaining hours in Seniority order to senior employees

The Master schedule must be completed and posted by 9:00 am on Friday prior to the start *of the* next *workweek. Such schedule* shall not be changed by management for that particular workweek except where such change is predicated on circumstances beyond the control of management such as sickness, injury, leaves of absence, vacations, jury duty, funeral leave, significant fluctuations in sales volume, utility failure or Acts of God. Nothing in this section should be *construed as* preventing management from calling in employees for extra work outside of the posted schedule, from requiring overtime *work* outside of the posted schedule, or from bringing in additional employees where it appears advisable in the opinion of management If the schedule is changed pursuant to this section, and hours are reduced, then the master schedule shall be re-bid downward, from the *point* of the schedule change. *If* hours are added, such hours shall be assigned as provided in the additional hours section of this Agreement.

For purposes of this Article; non- management positions are defined as those below the level of Assistant Deli Manager. Time spent by employees selecting shifts shall not be considered compensable work. Time, but, notwithstanding, management may permit employees to select shifts on Company time. To be considered qualified, the employee must have been previously classified as, trained for and have worked the job assignment for a minimum of six (6) months within the last two (2) years. Training hours, as designated by management, shall not be subject to selection by employees.

<u>Additional Hours:</u> Management shall post a weekly additional hours request list. Employees interested in working additional hours must sign and designate the days they are interested in working additional hours on such list by midnight of the Saturday prior to the start of the applicable workweek. When additional hours become available, management shall contact, in seniority order, employees who have requested to work on the day indicated on the request list and offer them the hours. If the hours cannot be assigned to the employees requesting them, then management may fill the hours at its discretion. Nothing in this section shall be construed to require management to assign hours at overtime or to employees who have not made a request to work additional hours.

## LETTER OF AGREEMENT
## #23
## MEAT WRAPPER RATES.  DATED 8/6/01

August 6, 2001


Mr. Ernest L. Duran, Jr.
UFCW, Local 7
7760 W. 38th Avenue, Suite 400
Wheat Ridge, CO 80033

     Re: Meat Wrapper Rates

Dear Mr. Duran:

     I had previously discussed with John Mathewson and Ilene Wolfe about moving the entry rate up for meat wrapper.  If you are in agreement, new hire wrappers, and anyone currently in the 1st and 2nd progression rates, will be paid at the 3rd progression level.

     We reserve the right to resume hiring at the first progression rate upon written notice to the Union.

     If you are in agreement please sign this letter and return a copy to me.


**The original document was signed by Steve DiCroce on 8/6/01 and Ernest L. Duran on 8/7/01 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## # 24
## AMEND SEAFOOD/SUSHI BAR. DATED 8/18/05

King Soopers and UFCW Local No. 7 hereby agree to the following understanding regarding the operation of Sushi Bar operations.

1)      The Employer may open Sushi Bar operations which shall be a part of the Seafood Department. The Employer may carry pre-processed and packaged sushi.

2)      The Employer may employ a maximum of three (3) Sushi Bar chefs in each combined Seafood/Sushi Bar Department. Fully qualified Sushi chefs shall be paid the following rate (s):

Effective 8/21/05: $16.04

In the event the Employer elects to advance, and qualify, a Deli, Butcher Block Clerk Or Meat Wrapper to the position of Sushi Chef, such clerk shall continue to remain at their current rates until such time the clerk becomes a fully qualified Sushi chef.

3)      Sushi Bar Chefs will be considered as a separate group for the purpose of applying the seniority provisions of Articles 27, 28, 30, 31, 32, 33, and 46, except that in operation, Sushi chefs shall be allowed to exercise their seniority, upon layoff, to bump into any lower classified position within the department in which they are assigned and working.

4)      The Employer may utilize, for a period not to exceed three (3) weeks from the date of opening a Sushi Bar, a trainer to assist in the training and development of Sushi Bar Chefs and other department employees. Such trainer shall be able to perform any work in the Sushi Bar during such training period.

**The original document was signed by Stephanie Bouknight and Kevin R. Schneider on 08/18/05 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT
## #25
## CULINARY HEAD CLERK CLASSIFICATION.  DATED 10/6/05

**Between**
**King Soopers**
**And**
**UFCW Local 7**

King Soopers and UFCW Local 7 in accordance with Article 7, Section 24, New Classification, of the Meat Agreement, agree to add the Classification of Culinary Head Clerk as follows:

**CULINARY HEAD CLERK** - Culinary Head Clerks may be designated at the discretion of management and is not a required classification. However, not more than one employee per store, per Deli, may be designated as a Culinary Head Clerk.

A Culinary Head Clerk is an employee who has been assigned to oversee the chef program management of the specialty cheese program and assist in the management and training of the Deli department

These Employees will receive the same rate of pay as an assistant deli manager and will be considered a separate classification for the purposes of seniority related issues, such as scheduling promotions, layoffs, reduction of hours, vacation, etc.

**The original document was signed by Stephanie Bouknight and Kevin R. Schneider on 10/06/05 and is on file at the King Soopers Labor Relations Department.**

**Between**
**King Soopers**
**And**
**UFCW Local 7**

King Soopers and UFCW Local 7 hereby agree to the following understanding regarding the operation of Starbucks Coffee Shops.

1) The parties agree to the establishment of a new classification of Starbucks Clerk that shall be part of current King Soopers, and UFCW Local7 retail Meat Agreement.

2) All duties associated with the preparation and serving of Starbucks beverages sold in the Starbucks Coffee Shop shall be performed exclusively by employees designated as Starbucks Clerks. Other merchandise, to include Starbucks Brand products and merchandise, and pastries sold in the Starbucks Coffee Shop will be handled by Starbuck Clerks.

3) Starbucks Clerks shall be subject to all the terms and conditions of the Meat Agreement except that the Company may fill this position at its discretion and such employees in the Starbucks Clerks classification cannot be bumped or otherwise displaced by employees in any other classification.

4) The rates of pay for a Starbucks Clerk shall be the same as the Deli Clerk classification.

5) One Starbucks Lead Person per store may be designated by the Employer at its discretion and will not be prohibited from performing any duties in the Starbucks Coffee Shop. The rate of pay will be $16.06 per hour.

6) It is understood and agreed that management retains the right to determine the number of hours and start times of each shift to be worked within the Starbucks Coffee Shop. Hours worked in the Starbucks classification cannot be claimed by employees in other classifications,

7) Employees in the Starbucks Department will be required to wear a Starbucks uniform.

8) In the event of a layoff, employees will have the right to, 1) displace the least senior Starbucks clerk or Lead in the bargaining unit, 2) bump the least senior Deli Clerk in the bargaining unit if they, have six (6) months of Deli experience with King Soopers.

**The original document was signed by Stephanie Bouknight and Kevin R. Schneider on 10/6/05 and is on file at the King Soopers Labor Relations Department.**

# Letter of Agreement

The United Food and Commercial Workers Union, Local No. 7 (hereinafter the "Union"), and King Soopers (hereinafter the "Employer"), hereby agree to resolve all pending and future grievances protesting the issuance of verbal and written warnings (not related to sexual harassment) as follows:

A. If the issuance of a verbal or written warning is grieved, the Union will notify the Employer of the same.

B. If the grievant is disciplined further, or otherwise adversely affected, and the verbal or written warning is relied upon by the Employer in doing so, the Union shall have the right to submit the grievance protesting the warning to arbitration together with the grievance contesting the disciplinary or adverse action. It is expressly agreed that all such grievances will be consolidated.

C. It is further agreed that said grieved verbal or written warnings shall be removed from all files after a period of two (2) years if not relied upon for further discipline.

United Food and Commercial
Workers Union, Local No. 7

King Soopers

By: _Kevin R. Schneider_

By: _Stephanie Boulright_

Dated: _1-26-06_

Dated: _1-26-06_

Letter of Agreement
Between
King Soopers
And
UFCW Local 7

King Soopers and UFCW Local 7 in accordance with Article 7, Section 24, New Classification, of the Meat Agreement, agree to add the Classification of Culinary Head Clerk as follows:

**CULINARY HEAD CLERK-** Culinary Head Clerks may be designated at the discretion of management and is not a required classification. However, not more than one employee per store, per Deli, may be designated as a Culinary Head Clerk.

A Culinary Head Clerk is an employee who has been assigned to oversee the chef program, management of the specialty cheese program and assist in the management and training of the Deli department

These Employees will receive the same rate of pay as an assistant deli manager and will be considered a separate classification for the purposes of seniority related issues, such as scheduling, promotions, layoffs, reduction of hours, vacations, etc.

_Stephanie Boulanger_ 10-6-05        _Kevin R. Schneider_ 10-6-05
King Soopers                    Date        UFCW Local7                    Date