# AGREEMENT

Between

## KING SOOPERS INC.,
### A DIVISION OF DILLON COMPANIES, INC.

and

## UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7,
### DENVER, COLORADO
### Chartered by the
### UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO

Colorado Springs, Colorado **(Clerks)**

TERM: September 12, 2004 through May 9, 2009



EXHIBIT
M

# TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---|---|---|
| 1 | Recognition and Exclusions | 4 |
| 2 | Bargaining Unit Work Jurisdiction | 5 |
| 3 | Union Security and Conditions | 6 |
| 4 | Check-Off | 6 |
| 5 | New Employees, Transferred Employees, Promoted or Demoted | 7 |
| 6 | Rights of Management | 7 |
| 7 | Definitions of Classifications | 8 |
| 8 | Rates of Pay | 11 |
| 9 | Prior Experience | 11 |
| 10 | Scheduling and Assignment of Hours | 12 |
| 11 | No Reduction in Pay | 16 |
| 12 | Overtime | 16 |
| 13 | Sunday Premium | 16 |
| 14 | Travel Between Stores | 17 |
| 15 | Night Premium | 17 |
| 16 | Holidays and Holiday Pay | 18 |
| 17 | Vacations | 19 |
| 18 | Minimum Weekly Schedule | 21 |
| 19 | No Free Work | 21 |
| 20 | Time Cards | 21 |
| 21 | Split Shifts | 21 |
| 22 | Store Meetings | 22 |
| 23 | Reporting Pay | 22 |
| 24 | Lunch Breaks | 22 |
| 25 | Relief Periods | 22 |
| 26 | Probationary Period | 23 |
| 27 | Seniority | 23 |
| 28 | Unscheduled Overtime | 27 |
| 29 | Layoffs | 27 |
| 30 | Transfer from Store to Store | 29 |
| 31 | New Store Language | 29 |
| 32 | Leaves of Absence | 29 |

# TABLE OF CONTENTS

| ARTICLE | TITLE | PAGE |
|---------|-------|------|
| 33 | Funeral Leave | 31 |
| 34 | Jury Duty | 32 |
| 35 | Sick Leave | 32 |
| 36 | Injury on the Job | 34 |
| 37 | Health & Welfare Coverage | 34 |
| 38 | Non-Duplication of Benefits | 39 |
| 39 | Pension | 39 |
| 40 | Discharge and No Discrimination | 41 |
| 41 | Union Representation Visitation | 42 |
| 42 | Union Steward | 42 |
| 43 | Dispute Procedure | 43 |
| 44 | No Strike or Lockout | 44 |
| 45 | Store Closing | 45 |
| 46 | Bulletin Board | 46 |
| 47 | Union Store Cards | 46 |
| 48 | Lie Detector Tests | 46 |
| 49 | Uniform / Equipment | 47 |
| 50 | Pharmacy Technicians | 47 |
| 51 | Master Safety Committee | 47 |
| 52 | Joint Labor Management Committee | 48 |
| 53 | Saving Clause | 48 |
| 54 | Apprentice Advancement | 48 |
| 55 | Technological Changes | 49 |
| 56 | Entire Agreement | 50 |
| 57 | Term of Agreement | 50 |
|  | Cost of Living Allowance | 51 |
|  | Appendix "A" | 52 |
|  | Letter of Understanding – Employee Buyout | 57 |
|  | Letter of Understanding – Courtesy Clerks | 58 |
|  | Letters of Agreement | 59 |

**A G R E E M E N T**

**Between**

**KING SOOPERS INC.,**
**A DIVISION OF DILLON COMPANIES, INC.**

**and**

**UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7,**
**DENVER, COLORADO**
**Chartered by the**
**UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO**

**Colorado Springs, Colorado  (Clerks)**
**TERM:  September 12, 2004 through May 9, 2009**

THIS AGREEMENT is made and entered into by and between KING SOOPERS INC., a Division of Dillon Companies, Inc., hereinafter referred to as the "Employer" and UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 7, Denver, Colorado, chartered by the United Food and Commercial Workers International Union, AFL-CIO, hereinafter referred to as the "Union".

## ARTICLE 1

## RECOGNITION AND EXCLUSIONS

**Section 1.**  The Employer recognizes the Union as the sole collective bargaining representative for all employees actively engaged in the handling and selling of merchandise, including part-time workers who work regularly one (1) day or more a week, employed by the Employer in the grocery store or stores owned or operated by the Employer within the metropolitan area of Colorado Springs, Colorado (such jurisdiction to apply to current stores represented by this Union and future stores only of the Employer), but excluding all store managers, first assistant managers, associate managers, service and grocery managers, office and clerical employees, meat department employees, delicatessen department employees, demonstrators, watchmen, guards, professional employees and supervisors as defined in the National Labor Relations Act as amended.

Within the geographical jurisdiction of this Agreement, any new stores opened by the Employer shall be accreted and shall be covered by the terms of this Agreement.

## ARTICLE 2

## BARGAINING UNIT WORK JURISDICTION

**Section 2.** All work and services performed in the bargaining unit connected with the handling or selling of merchandise to the public shall be performed exclusively by bargaining unit members except as provided below. Store Managers, Assistant Managers, Field Merchandisers can perform all duties in the store.

## AUTHORIZED WORK FOR VENDORS

**Section 3.** Vendor Work: Direct store vendors who deliver the product categories of beverages (including juice sold in produce/deli departments), cookies and crackers, bakery, pizza, ice cream, chips, specialty/gourmet/natural foods, greeting cards (and related products such as bows, wraps, candles, balloons, ribbons), newspapers, magazines, books and related products shall be allowed to perform all work in connection with the sale of their products directly delivered to the store. For purpose of this provision, the product categories as used herein shall be interpreted to include all products delivered by such vendor. Additionally, all vendors shall be allowed to stock and otherwise maintain any J-Hook or Clip strip program. Additionally, all vendors may perform: any work in connection with promotional and seasonal displays; facing in connection with the service of product; rotation of product; cleaning of product, shelves and racks; affixing coupons and other promotional materials to products; vendors shall be permitted to perform three (3) major resets per store per section per calendar year. Additionally, vendors may perform work, as necessary to accommodate the introduction of new items, or removal of discontinued items, from the set; checking of code dates and removal of out-dated product; and any work in connection with the opening of a new store and the two (2) week period thereafter, or during the two (2) weeks before and after a store remodel.

**Section 4.** Work Jurisdiction. Except for sanitation and floor maintenance, the Employer agrees not to subcontract operations existing within the stores. The Employer agrees that no employee classified as a Sanitation Clerk or Sanitation Manager on May 11, 1996 shall be laid-off or reduced in hours as a result of the subcontracting of floor care or expansion of Courtesy Clerk duties. However, the Employer reserves the right to promote Sanitation Clerks and\or Managers to All Purpose Clerk vacancies in order to provide for the use of outside contractors for floor maintenance and sanitation work. It is understood that before a full-time Sanitation Clerk is advanced to a full-time All Purpose Clerk position, such employee must have more seniority than the most senior employee on the All Purpose Clerk full-time list for the vacancy. It is understood that Sanitation Clerks protected herein may be assigned hours in lower classifications, at their sanitation rate, for purpose of meeting the job security provision of this section.

5

Subcontracting is defined as a contractual relationship with another employer whereby employees of that employer perform the work of bargaining unit employees. A purchase order is not a subcontracting agreement.

## ARTICLE 3

## UNION SECURITY AND CONDITIONS

**Section 5.** Union Membership. It shall be a condition of employment that all employees covered by this Agreement who are members of the Union on the effective date of this Agreement shall remain members, and those who are not members on the effective date of this Agreement shall, on the thirty-first (31st) day following the effective date of this Agreement, become and remain members in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, on the thirty-first (31st) day following the beginning of such employment, become and remain members in the Union.

**Section 6.** For the purpose of Section 5 above, the execution date of this Agreement shall be considered as its effective date.

**Section 7.** Delinquent Members. Whenever the Union requires the Employer to discharge any employee for failure to join or maintain his membership in the Union in accord with the terms of this Article, the Union agrees to furnish the Employer an itemized copy of the delinquent's account with the Union together with a written request for discharge. The Employer will discharge any employee who falls within the bargaining unit as described in Section 1 hereof within ten (10) days after the receipt of said written request for discharge, unless, within said ten (10) day period, the delinquent employee pays or tenders his delinquent initiation fee (or uniform reinstatement fee, where applicable) and/or delinquent union dues to an authorized agent of the Union.

## ARTICLE 4

## CHECK-OFF

**Section 8.** The Employer agrees to deduct the weekly union dues (including initiation fees for new employees) and uniform assessments, from the net amount due each employee in the bargaining unit as described in Section 1 hereof who has furnished the Employer (either directly or through the Union) with an individual written authorization for making such deductions on a form mutually agreed upon between the Employer and the Union. It is understood that the check-off authorization is to be entirely voluntary upon the part of each such individual employee and that any such employee may revoke his individual check-off authorization upon giving thirty (30) days' written notice to the Employer and the Union.

**Section 9.** The Employer agrees to remit all such deductions to the President of the Local Union within ten (10) days after the last pay period of each month.

**Section 10. ABC Checkoff.** The Employer agrees to deduct amounts designated by employees for the Active Ballot Club when the Employer has been furnished an individual written authorization for making such deductions on a form mutually agreed upon between the Employer and the Union. It is agreed that the ABC authorization is to be entirely voluntary upon the part of each such individual employee and that any such employee may revoke his ABC checkoff authorization upon giving thirty (30) days written notice to the Employer and the Union.

## ARTICLE 5

## NEW EMPLOYEES, TRANSFERRED EMPLOYEES, PROMOTED OR DEMOTED

**Section 11.** When an employee is hired for a job or transferred or promoted or demoted into a bargaining unit job as described in Section 1 hereof, the Employer agrees within three (3) days to fill out a mutually agreeable form in triplicate, which advises the employee of his obligation to join the Union. One (1) copy of this form will be given to the employee and one (1) copy will be mailed to the Union in a stamped, addressed envelope provided by the Union.

**Section 12. Completion of Forms For Benefit Programs.** At the time of hiring, the Employer will advise each such employee of the fact that he must become a member of the Union within thirty-one (31) days and must remain a member of the Union as a condition of employment during the life of this Agreement. The Employer will likewise furnish each such employee with the address of the Union office and name of the Union representative. Completion of any necessary applications, forms and papers for qualification under the Health and Welfare Article or any other benefit programs provided by this Agreement, shall be completed on the first (1st) day of employment, but not later than the eligibility date of participation in the various plans.

**Section 13. Off Premise Training.** Any employee who has completed his probationary period and who is sent to an off-premise training program shall not have his rate of pay reduced, and, if subsequently reclassified, shall receive the appropriate rate for the new classification. The rate of pay for attendance at the Employer's off-premise training school shall be no less than the minimum hourly rate set forth in the labor Agreement.

## ARTICLE 6

## RIGHTS OF MANAGEMENT

**Section 14.** The Employer retains the right to manage the store or stores, to direct the working forces, and to make necessary reasonable rules and regulations for the

conduct of business, providing that said rules and regulations are not in conflict with the terms of this Agreement in any way, and to establish reasonable standards of dress.

**Section 15.** Nothing in this Agreement shall be construed to prevent the Employer from placing cash registers in the Deli Department of the store and from assigning the employees of such department to operate the register.

## ARTICLE 7

## DEFINITIONS OF CLASSIFICATIONS

**Section 16.** For the purposes of this Agreement, the terms set forth below shall have the following meanings:

a.  DEMONSTRATORS. The duties of demonstrators shall not include work normally done by employees covered by this Agreement.

b.  ASSISTANT STORE MANAGER. An Assistant Store Manager and/or Associate Store Manager is an employee who serves in the capacity of the manager in the absence of the regular manager. Store Managers and Assistant Managers can perform all duties in the store.

c.  HEAD CLERK. A Head Clerk is an employee who has been assigned by the Employer to direct or supervise the work of others. The mere fact that two persons work together does not mean that one is a Head Clerk. The intent of the Head Clerk classification shall not be used to circumvent this Agreement.

d.  PRODUCE DEPARTMENT MANAGER. A Produce Department Manager is defined as the one employee in a store who manages the operation of the Produce Department under the supervision of the Store Manager.

e.  BAKERY DEPARTMENT MANAGER. The Bakery Department Manager is the employee in each store who is directly responsible to the Employer for the operation of the Bakery Department. This shall not be construed as meaning that the Employer is required to designate a Bakery Department Manager for the Bakery Department in each store which has a Bakery Department, inasmuch as the Employer may not choose to assign the managerial responsibilities to any employee within the Department, depending on the set-up in the particular store, the size of the Department, etc.

f.  NON-FOODS OR GENERAL MERCHANDISE CLERK. A non-foods or general merchandise clerk's duties shall not include operating a checkstand where food items are handled (except that non-food clerks may be assigned to work at a checkstand handling food items, providing they do not handle the merchandise where their primary duty involves the financial transactions only) or stocking or price marking food or bakery merchandise, but shall include

pricing, handling, displaying, selling and stocking those items generally considered as non-food, general merchandise or drug merchandise. Notwithstanding, in a fuel center, GM/Non-Food Clerks shall be permitted to perform all work in conjunction with the operation of the fuel center without restriction including, but not limited to, the stocking, handling and checking of food items. It is further agreed that seasonal employees working in the classifications listed above shall be excluded from the terms of this Agreement.

A Non-Foods Clerk's duties shall include operation of the currency booth and customer service counter. The Letter of Agreement concerning eighty-four (84) hours requirement shall be null and void and shall only apply to those persons currently performing work in the booth or at the customer service counter. As those persons leave those positions through attrition, the hours made available may be filled by a Non-Foods Clerk.

g.   NUTRITION CLERKS. A Nutrition Clerk is a clerk with special skills and education qualifying them to engage in sales and marketing related to the area of nutritional food products.

It is understood that the Nutrition Clerk will only be assigned in a store having a separate "Nutrition Department" and will only handle merchandise offered for sale in the Nutrition Department.

h.   SALAD BAR CLERKS.

1.   Employees promoted to the Salad Bar Classification must remain at that classification for six (6) months before moving to a higher classification.

2.   No employee in the Salad Bar Classification shall be allowed to perform work in any other classification.

3.   Any higher-rated employee in either the Retail Clerks or Meat Cutters Agreements may perform work in this Salad Bar Classification.

4.   The Employer will notify the Union when salad bar operations are opened, and also advise the Union regarding the names of employees assigned in the Salad Bar Classification.

5.   Employees on the payroll prior to ratification, shall receive the current rate of pay, plus the same amount of increases on the same effective dates as the newly negotiated rates for Salad Bar employees hired after ratification.

6. It is understood the new lower pay progression and new classification as set forth herein shall be effective the Sunday following ratification.

i. **MANAGER TRAINEES.** Manager Trainees are defined as employees identified and selected by Management to be trained for store management responsibilities. Said Trainees shall be permitted the necessary flexibility to adequately prepare for store management. This will necessitate their access to all retail and meat departments existent in the store.

Hours worked by Management Trainees shall not affect hours worked by permanent bargaining unit employees. Hours allocated to Manager Trainees shall not be included in hours chargeable to store operations as relates to allocated store hours.

j. **COURTESY CLERK DUTIES.** The duties of a Courtesy Clerk are limited to facing of shelves, checking of code dates, sorting, bagging, and packing of sold merchandise, carrying and loading of sold merchandise, floor maintenance anywhere in the store, cleaning of parking lot and other adjacent areas outside the store, cleaning all areas in the store, collecting and disposing of trash and rubbish, repair and maintenance work, collecting shopping carts, the hanging and removal of signs and decorations (it is understood that Courtesy Clerks may hang signs from the ceiling containing prices), washing windows, returning unsold merchandise to shelves or point of disposal (including salvage, reclamation, shop back and abandoned merchandise), removing merchandise from the shelf which is damaged or abandoned, removing merchandise from the shelf and replacing merchandise to the shelf in the case of equipment breakdown or housekeeping, performing price checks, handling of recycling, sorting, counting and stacking of empty containers and the placement of such containers in areas designated by the Employer and the issuing of customer refund slips related to such returns, all work connected with the selection of customer purchases from the sales floor (including the storage and retrieval thereof), the delivery of merchandise (in such instance, the employee shall receive the delivery driver rate of pay), and the filling of supply items throughout the store.

The Employer may temporarily assign any employee within the bargaining unit, including Courtesy Clerks, without regard to seniority, to assist with seasonal demands in the Floral Department. Such employee shall receive hours not claimed by regular Floral department employees in the store. Such employees shall not be assigned more than thirty (30) days from their most recent assignment date.

**Section 17. Work Between Classification**: It is understood that employees may perform incidental work in another classification without violating this Agreement. It is further agreed that where registers are placed within a department (including departments not covered under this Agreement and including employees of the

customer service center) that the employees of such department shall be allowed to operate and handle sales of merchandise presented by customers at such register. Notwithstanding, any employee of a higher classification can be assigned work in a lower classification without restriction. Production Bakers and Cake Decorators (including non-Retail Clerks bargaining unit Production Bakers and Cake Decorators) may perform Bakery Clerk work, provided that such employees do not replace a scheduled Bakery Clerk shift.

**Section 18. New Classifications.** When a new job is created by the Employer, the Union shall be notified immediately, and a new wage rate of such job shall be determined by the Employer and the Union.

## ARTICLE 8

## RATES OF PAY

**Section 19.** The minimum wages for the indicated classifications shall be as set forth in Appendix "A" attached hereto, and by this reference made a part hereof.

**Section 20.** Part-Time employment shall be computed in accord with the appropriate hourly rates set forth in Appendix "A" attached hereto, and by this reference made a part hereof.

**Section 21.** Employees must actually work the hours set forth in Appendix "A" before progressing to the next wage bracket, except as otherwise provided in this Agreement.

## ARTICLE 9

## PRIOR EXPERIENCE

**Section 22.** In applying Sections, 19 and 20 of Article 8 of this Agreement to any newly-hired employee, the Employer will give recognition to the verified number of hours of actual work experience on a comparable job which said newly-hired employee may have performed within the previous five (5) years for any other employer in a similar retail grocery operation.

Any grievance over recognition given an employee for comparable work experience at the time of his employment must be filed pursuant to the terms and conditions of the grievance procedure of this Agreement (excluding the employee's trial period).

Any employee shall receive upon request to his employer or former employer, the following information: Date of hire, date of termination, total hours worked in retail store unless such hours worked shall exceed six thousand five hundred (6,500) and then

such fact shall be stated. The employee must show evidence of employment in the grocery industry before making such request.

## ARTICLE 10

## SCHEDULING AND ASSIGNMENT OF HOURS

**Section 23. Work Schedules and Hours.** Management retains the right to determine the number of hours, and start times of each shift, to be worked within each department and store. Daily scheduled shifts shall not be less than four (4) hours or more than eight (8) hours, at straight-time.

Not later than ten (10) days prior to the start of any workweek, management shall post a list of shifts for each department. Non-management, employees shall be allowed to select their schedule from the posted list of shifts for which they are qualified to perform, in seniority order, within their department. Full-Time employees shall select first, followed by part-time employees. No employee shall be allowed to select a schedule that will result in overtime or other penalty provisions, unless expressly authorized by management. The Employee's selection shall be recorded on a master work schedule. Employees shall not be permitted to select a portion of a shift. Prior to the start of the selection process, management shall identify approved vacations requests on the schedule.

Management may allow employees of one department to select shifts in another department. In this event, the employee must be qualified as defined herein, to perform the work of the other department. In addition, management reserves the right to assign, at its discretion, employees to, and designate the starting times of, any ordering shift.

Employees must immediately make their shift selections at the time directed by management. If an employee fails to promptly select, management shall select on behalf of the employee based on the employee's last written scheduling preference request. In this event, the employee waives all rights to grieve management's scheduling selection.

Unless otherwise approved, or as the result of a reduction in hours, no full-time employee shall select less than forty (40) hours and no part-time employee shall select less than twenty (20) hours per week.

Management may require junior employees to select a specific number of shifts so as to facilitate the selection of all shifts from the list. In the event an employee is left with less than minimum hours, but has not been zeroed out, management may pull shifts in reverse seniority order from senior employees to get such employee to minimum hours, or management may elect to zero such employee out and assign any remaining hours in seniority order to senior employees.

The master schedule must be completed and posted by 9:00 AM on Friday prior to the start of the next workweek. Such schedule shall not be changed by management for that workweek except where such change is predicated on circumstances beyond the control of management such as sickness, injury, leaves of absence, vacations, jury duty, funeral leave, significant fluctuations in sales volume, utility failure or Acts of God. Nothing in this section should be construed as preventing management from calling in employees for extra work outside of the posted schedule, from requiring overtime work outside of the posted schedule, or from bringing in additional employees where it appears advisable in the opinion of management. If the schedule is changed pursuant to the this section, and hours are reduced, then the master schedule shall be re-bid downward, from the point of the schedule change. If hours are added, such hours shall be assigned as provided in the additional hours section of this Agreement.

Part-Time Courtesy Clerks shall be schedule for at least minimum hours, if available, at management's discretion.

For purposes of this Article; non-management positions are defined as those below the level of Department Head, Assistant Department Head and Head Clerk. Time spent by employees selecting shifts shall not be considered compensable work time, but, notwithstanding, management may permit employees to select shifts on Company time. To be considered qualified, the employee must have worked in the job assignment for a minimum of six (6) months within the last two (2) years. However, employees shall be qualified grocery/GM stocking or checking position if the employee has worked a minimum of three (3) months as a checker or stocker within the last three (3) years. Training hours, as designated by management, shall not be subject to selection by employees.

**Section 24. Department Bidding.** The Company shall allow during the first fifteen (15) days of February, to be effective the first workweek in March, and the first fifteen (15) days in August, to be effective the first workweek in September, non-management employees to bid within their classification and store to another department. Management retains the right to determine the number of full-time and part-time positions in each department. If a senior employee from a department bids into another department, the least senior employee in the classification and status affected shall be moved to the department vacated by the bidder. Employees may not bid into a department if such bid will result in the displacement of a booth, dairy, service desk, order, produce or frozen food clerk, unless the bidding employee has been previously classified as, trained for and work, for six (6) months or longer within the last two (2) years, in such position. Produce clerks may not bid out of the produce department unless an employee with the same status, who is qualified as described herein, has requested bid into the produce department. The Employer agrees to provide training to qualify an employee to bid into another department as a grocery/GM stocker or as a checker.

**Section 25. Additional Hours.** Management shall post a weekly additional hours request list. Employees interested in working additional hours must sign and designate

the days they are interested in working additional hours on such list by midnight of the Saturday prior to the start of the applicable workweek. When additional hours become available, management shall contact, in seniority order, employees who have requested to work on the day indicated on the request list and offer them the hours. If the hours cannot be assigned to the employees requesting them, management may fill the hours at its discretion. Nothing in this section shall be construed to require management to assign hours at overtime or to employees who have not made a request to work additional hours.

**Section 26. Temporary Advancement.** When an employee is required to perform work in a higher classification, he shall receive the higher rate, based on his experience, but if required to perform work in a lower classification, he shall retain his regular rate, except in the case of actual demotion, when the employee shall receive pay according to his classification and experience.

**Section 27. Reduction of Hours.** Part-Time Employees: If a part-time employee is zeroed out as a result of the selection of shifts, such employee shall be given layoff rights pursuant to the contract. However, if the average of all part-time employees within the classification and department is twenty-four (24) or more hours (including hours paid for vacation, sick, funeral, unworked holiday and jury duty pay) management may elect to pull hours, in reverse seniority order, from senior employees to maintain the bottom twenty percent (20%) (or three (3) employees whichever is greater) of employees within the classification and department at minimum weekly hours. An employee electing to displace pursuant to the layoff procedure shall assume the selected schedule of the employee he is bumping until he is able to select for the next workweek.

Full-Time Employees: Management shall not write a schedule of shifts that would result in a full-time employee being unable to select a forty (40) hour schedule (thirty-two (32) hours in a holiday week) unless the average scheduled hours (including hours scheduled and paid for vacation, unworked holiday, jury, sick, and funeral pay) of all part-time employees within the classification and department is twenty-four (24) hours or less for the involved workweek. A full-time employee unable to select a forty (40) hour schedule, shall in their second consecutive week of such reduced hours, be allowed to exercise his/her seniority to claim the schedule of the least senior full-time employee in the classification within the bargaining unit who is working a forty (40) hour schedule. It is understood that the employee may exercise his\her seniority to bump any time between the second and eleventh week of reduction. The employee whose schedule is claimed under this procedure shall immediately be assigned the schedule of the claiming employee, or be allowed to step-down to part-time status and displace the least senior part-time employee in their store.

The parties agree that no employee assigned as full-time on May 11, 1996, shall have his hours reduced to less than forty (40) hours as the result of this provision, unless all part-time employees in the classification have had their scheduled hours reduced to twenty-four (24) hours or less. Such full-time employee shall have his hours

14

reduced to twenty-four (24) or less before any other full-time employee protected under this paragraph is reduced.

Full-Time Employees-Competitive Openings: During the first sixty (60) days following a competitive opening, management may elect, in lieu of reducing hours as provided above, to layoff full-time employees to maintain the same proportion of full-time employees to part-time employees the store averaged in the month prior to the competitive opening. In the event of a layoff, the displaced employee shall be given the following options:

1. Displace the least senior full-time employee in the bargaining unit, or

2. Step-down to part-time and displace the least senior part-time employee within the classification and store.

Employees displaced by the full-time reduction under this procedure shall be given their layoff options pursuant to the layoff language of this Agreement.

It is understood that the provisions of this section shall apply only to those classifications impacted by a competitive opening.

**Section 28. Vacation Scheduling.** The Employer retains the right to determine the number of employees who may be on vacation at any given time. However, in no event shall it be less than one (1) person per store. If a dispute develops between employees as to vacation preference, seniority shall govern within the department, the classification and store. Any vacation weeks that become available after the posting of such roster shall be offered by seniority within the classification and store.

The Employer will post a notice December 1 of the prior calendar year, and the employees will sign the roster as to their choice of vacation. This list will remain posted for selection until January 31 of each calendar year.

Any employee who fails to sign such roster prior to January 31 will be permitted to take vacation at a time that will not interfere with the other employees' established vacation period(s).

When the vacation dates have been established, they will not be changed unless mutually agreeable between the employee and Employer.

Notwithstanding the above, employees who voluntarily transfer to another store or department after their vacation has been selected are subject to having their vacation rescheduled.

On a basis agreeable to both the Employer and employee, employees shall be allowed to schedule vacations from mid-week to mid-week. For purposes of this provision, mid-week shall be defined as a vacation starting and stopping Tuesday,

15

Wednesday or Thursday. An employee shall be considered to have met the minimum scheduling requirements of this Article if the total of the hours worked and paid for vacation (and unworked holiday if applicable) for the two workweeks involved is equal to eighty (80) for a full-time employee, forty (40) or more for a part-time employee.

## ARTICLE 11

## NO REDUCTION IN PAY

**Section 29.** No employee shall suffer any reduction of present hourly pay because of the adoption or through the operation of this Agreement, nor shall be reclassified to defeat the purpose of this Agreement unless otherwise agreed between the parties.

**Section 30.** The Employer shall not raise or subsequently lower hourly rates of pay for classifications covered by this Agreement without the mutual consent of the Union.

## ARTICLE 12

## OVERTIME

**Section 31.** Overtime compensation at the rate of time and one-half (1-1/2x) the employee's base hourly rate of pay shall be paid under the following conditions:

a. For all time worked in excess of eight (8) hours in any one (1) day.

b. For all time worked in excess of forty (40) hours in any one (1) workweek as described above.

c. For hours worked prior to an employee's scheduled starting time when less than eight (8) hours has elapsed since his last previously scheduled quitting time. (There will be at least eight (8) hours between each employee's scheduled quitting time and his next scheduled starting time.)

d. For all hours scheduled and worked on the sixth and seventh day in a workweek by part-time employees who work less than forty (40) hours in that workweek. No employee shall be permitted to claim additional hours or schedules which would provide a six (6) or seven (7) day schedule during a workweek.

**Section 32. No Pyramiding of Overtime.** It is understood and agreed that there shall be no pyramiding of overtime and premium pay for the same hours of work.

## ARTICLE 13

## SUNDAY PREMIUM

**Section 33.** The premium rate for work performed on Sunday as such shall be one and one-fourth times (1-1/4x) the employee's regular straight-time rate of pay (exclusive of Courtesy Clerks). The Sunday premium, for hours worked up to eight (8) shall in no

instance be offset against any weekly overtime which may be due under subparagraph b of Section 31 because of the fact that the employee worked over forty (40) hours in the particular workweek. The Sunday premium shall not be averaged into the employee's straight-time rate for the purpose of determining the rate upon which daily or weekly overtime is based in any workweek under Section 31 hereof. Employees hired on or after March 6, 2005 shall not be eligible for Sunday Premium.

**Section 34.** An employee whose straight-time scheduled shift begins on Saturday and continues beyond midnight on Saturday shall receive Sunday Premium Pay for those hours worked on Saturday, and such shifts in their entirety shall be the first shift of the new workweek.

**Section 35.** In those situations where an employee's straight-time scheduled shift begins at or after 8:00 PM on Saturday and continues beyond midnight on Saturday, the Employer shall not reschedule or reduce the hours of such employee for the sole purpose of avoiding the payment of such Sunday premium, though it is recognized that changes in the schedule may be necessitated by changes in business operations.

**Section 36. Courtesy Clerk Sunday Premium.** Courtesy Clerks shall receive a premium of fifty cents ($0.50) per hour for all work performed on Sunday.

## ARTICLE 14

### TRAVEL BETWEEN STORES

**Section 37.** When an employee is transferred from one store to another store during his workday, reasonable time spent in traveling between said stores shall be considered as time worked. Assigned travel between stores in the employee's personal vehicle shall be reimbursed in the amount established by the Employer for reimbursement to its non-bargaining unit employees (but not less than the IRS rate), exclusive of travel to and from the employee's home. No employee will be required to use his personal vehicle to conduct Company business.

Before an employee is permitted to use their personal vehicle for company business, the employer shall have the employee sign a statement acknowledging their risk and certification of a valid drivers license and insurance coverage.

## ARTICLE 15

### NIGHT PREMIUM

**Section 38.** A premium of fifty cents (50¢) per hour shall be paid for all work performed between the hours of 12:00 midnight and 6:00 am to all employees (excluding Courtesy Clerks). Employees whose shifts are scheduled to end at 12:00 midnight need not be paid any premium under this Section, even where it is necessary

for them to remain on the job for a short period in order to complete their work, provided that such additional period does not exceed fifteen (15) minutes.

All Courtesy Clerks shall receive twenty-five cents (25¢) per hour in addition to the hourly rate for all work performed between the hours of 12:00 midnight and 6:00 am.

Night premium shall not apply where the employee is working at overtime or on Sunday or on a holiday.

## ARTICLE 16
## HOLIDAYS AND HOLIDAY PAY

**Section 39.** All employees hired on or before March 5, 2005 who have completed their probationary period shall be paid for the following holidays whether or not they fall on what would normally be a workday for the employees involved: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day. Such employees shall be entitled to two (2) personal holidays, which must be requested two (2) weeks in advance and approved by the Store Manager.

All employees hired on or after March 6, 2005 who have completed their probationary period shall be paid for the following holidays whether or not they fall on what would normally be a workday for the employees involved: Thanksgiving Day and Christmas Day. After two years of service such employees shall be entitled to one (1) personal holiday, two (2) personal holidays after three (3) years of service and three (3) personal holidays after four years of service, which must be requested two (2) weeks in advance and approved by the Store Manager.

The employer may operate its stores, at its sole discretion, on any of the holidays recognized by this agreement.

**Section 40. Personal Holidays.** To be eligible for personal holidays during each calendar year, an employee must be on the payroll as of January 1 of each year. Such holidays must be taken during the respective calendar year. An employee whose employment terminates prior to having taken his personal holiday or who fails to take his personal holiday in the calendar year shall not be entitled to holiday pay. In the event an employee fails to schedule his personal holiday by October 1 of the calendar year, the Employer will select a date and schedule such employee for his remaining personal holidays for that year. Further, personal holidays shall be granted by seniority, classification and store.

**Section 41.** When a holiday falls on Sunday, the following day shall be observed.

**Section 42. Holiday Pay for Full-Time.** As pay for an unworked holiday, regular full-time employees will be paid at straight-time for the number of hours they would normally have worked on the day in question, but not to exceed eight (8) hours. If the

holiday falls on a day which would normally have been such employee's scheduled day off, he shall be paid eight (8) hours at straight-time as pay for the unworked holiday.

**Section 43. Holiday Pay for Part-Time.** Holiday pay for part-time employees who have completed their probationary period, and who otherwise qualify, shall be based on the number of hours worked in the calendar week immediately prior to the week in which the holiday occurs, divided by five. Provided the employee actually performs work in the calendar week immediately prior to the Holiday week (unless on vacation or receiving sick pay for time not worked during such week or during the first thirty (30) days of an absence for which an employee is receiving Workmen's Compensation), an employee shall not receive less than three (3) hours holiday pay.

**Section 44. Qualification for Unworked Holiday Pay.** In order to qualify for pay for an unworked holiday, an employee otherwise eligible for such pay under the terms of this Article must work his regularly scheduled day immediately preceding the holiday, the holiday if scheduled, and his regularly scheduled day immediately following the holiday, unless he has been previously excused from such work by the Employer or unless he was prevented from so working due to a bona fide illness. In any event, the employee must perform work during the week in which the holiday occurs, unless on vacation, or receiving sick pay for time not worked during the week in which the holiday occurs, or during the first thirty (30) days of an absence for which an employee is receiving Workmen's Compensation.

**Section 45.** An unworked holiday, even though paid for under the terms of this Article, shall not be counted as a day worked for the purpose of computing overtime pay in a holiday workweek.

**Section 46. Premium Pay for Holiday Work.** For employees hired on or before March 5, 2005, when a holiday is worked, the employee shall be paid one and one-half (1½) times his/her normal hourly rate of pay, in addition to the holiday pay provided herein. For employees hired on or after March 6, 2005, when a holiday (as defined above for such employees) is worked, the employee shall be paid one dollar ($1.00) per hour worked.

## ARTICLE 17

## VACATIONS

**Section 47.** All regular full-time employees, and all part-time employees, who were hired on or before March 5, 2005 and who have worked eight hundred and thirty-two (832) or more hours in their anniversary year, covered by this agreement, shall receive one (1) week's paid vacation after one (1) year's service, two (2) week's paid vacation after two (2) years' service, three (3) week's paid vacation after five (5) years' continuous service, four (4) weeks' paid vacation after twelve (12) years' continuous service and five (5) weeks' paid vacation after twenty (20) years continuous service.

All regular full-time employees, and all part-time employees, who were hired on or after March 6, 2005 and who have worked one thousand forty (1,040) or more hours in their anniversary year, covered by this agreement, shall receive one (1) week's paid vacation after one (1) year's service, two (2) weeks' paid vacation after three (3) years' service, three (3) weeks' paid vacation after eight (8) years' continuous service.

Such vacation shall be paid at straight-time rates. The number of hours for which such employees shall be paid for a vacation week shall be the average number of weekly hours worked during the twelve (12) months immediately preceding the employee's anniversary date of employment not to exceed forty (40) hours pay for each week of vacation. Hours paid for vacations, holidays and sick leave shall be considered as hours worked for the purpose of computing vacation amounts.

**Section 48.** Effective the first Sunday following execution of this Agreement, the Employer will convert the employees' weekly vacation allotment to a daily vacation allotment by multiplying the number of weeks of vacation due by five (5). The hours paid for each day of vacation will be based on the average weekly hours of vacation as calculated in Section 47 divided by 5. Employees may be allowed to take vacation one (1) day at a time subject to approval by the Employer and based on the following requirements:

1. Daily vacation may not be scheduled through the annual sign-up procedure.

2. Daily vacation must be requested of the Store Manager in writing by Tuesday prior to the posting of the schedule for the week in which the time off is requested.

3. Employees may not receive more than five (5) days vacation pay in any calendar week.

4. Not more than one (1) week (five (5) days) may be taken one (1) day at a time per anniversary year.

5. Weekly vacation requests shall take preference over daily vacation requests.

**Section 49. Vacation Pay in Advance.** An employee who has earned vacation on the basis of having completed an anniversary year shall receive his vacation pay during the workweek immediately preceding the employee's vacation, provided the employee has requested such in writing at least two weeks in advance of his vacation.

**Section 50. Holiday During Vacation.** If any one of the holidays enumerated in Article 16 hereof falls during an employee's vacation, the employee shall receive an extra day's vacation pay because of it.

**Section 51.** A vacation may not be waived by an eligible employee and extra pay received for work during that period, unless agreed by the Union and the Employer. Vacations must be taken during each anniversary year.

**Section 52.** **Vacation Upon Lay off or Termination.** When an employee is laid off, or discharged, or leaves his place of employment, and at said time he is entitled to a vacation, he shall receive his vacation wages at the time of the layoff or discharge, or at the time he leaves his place of employment. Provided, however, that if such employee be discharged for proven dishonesty, he shall not be entitled to any vacation or vacation pay, whether the same has accumulated or not.

**Section 53.** In the event a regular full-time employee who has been employed two (2) years or longer voluntarily quits or is discharged for reasons other than proven dishonesty, such employee shall be paid pro rata vacation pay earned up to the time the employment relationship is severed.

## ARTICLE 18

### MINIMUM WEEKLY SCHEDULE

**Section 54.** No regular employee shall be scheduled for less than twenty (20) hours in a workweek, if the employee is available.

## ARTICLE 19

### NO FREE WORK

**Section 55.** It is intended that there shall be no "free" or "time-off-the-clock" work practices under this Agreement. Any employee found by the Employer or the Union to be engaging in such unauthorized practice shall be subject to discipline.

## ARTICLE 20

### TIME CARDS

**Section 56.** In stores where time cards are used, employees shall be required to punch their own time card immediately before beginning work and immediately upon ending work. No employee shall have the right to punch another employee's time card.

In stores without time clocks, time cards shall be filled in daily by each employee. Any employee punching or filling in another employee's time card shall be subject to immediate discipline.

## ARTICLE 21

### SPLIT SHIFTS

**Section 57.** There shall be no daily split shifts. A split shift is defined as two work periods separated by more than a normal meal period, but within eight (8) hours.

21

Notwithstanding the above, store meetings which are covered elsewhere in this agreement shall under no circumstances be considered as a split shift.

## ARTICLE 22
## STORE MEETINGS

**Section 58.** All time spent by an employee actually attending any store meeting where his attendance is required by the Employer shall be counted as time worked with a minimum of two (2) hours at the applicable rate of pay when an employee is called back for such a meeting. In the event the employee is required to attend more than two (2) meetings per calendar year, the call-in-provision in Article 23 shall apply.

## ARTICLE 23
## REPORTING PAY

**Section 59.** Any employee able to render required services shall, if called for work, be guaranteed an amount equal to four (4) hours' pay at his straight-time rate of pay. Employees working in two (2) stores of the Employer in any one (1) day shall receive a full day's pay for such work.

Notwithstanding the above, students and Courtesy Clerks able to render required services shall, if called for work, be guaranteed three (3) hours' pay, provided the employee is able and available to work the three (3) hours.

## ARTICLE 24
## LUNCH BREAKS

**Section 60.** Each employee who is scheduled to work in excess of five (5) hours in a day shall receive, on his own time, a one (1) hour lunch period, or, upon mutual agreement between the employee and the Employer, a one-half (1/2) hour lunch period at approximately the middle of his workday. Individual employees' change of lunch period from one (1) hour to one-half (1/2) hour, or vice versa, shall occur only at the beginning of a new work schedule.

Employees' scheduled lunch periods will be set forth on the schedule, but the parties recognize it may be necessary to alter the lunch period schedule due to the needs of the business.

## ARTICLE 25
## RELIEF PERIODS

**Section 61.** The Employer will give employees a relief period of fifteen (15) uninterrupted minutes for each four (4) hour period worked, as near as practical to the

middle of the four (4) hours. Notwithstanding the above, any employee whose work shift is seven (7) hours or more, shall receive at least two (2) rest periods.

Employees' scheduled lunch periods will be set forth on the schedule, but the parties recognize it may be necessary to alter the lunch period schedule due to the needs of the business.

When an employee is required to work ten (10) hours in a day, he shall be entitled to a third relief period.

## ARTICLE 26
## PROBATIONARY PERIOD

**Section 62.** The first thirty (30) calendar days of employment shall be considered a trial period, during which time an employee may be terminated for any reason and he shall have no recourse to the grievance or arbitration procedures set forth in this Agreement concerning such termination.

This probationary period may be extended an additional thirty (30) calendar days by mutual agreement between the Employer, employee and the Union.

## ARTICLE 27
## SENIORITY

**Section 63.** Seniority is the length of continuous employment with the Employer. Seniority shall be dated from the date the employee actually reports for work.

**Section 64. Seniority of Transferred Employees.** Employees transferring into the bargaining unit shall have no seniority rights during the thirty (30) calendar-day period immediately following such transfer. Upon completion of such calendar thirty (30) day period, all seniority acquired since the most recent hire date of the employee while in the employ of the Company shall be fully restored to the employee to be used for whatever purpose or rights he or she is otherwise entitled.

**Section 65. Termination of Seniority.** Seniority shall terminate for any of the following reasons:

1. Quit.

2. Justifiable Discharge.

3. Layoff of nine (9) months for employees with less than two (2) years of service; twelve (12) months for employees with two (2) or more years of service.

4. Failure to return to work in accordance with the terms of a leave of absence.

5.  Failure to report for work upon recall after a layoff within five (5) days after date of mailing of recall notice sent by registered letter to the last address furnished in writing to the Employer by the employee.

**Section 66.** **Seniority Lists.** Bargaining unit seniority lists shall be provided to the Union no more than two (2) occasions during the calendar year, upon request by the Union.

**Section 67.** **Definition of Full-Time Employee.** A regular full-time employee is defined as an employee who has been hired as such or works forty (40) or more hours per week for at least four (4) consecutive weeks, in his home store, except for assignment to a forty (40) hour per week schedule as a result of the employee receiving any hours caused by other employees' absence for any reason. Scheduled hours of work voluntarily vacated by an employee (such as trading of hours) shall not be used for purpose of advancing an employee to full-time status. An employee who fails to maintain full-time status as a result of working less than forty (40) hours per week for reasons other than absence due to an approved leave of absence, or a reduced schedule resulting from an on-the-job injury for twelve (12) consecutive weeks shall be designated as a part-time employee.

*BARGAINING NOTE*: It is understood that for purposes of this provision, the definition of "absence" shall include such things as absence from work due to vacation, holiday, vacated shift, unexcused absence, funeral leave, jury duty, leave of absence and illness.

Assignment to Full-Time Status. When a full-time vacancy, other than a four (4) week at forty (40) hour opening defined in Section 67, occurs and the Employer determines that such vacancy shall be filled by a full-time employee, the job vacancy for non-management positions shall be filled by the assignment of the most senior qualified employee of the classification who has signed the current full-time request list as provided for in this Agreement. Should management be unable to fill such vacancy from the list, then such vacancy shall be posted within the affected store for seventy-two (72) hours and management shall offer the full-time assignment to the senior qualified employee of the store and classification who signed the posting before hiring off-the-street.

Four (4) week at forty (40) hour openings shall be filled by the most senior employee within the store and affected classification who has signed the full-time request list as set forth in this Agreement. Should management be unable to fill such vacancy from the list, then such vacancy shall be posted within the affected store for seventy-two (72) hours and management shall offer the full-time assignment to the senior qualified employee of the store and classification who signed the posting before hiring off-the-street.

Notwithstanding the above, the Employer may transfer a full-time employee from another store to fill a vacancy in lieu of advancing an employee to full-time status under this Article.

Employees with three (3) or more years of service may sign the full-time request list during the first fifteen (15) days of January and the first fifteen (15) days of July to be considered for advancement to full-time effective with the first workweek in February and August respectively. Such request shall state the specific store(s) in the bargaining unit that the employee desires advancement to full-time. The Employer will send the Union a copy of the new full-time request list.

If an employee is offered assignment to full-time status and accepts or declines the same, his/her request shall be voided.

The Employer shall not make assignments of full-time status to a probationary employee or to an employee on leave of absence.

**Section 68. Voluntary Reduction to Part-Time.** A full-time employee, who has requested and has been assigned a part-time schedule, shall immediately be classified as part-time.

**Section 69. Promotions.** The Employer agrees to make promotions to non-management, non-APC classifications to the most senior qualified employee within each store. Management will post a list of openings within the store on Monday. Employees may sign the posting and be considered for promotion. The posting shall remain posted through midnight Wednesday. The Company shall offer the promotion to the senior qualified employee within the store prior to hiring off-the-street. Floral clerks, Pharmacy Technicians, Bakery Production employees, and Cake Decorators may be assigned at management's discretion.

For purposes of this section, a promotion is an assignment to a classification which has a higher "journeyman" or "thereafter" rate than the classification being vacated by the involved employee.

For All Purposes Clerk (APC) positions, management shall fill the opening with the most senior qualified employee in the bargaining unit who has previously signed the promotion request list as described below. An employee who is desirous of promotion to All Purpose Clerk (APC) may sign the promotion request list during the first fifteen (15) days of January and the first fifteen (15) days of July to be considered for promotion effective with the first workweek in February and August respectively. Such request shall state the specific stores in the bargaining unit the employee is desirous of promotion to. The employer will send the Union a copy of the new promotion request list. If the list is exhausted for a particular store, then management will post the opening within the store and allow employees of the store, regardless of their seniority date, to request promotion. The Company shall offer promotion to the senior qualified employee within the store prior to hiring off-the-street.

If an employee is offered and accepts or declines the same, he/she will have his\her request voided. An employee accepting a promotion must hold such position for six (6) months before being eligible to sign up and accept another promotion.

The Employer shall not make promotional assignments to probationary employees or to an employee on a Leave of Absence.

**Section 70.** Probationary Period for Promotions. When any employee is promoted to a higher classification, he shall be on probation for thirty (30) calendar days if full time, forty-five (45) calendar days if part time. If an employee is unsuccessful during probation, the employee will be returned to his prior classification with regard to position and status.

**Section 71. Demotion for Just Cause.** Except under the provisions of Section 74, no employee shall be demoted from a higher classification without just cause.

### Section 72. Demotions and Step Downs.

1.  Whenever a member of the bargaining unit, classified as a Head Clerk, or above, is demoted, such employee may be returned to the classification and status (i.e., full-time or part-time) held when he/she accepted the bargaining unit position of Head Clerk or above, or the employee may exercise his/her seniority to claim a position in accordance with the current Full-Time or Promotion Request Lists. It is understood that the employee must be employed for one continuous year in the bargaining unit prior to the demotion or step down or the employee shall be placed in the position of Courtesy Clerk.

2.  Whenever a management employee, who is not a member of the bargaining unit, is demoted, or steps down into the bargaining unit, such employee may exercise his or her seniority, provided a vacancy (as defined in the collective-bargaining agreement) exists, to claim a position in the bargaining unit in accordance with the Full Time or Promotion Request Lists. For the purpose of this Section, the non-bargaining unit management employee shall be deemed to have full company seniority from the first day of assignment into the bargaining unit notwithstanding language set forth in the collective bargaining agreement establishing a 30-day waiting period. It is understood that the employee must be employed for one continuous year in a store or facility covered by a collective bargaining agreement with Local No. 7 immediately preceding the demotion or step down or the employee shall be placed in the position of Courtesy Clerk.

3.  This agreement shall not apply when Head Clerks or above are affected by a layoff (as opposed to a demotion or step down). Under such circumstances, the provisions of the collective bargaining agreement concerning layoff shall govern.

4. Notwithstanding the foregoing, it is understood that the demotion and step down of bargaining unit employees will be subject to the provisions of the collective bargaining agreements.

5. Whenever a member of the bargaining unit, in a lesser classified job than Head Clerk, is demoted, whether voluntary or involuntary, such employee may be returned to the classification and status (i.e. full-time/part-time) held when he accepted the current classification being vacated, or the employee may exercise his seniority to claim a position in accordance with the current Full-Time or Promotion Request Lists.

## ARTICLE 28

### UNSCHEDULED OVERTIME

**Section 73.** **Unscheduled Overtime Hours.** Daily overtime not previously scheduled shall be offered in seniority order within the department, the classification and the store, to the employees present when the need for overtime arises. Nothing herein shall be construed to require the scheduling of overtime when another employee's scheduled hours can be extended or part-time employees may be called in without overtime penalty. Hours unclaimed under this procedure may be assigned in reverse order of seniority among those employees within the department within the classification within the store present when the need for overtime arises.

Overtime assignments of four (4) hours or more may be filled by calling in employees, in seniority order, within the classification and the department on their non-scheduled day without violating this Section.

## ARTICLE 29

### LAYOFFS

**Section 74. Layoffs.** When a reduction in the workforce is necessary, as opposed to a reduction in hours, the following procedure shall be used:

Layoff will begin in departments (checker, day stocker, night stocker and produce for all-purpose clerk classification; general merchandise and grocery department for the general merchandise clerk classification) in the classification to be affected in reverse seniority order. The affected person shall be notified and given the following options:

(a) Displacing a less senior employee in the same classification in the store, if the affected employee is qualified for such position.

(b) Displacing the least senior employee within the same classification within the bargaining unit, if the affected employee is qualified for such

position, (with regard to booth assignments, floral designer (most senior by store) and pharmacy technicians, an employee must be qualified to exercise the rights herein),

(c) Displacing the least senior employee in a lower classification within the same store, if the affected employee is qualified for such position. (With regard to booth assignments, floral designers [most senior by store] and pharmacy technicians, an employee must be qualified to exercise the rights herein.)

(d) Accepting the layoff.

(e) Employees on medical leave of absence, and subject to layoff, shall be placed on layoff until such time as they are released to return to work. The affected employees shall be given their layoff options immediately upon their release to work.

Such employee shall receive the rate of pay for any lower classification to which he moves under this procedure.

**Section 75. Employees Accepting a Lower Classification.** Laid off employees, and employees who accept a job in a lower classification in lieu of layoff, shall be recalled as needed, in order of seniority, to jobs they are qualified to perform. The Employer shall not hire a new employee or promote an existing employee into a position for which a laid off employee or employee who accepts a job in a lower classification is qualified and available to perform. Employees recalled from lay-off may refuse if the store being offered is more than ten (10) miles from their previous store. In such event, the employees will maintain recall rights.

**Section 76. Employees Accepting Lay Off.** An employee accepting a layoff, rather than accepting a job in a lower classification, may inform the Employer in writing at the time of the layoff of his desire to be recalled to a lower classification and such notification shall be honored when a vacancy occurs. The notice shall specify the lower classification to which the employee desires recall. It is understood that any employee on layoff from the classification where the vacancy occurs shall have preferential rights to such vacancy. Employees recalled from lay-off may refuse if the store being offered is more than ten (10) miles from their previous store. In such event, the employees will maintain recall rights.

**Section 77. Courtesy Clerk Options.** The above notwithstanding, the options of a Courtesy Clerk shall be limited to displacing the shortest service Courtesy Clerk in that store or accepting the layoff. Courtesy Clerks with three (3) or more years of service may displace the least senior courtesy clerk in the bargaining unit.

## ARTICLE 30

## TRANSFER FROM STORE TO STORE

**Section 78. Transfers from Store to Store.** Transfers from store to store shall not be made or denied for capricious, arbitrary or discriminatory reasons. Employees desiring a transfer to another store within the bargaining unit, in order to be near their residence, may indicate their desire for transfer in writing to their Store Manager. Such transfer requests will be considered at the time an opening occurs within their classification and status.

## ARTICLE 31

## NEW STORE LANGUAGE

**Section 79.** In the event of the opening of a new store within the bargaining unit (not a replacement of an existing store), the following procedure shall apply:

1. At least four (4) weeks prior to the opening of a new store, the Employer will post a sheet in each location for interested employees to sign if desirous of a transfer to the new location. The sheet shall remain posted for at least ten (10) days.

2. Job openings either at the new store or created by transferring employees at their former store shall first be filled by employees on layoff in the classification of the vacancy before any new employees are hired or current employees are promoted.

3. Employees who have signed the new store transfer request sheet shall be given consideration based on their qualifications and the requirements of the store. It is understood that the Employer may move employees from its own competitive stores which may be impacted by the new store opening before consideration of other employee desires.

4. In the event the Employer opens new stores within the geographical area of this Agreement, as set forth in Article 1, not less than sixty percent (60%) of the initial staffing of the new store shall be made by employees covered by this bargaining Agreement, if available.

## ARTICLE 32

## LEAVES OF ABSENCE

**Section 80. Sickness, Injury or Pregnancy.** Leaves of absence shall be granted for up to eighteen (18) months without pay when an employee with three (3) months of continuous service is unable to work because of bona fide sickness, accident, disability, or pregnancy. However, in the event such an employee is unable to return to work at

the end of eighteen (18) months of his/her leave period, he/she shall be entitled to an additional leave of six (6) months if he/she submits satisfactory medical evidence that he/she will be able to return to duties within his/her classification within the said additional period.

**Section 81.  Leave of Absence for Care of Newborn or Adopted Child.**  For employees with one (1) year of continuous service in the bargaining unit, a Leave of Absence for either parent shall be granted without pay for a period of up to twelve (12) months for the purpose of Newborn or Adopted Child Care.  The employee shall be guaranteed reinstatement in accordance with his seniority.  An employee who wishes to change his or her date of return to work shall notify the Store Manager two (2) weeks in advance and shall be returned to work as set forth above.  The Leave of Absence for either parent must end no later than twelve (12) months from the date of birth or date of adoption.  The Employer may require verification of the parent relationship to the newborn or to the adopted child.

**Section 82.  Leave of Absence for Family Care.**  A family care leave, without pay, shall be granted, upon request by an employee for a total of up to six (6) consecutive months within a two (2) year period.  The employee requesting the leave must have a minimum of one (1) year continuous service in the bargaining unit at the time of the request.  The employee shall be guaranteed reinstatement in accordance with his seniority at the end of his leave.  Any employee who wishes to change his or her date to return to work shall notify the Store Manager two (2) weeks in advance of the date they intend to return.  The purpose of this leave shall be to care for seriously ill family members.  For the purpose of this leave, "family members" shall be:

1.  Spouse and parents of the employee.

2.  Biological or adopted unmarried children under nineteen (19) years of age and full-time students up to age 23.

3.  A child of any age who is incapable of self-support.

4.  Any relative residing in the employee's home and dependent upon the employee for care.

The employee shall be required to present satisfactory evidence of serious illness of the family member, the expected duration of the absence,  and the reason for the employee's involvement.

**Section 83.  Personal Leaves.**  Leaves of absence without pay for reasonable periods not to exceed thirty (30) days may be granted by the Employer to employees who have completed one (1) year of service for other reasons mutually agreed to between the Employer and the employee.  The thirty (30) day period may be extended by an additional thirty (30) days by mutual agreement between the Employer and employee.

**Section 84.  Military Leave.**  All seniority granted employees under the terms of this Agreement shall be subject to the rights granted by law to the employees volunteering, called or conscripted for active military service under the National Guard Act of 1940 and the Selective Service Act of 1942, and any additions or amendments thereto, or rulings and interpretations thereof by any authorized court or agency.

**Section 85.  Union Leave.**  Leaves of absence without pay for Union business not to exceed six (6) months may be granted by the Employer to employees who have completed one (1) year of service.  The six (6) months may be extended by an additional six (6) months by mutual agreement between the Employer and employee.

**Section 86.  Request for Leave of Absence.**  All leaves of absence must be requested in writing to the Store Manager unless the employee is physically disabled to the extent that such advance request is not possible and shall state: (1) the reason, (2) date leave is to begin, and (3) expected date of return to work.  Leaves of absence shall be granted in writing in advance and a copy shall be given to the employee.

**Section 87.  Returning from Leave of Absence.**  The employee must be qualified to resume his regular duties upon return to work from an approved Leave of Absence. A doctor's certificate verifying that the employee is able to resume his normal duties may be required.  The employee shall be returned to the job previously held, or to a job comparable with regard to rate of pay no later than on the first (1st) weekly schedule, provided the notice of intent to return to work is received prior to 9:00 am, Wednesday of the week preceding the next available schedule.

## ARTICLE 33

### FUNERAL LEAVE

**Section 88.**  Upon request, an employee covered by this Agreement shall be granted the necessary time off with pay at his regular straight-time rate of pay in order to make arrangements for, attend a funeral and/or for grieving occasioned by a death in his immediate family.  Such time off with pay shall in no event exceed three (3) regularly scheduled working days, and the amount of such paid time off actually granted shall normally depend upon the distance involved.  The immediate family is defined as the employee's father, mother, grandparents, spouse, children, brother, or sister; and father, mother, brother or sister of the then existing spouse, step-child, and grandchildren.  Payments shall not be made hereunder where the relative's death occurs while the employee is on vacation or on a Leave of Absence.

Additional time, without pay, shall be granted as is needed by the employee up to 7 days.

**Section 89.**  If an employee is notified of the death of his spouse, parent, child or grandchild while at work, he shall be granted the remainder of the day off and paid for

scheduled work hours that day. This shall not be counted as part of the above three (3) days. Employees must attend the funeral in order to qualify for pay, and the Employer may require satisfactory evidence confirming the relationship to the deceased person.

**Section 90.** No schedule shall be changed for the purpose of making the employee's day off replace a day that would otherwise have been paid for under these provisions.

## ARTICLE 34

## JURY DUTY

**Section 91.** Whenever any employee covered by this Agreement is required to serve on a petit jury during his regular working hours, the Employer agrees to pay such employee the difference between what he is paid for serving on the jury and what he would have received from the Employer in straight-time pay had said jury duty not prevented him from being at work. On any scheduled work day, the employee shall promptly report to complete any remaining hours of his scheduled work day; provided, no employee shall be required to so report for work on any day on which he has served and been compensated by the court for at least eight (8) hours' jury duty, nor shall any employee who reports back to work under this Section be required to work more than ten (10) hours, less the number of hours for which he served and was compensated for jury duty by the court on that day. The Employer may require a statement from the court certifying attendance.

**Section 92.** When the Employer requests an employee to appear in court, he shall be compensated at his regular straight-time hourly rate of pay for such time.

**Section 93.** The Employer will maintain its practice of rescheduling employees required to serve on jury duty.

## ARTICLE 35

## SICK LEAVE

**Section 94.** Full-Time employees covered by this Agreement who, in their first anniversary year, worked two thousand (2,000) hours or more and who have been continuously employed by their employer for a period of one (1) year, shall be credited with forty-eight (48) hours of sick leave pay. Employees (excluding part-time courtesy clerks) who in their first anniversary year work one thousand two hundred and forty-eight (1,248) hours or more (but less than two thousand [2,000] hours) and who have been continuously employed by their employer for a period of one (1) year, shall be credited with hours of sick leave with pay on the basis of the total hours worked (including vacation hours) in their anniversary year divided by two thousand eighty (2,080) hours times forty-eight (48) hours. It is understood that employees shall not be credited with more than forty-eight (48) hours of sick leave credit per anniversary year.

Unused sick leave shall be cumulative, and after the first (1st) year of continuous employment, full-time employees shall accumulate unused sick leave at the rate of four (4) hours for each month of continuous employment in which they work one hundred sixty (160) hours in a four week month and two hundred (200) hours in a five week month. Employees who work at least ninety-six (96) hours (but less than one hundred sixty (160) hours) in a four week month and one hundred twenty (120) hours (but less than two hundred (200) hours) in a five week month shall accumulate unused sick leave for each month of continuous employment on the basis of total hours worked during the preceding month divided by one hundred sixty (160) hours in a four week month and two hundred (200) hours in a five week month times four (4). Said monthly credit shall not exceed four hours for each month. Unused sick leave shall not exceed a maximum accumulation of six hundred (600) hours.

A doctor's certificate or other authoritative verification of illness may be required by the Employer. Said sick leave is to commence on the second (2nd) full workday's absence for sickness or non-occupational injury, and on the first (1st) workday's absence if the employee is hospitalized or has accumulated in excess of two hundred and forty (240) hours. The waiting period provided herein shall apply for each illness or non-occupational injury.

Sick leave shall be paid after the appropriate waiting period and will be based on the number of scheduled hours missed due to the sickness or non-occupational injury. For consecutive absences which exceed one (1) week, the maximum hours paid will be the same as the hours scheduled in the week in which the illness or non-occupational injury occurred. Sick leave pay must be requested by the employee and will be paid, if eligible as provided above, at the employee's regular classification rate, calculated at straight time, not to exceed eight (8) hours per day until accumulated sick leave is used up or employee returns to work.

Sick leave benefits are not convertible to cash.

**Section 95.** Employees hired on or after March 6, 2005. Employees hired on or after March 6, 2005 who have completed three (3) consecutive years of employment shall commence accumulating sick leave credit of up to two (2) hours for each month that such employee works at least one hundred twelve (112) hours in a four week month or one hundred forty (140) hours in a five-week month. Such credit shall be determined by dividing the actual hours worked for such month by one hundred sixty (160) hours (in a four week month) or two hundred (200) hours in a five week month times two (2). Unused sick leave shall not exceed a maximum accumulation of sixty (60) hours. Sick leave shall be paid as provided in the preceding section, except sick leave shall not commence until the third (3rd) full workday's absence. There shall be no first (1st) or second (2nd) day sick leave for these employees.

## ARTICLE 36

### INJURY ON THE JOB

**Section 96.** When an employee is injured on the job, there shall be no deduction from the employee's pay for the day in which the employee was injured and reported for medical care.

## ARTICLE 37

### HEALTH AND WELFARE COVERAGE

(Medical, Surgical, Hospital, Dental, Prescription,
Vision and Life Insurance)

**Section 97. Trust Fund.** The Rocky Mountain UFCW Union and Employers Health Benefit Trust ("Health Benefit Trust") is a trust fund jointly administered by an equal number of Trustees representing the Employer and the Union. All equal number of Trustees representing the Employer and the Union. All contributions provided for in this Article will be paid into the Health Benefit Trust. The Trust Fund is to be jointly administered by an equal number of Trustees representing the Employer and the Union. There shall be three (3) Plans of benefits, Plan A, Plan B and Plan C with contributions as provided herein. As a condition of receiving the contributions provided above, the Trustees of the Plan will:

1. Establish Plan(s) of benefits, which can be supported by the contributions provided in the Agreement, and

2. Maintain the Trust in a fully funded status as provided herein and in the Trust Agreement

The Trustees shall establish a separate accounting of income and expenses for participants of the Fund who agree in their collective bargaining Agreements to a fixed contribution rate. The Trustees are expressively prohibited from using the contributions of the Employer's contributing on fixed contribution rate basis to pay benefits for participants of other employer's who have not adopted these fixed contributions.

**Employer Contributions and Benefit Levels.** The Employer agrees to contribute the following amounts per month for each eligible employee.

### Employees hired on or before March 5, 2005

|  | PLAN A | PLAN B |
|---|---|---|
| Effective September 12, 2004 | $779.00 | $623.20 |
| Effective January 1, 2005 | $599.67 | $479.73 |
| Effective January 1, 2006 | $647.65 | $518.11 |
| Effective January 1, 2007 | $699.46 | $559.57 |
| Effective January 1, 2008 | $755.42 | $604.33 |

34

## Employees hired on or after March 6, 2005

|  | PLAN A | PLAN B | PLAN C |
|---|---|---|---|
| Effective January 1, 2005 | N/A | $412.69 | N/A |
| Effective January 1, 2006 | N/A | $445.71 | $239.60 |
| Effective January 1, 2007 | $601.70 | $481.37 | $303.25 |
| Effective January 1, 2008 | $649.84 | $519.88 | $327.51 |

**Employee Co-Premiums.** Employees who are eligible to participate and enroll in the Health Plan shall as a condition of such participation make a monthly co-premium payment equal to $5.00 per week if enrolled in employee only coverage $10.00 per week if enrolled as employee plus spouse or employee plus children and $15.00 per week if enrolled in family coverage. Such co-premiums shall be made by payroll deduction and forwarded to the Trust Fund on a monthly basis by the Employer.

**Enrollment and Eligibility.** Effective at the earliest possible date but not later than June 1, 2005, the Plan shall conduct an annual enrollment. To remain enrolled as a participant eligible for plan coverage, each employee who is currently enrolled, or who initially enrolls during the term of the collective bargaining agreement, must re-enroll prior to the start of each succeeding plan year. Employees must make a positive election to enroll in the Plan. Enrollment is for the entire plan of benefits for the Plan and an employee's failure to make a positive enrollment into the Plan shall result in such employee being ineligible for all benefits of the Plan for the remainder of the calendar year or until there has been a qualifying life event, as defined herein, whichever occurs first. During the first enrollment, the Plan will allow a 30-day grace period to allow an employee to enroll who missed the deadline for enrollment.

The administrator of the fund will use the enrollment data in order to establish the eligibility of employees and their dependents for participation in plan coverage. None other than those employees contained on the enrollment report shall receive benefits from the Trust without the express authorization of the Trustees. The administrator will promptly notify the Trustees in writing of any instances where coverage has been provided to persons who are not included in the enrollment data, or where a claim for payment has been submitted by or on behalf of such person.

The Fund will audit its enrollment and claims records as least once within each 24 month period to ensure that no employees of the Employer, or the dependents of such employees, are participating in plan coverage for which they are not eligible and to ascertain that claims and other plan expenses are being paid in accordance with the Plan's provisions.

**Initial Eligibility** – Part-time employees hired before March 6, 2005 who on March 5, 2005 have met the initial eligibility requirement for benefits under the Trust will continue to be eligible for coverage provided the employee enrolls in the Plan beginning

in 2005, and further provided the employee has made the required employee co-premium payment. Such employees shall continue to be eligible for Plan A if such employee was eligible for Plan A on March 5, 2005. Employee's who were eligible for and were participating in Plan B on March 5, 2005, shall participate in Plan B until such employee has been covered under such Plan B for 24 months. Thereafter, such employee may advance to Plan A provided they continue to enroll and meet the eligibility requirements of the Plan. Employees hired on or before March 5, 2005, who are not eligible for coverage as of March 5, 2005 shall be required to meet initial eligibility for Plan B, and subsequent eligibility to begin participation in Plan A, as provided in the predecessor agreement which terminated in 2004.

All part-time employees (excluding Courtesy Clerks) hired on or after March 6, 2005 shall, beginning the first of the month following 12 calendar months of employment, be eligible to enroll and participate in the Health Plan, on an employee only basis for the first 12 months of coverage, under the Health Plan C. Upon completion of the first (36) months of eligibility under Plan C, such employee and their eligible dependents may enroll in Plan B for the next (36) months of eligibility under Plan B. Thereafter, provided the employee continues to maintain eligibility, such employee and their eligible dependents may enroll and participate in Plan A.

Full-time employees (excluding Courtesy Clerks) shall on the first of the month following 3 months of employment, be eligible to enroll with their eligible dependents in Plan B, and after (36) months of eligibility under Plan B, shall be allowed to enroll with their eligible dependents in Plan A.

Courtesy Clerks hired on or after March 6, 2005 shall, beginning the later of the first of the month following thirty-six (36) months of employment or attaining the age of nineteen (19), be eligible to enroll and participate in the Health Plan on an employee only basis under the Health Plan C. Upon completion of the first thirty-six (36) months of employee only eligibility under Plan C, such Courtesy Clerks and their eligible dependents may enroll in Plan B. Such Courtesy Clerks shall not be eligible to progress to Plan A.

**On-going Eligibility** – After satisfying initial eligibility requirement provisions and enrollment in the Health Plan, the employee must continue to meet the monthly on-going eligibility requirements as a condition of continued participation in the Health Plan. Enrolled employees who work (80) hours in a (4) week month or (100) hours in a (5) week month shall be eligible for coverage on a lag month basis. For the purpose of this Article, hours worked shall include hours paid directly by the Company for holiday and vacation.

Employees shall continue to be eligible for benefits provided they enroll for coverage in accordance with this Article. In any event, all employees must continue to meet all eligibility requirements of the Plan as a condition of continued eligibility.

**Trust Plan Changes.** The Trustees at the earliest possible date but not later than June 1, 2005 shall revise the plan of benefits to include:

- The Plan's current coordination of benefits provision and credit balance system shall be replaced with a coordination of benefit provision that limits payment to the maximum payable under the Plan.

- The Plan shall adopt a fee of $100 per month for a spouse of a covered employee who is eligible to enroll in health coverage at their employer, but fails to do so, as a condition of enrollment in this Plan.

- Adopt the long term funding policy contained herein.

- The Parties agree to adopt true managed care approaches to providing mental/nervous and physical benefits under the Plan. The Plan Administrator should not perform such managed care.

- The Parties will adopt cost control measures that will aid the Fund in managing costs within the contributions provided by the Employers and Participants to this Plan.

- The Parties agree to withdraw all of their respective deadlocked motions.

- The Trustees agree to re-bid the Fund Administrator. In the event the Trustees deadlock over a replacement Administrator, the Trustees agree to submit such dispute to expedited arbitration within 60 days following the deadlock. Such arbitrator will be limited to giving a bench decision in the case.

- Adopt the attached schedule of benefits

- The Parties agree to adopt the CIGNA health plan network at the earliest possible date but not later than June 1, 2005.

## Long Term Funding Policy

1. The parties recommend to the trustees that a Minimum Reserve Requirement be established equal to IBNR reserves plus a lag month reserve. The Fund consultants shall calculate the IBNR and lag month reserve requirement at least once every twelve months beginning on (date) and report these amounts to the Trustees at their next regularly scheduled meeting. Any withdrawing employer shall reimburse the Fund for their participants claims run off.

2. If the market value of the assets at any twelve-month review point is ever below the calculated minimum reserve requirement level as calculated by the Fund consultants, then the Fund consultants shall prepare recommendations for benefit plan redesign and/or employee co-premium contributions such that the dollar amount of any such deficiency will be fully recovered by the end of the 12-month period beginning after the trustee meeting in which the deficiency is first projected.

3. No changes are permitted that would violate any contractual agreement between the Fund and any third party vendor.

4. If the Fund consultants cannot agree on a recommended plan of benefit redesign and/or employee co-premium contributions, and the Trustees cannot agree to a corrective action plan, by virtue of deadlock motions, then the trustees must act to adopt the recommended corrective action plan that has the least adverse impact on plan participants, however, one set of Trustees may exercise the Fund's dispute resolution procedure on an expedited basis to determine if other corrective actions must be taken.

5. The minimum reserve target defined above is solely meant to be a "floor". It is not also a "ceiling". That is, no Trustee action is required or expected in the event that reserve levels are above the minimum reserve target.

6. Effective January 1, 2009, the Employer shall make available up to an amount equal to 8% of the Employer's December 2008 contribution to the Fund times 4 in lump sum contributions to the Fund to cover projected funding deficiencies as described herein provided that in prior years the Trustees have taken action as required by the Policy to ensure that the Plan was fully funded for that calendar plan year and further provided that Trustees have not improved benefits during the term of this Agreement. Such lump sum shall only be required to fund the minimum reserve requirement.

**Extended Benefits.** An employee who has been eligible for benefits for six (6) months or more immediately prior to becoming physically disabled and thereby unable to work, shall continue to be eligible for benefits during his continuing period of disability, up to a maximum of six (6) months.

**Courtesy Clerk Coverage.** Courtesy Clerks who are qualified for coverage under any other Plan as a dependent are not entitled to benefits under the Health Benefit Trust; except that under the coordination of benefits provision as established by the Trustees, where a Courtesy Clerk is covered as a dependent under any other "Plan," shall be considered the primary carrier and this Health Benefit Trust shall be considered as secondary carrier.

**Retiree's Benefits.** The Employer will contribute eighteen dollars and thirty-four cents ($18.34) per month per eligible active bargaining unit employee, covered under this Agreement, in the Health Plan to subsidize the self pay costs of providing Health and Welfare benefits to eligible retirees under the Rocky Mountain UFCW Unions and Employers Health Benefit Plan (the "Retiree's Health Plan").

Effective for employees who retire on or after October 1, 1996, the eligibility requirements for participation in Retiree's Health Plan shall be:

Employees retiring on or after October 1, 1996, must have a combined total of 15 years of service and have attained age 50, or be totally disabled, at the time of his termination of employment.

## ARTICLE 38

## NON-DUPLICATION OF BENEFITS

**Section 98.** In the event that any law or government regulation requires any payment from the Employer for benefits which would replace, supplement or modify the Health and Welfare, Dental, Pension or other benefits provided hereunder this Contract, the parties will upon thirty (30) days notice, by either party, meet and negotiate new provisions pertaining to such affected benefits.

## ARTICLE 39

## PENSION

**Section 99. Employer Contributions.** For all employees hired before March 6, 2005, covered by this Agreement, the Employer shall pay one dollar and five cents ($1.05) per hour for all hours worked at straight time (including hours worked on Sunday, vacation and holiday hours paid) into the Rocky Mountain UFCW Unions and Employers Pension Plan, which shall be jointly administered by the Union and the Employer by an equal number of trustees as provided in an agreement establishing such Pension Fund.

For all employees hired after March 5, 2005, contributions shall be at a rate of forty-eight cents ($0.48) per hour for all hours worked at straight time (including hours worked on Sunday, vacation and holiday hours paid).

Though no contributions are required on Courtesy Clerks, except as set forth below, they shall be granted past service credits if promoted from the Courtesy Clerk classification.

The Trustees agree to re-bid the Fund Administrator. In the event the Trustees deadlock over a replacement Administrator, the Trustees agree to submit such dispute to expedited arbitration within 60 days following the deadlock. Such arbitrator will be limited to giving a bench decision in the case.

**Section 100. Courtesy Clerk Contributions.** Pension contributions will be made on behalf of all Courtesy Clerks with ten (10) years or more of continued service with the Employer. Pension contributions shall be made as set forth above. All hours worked as a Courtesy Clerk prior to the time contributions are required will count towards pension eligibility and credits.

## Section 101. Long-Term Funding Policy

1. The trustees shall, no later than April 1, 2005, adopt the following Long Term Funding Policy. Such Long Term Funding Policy shall be applicable for plan year 2005 and subsequent plan years. Effective with the January 2005 contribution payment, the employers will increase the hourly contribution by $0.15 per hour from $1.05 to $1.20 for employees hired before ratification.

   This $0.15 per hour increase in contribution is a "supplemental contribution dedicated solely to improving the funding of the pension plan, will not be used to increase benefits and will be discontinued at the times set forth in paragraph 2.

2. This supplemental contribution shall continue to be made until the earlier of such time the Plan reaches a financial state whereby either: (i) the funding ratio of the Plan (actuarial value of assets over actuarial liability) is at least 100%; or any contribution of the employers would not be deductible for federal income tax purposes in the year in which it is required to be made. However, unless changes are needed to support contribution deductibility, no changes shall be made when the Plan has withdrawal liability.

3. If as of any valuation date commencing with the 01/01/06 valuation, a funding deficiency is projected to occur in less than 5 years, the Trustees will reduce benefits such that a projected funding deficiency will not occur within any of the 8 years following the valuation date. The parties agree to apply for section 412(e) relief if available before the benefit reductions are enacted. It is understood that application for section 412(e) requires the parties to reduce benefits as a condition of the application. Such section 412(e) application, if approved, must cure the funding deficiency as prescribed above.

   If the section 412(e) application is not approved, or not acted on, within 18 months of the valuation date (for example 01/01/06 valuation), then the Trustees will immediately enact benefit reductions to cure the funding deficiency as prescribed above.

4. In no event will benefit reductions be delayed to or beyond a time that would expose the employers to liability beyond the supplemental contribution including but not limited to liability for the payment of excise taxes or additional contributions. Any deadlocked issue over the enactment of benefit reductions and/or the application of this policy shall be submitted to expedited arbitration ahead of any other matter pending arbitration. Such expedited arbitration shall occur within 60 days of the request for arbitration and the arbitrator shall render his decision within 60 days following the close of the hearing in the matter.

5. The parties authorize and direct the Trustees of the Plan to develop Maintenance of Equity Policy for employers that do not adopt this agreement upon renewal of the collective bargaining agreement (or for new agreements).

6. If the Plan experiences a minimum funding deficiency, any excise tax that is levied against the employers will be allocated amongst such employers in a way that first makes all employers not contributing the full amount of the supplemental contribution responsible for fully paying any accumulated missed supplemental contributions with interest. Thereafter, the balance of any excise tax remaining will be allocated to all employers in proportion to their non-supplemental contribution rate. Finally, for any employer not adopting this agreement, future benefits will be based on the assumption that $0.15 of the current rate being contributed is deemed to be supplemental.

7. The parties recognize there is a possibility of merger of the Denver Area Meatcutters Pension Fund with the Rocky Mountain UFCW Union and Employers Pension Plan and give full authority to effectuate such merger to the Board of Trustees of the two pension plans without further approval of the parties of this Agreement.

**Section 102.** Said Pension Fund shall be used to provide benefit pensions for eligible employees of the Employer as provided in a Pension Plan, the terms and provisions of which are to be agreed upon by the parties hereto; said Pension Plan shall, among other things, provide that all benefits under the Plan and costs, charges and expenses of administering the Plan and all taxes levied or assessed upon or in respect of said Plan or Trust or any income there from shall be paid out of the Pension Fund.

**Section 103.** Said Pension Plan and the Trust Agreement establishing the Pension Fund have been submitted to the United States Treasury Department and the United States Department of Labor for the approval and rulings satisfactory to the Employer, that said Plan is qualified under I.R.C. Section 401, et seq. and that no part of such payments shall be included in the regular rate of pay of any employee.

**Section 104.** If for any reason, the United States Treasury Department and the United States Department of Labor withholds approval and rulings satisfactory to the Employer, the parties to this Agreement hereto agree to negotiate other fringe benefits or wage increases in the amount equal to the cents per hour provided for in this Article for all hours worked at straight-time in lieu of payments into the Pension Fund.

**Section 105**. The Employer shall be represented by its employees, or some other representative on the Board of Trustees administering such Pension Plan. A copy of the Trust Agreement and any amendments thereto shall be made a part hereto as if herein at length set forth, when adopted.

## ARTICLE 40

## DISCHARGE AND NO DISCRIMINATION

**Section 106.** The Employer hereby agrees not to discriminate against any employee or discharge him because of membership in the Union and/or for upholding

Union principles; and further, no employee who falls within the bargaining unit shall be discharged without good and sufficient cause.

No employee who, because of his or her religion, has conscientious objections to working on his or her day of Sabbath, will be required to work on his or her Sabbath as a condition of employment. If the rights of the employees under this paragraph operate in conflict with the seniority provisions contained elsewhere in this agreement, the right of seniority shall prevail.

**Section 107.** The Employer and the Union agree that each will fully comply with the applicable laws and regulations regarding discrimination against any employee, or applicant for employment, because of such person's race, religion, color, national origin, sex or age.

**Section 108.** Use of the male gender herein shall, except as the context requires, be deemed to include the female gender.

## ARTICLE 41

## UNION REPRESENTATIVE VISITATION

**Section 109.** The President of the Union, or the Business Representative thereof, shall have the right of entering the premises of the Employer for the purpose of interviewing employees in such a way as to not interfere with the service of the Employer. The said representative shall make their presence known to the Manager, or the person in charge in the absence of the Manager, when possible, upon entering the premises. The Employer shall, upon request of an authorized Union Representative, furnish satisfactory evidence to ascertain whether employees are being paid in accordance with the terms of this Agreement and review with the Union Representative the facts giving rise to disciplinary action.

## ARTICLE 42

## UNION STEWARD

**Section 108.** The Union shall have the right to designate two (2) Stewards per store (stores that employ over one hundred (100) clerks may have three (3) Stewards, and stores that employ over one hundred seventy-five (175) clerks may have four (4) Stewards) in which they work who shall perform their duties with the least possible inconvenience to the Employer. Such Stewards shall not be discriminated against because of their Union activities and such Stewards shall have top seniority for the purpose of layoff in that store. The Store Manager shall be advised in writing by the Union of the name of the Steward(s) in his store.

The Employer agrees to schedule the stewards two days off, without pay, to attend the Union's annual stewards' conference. Such days shall be unscheduled days of

work. It is expressly understood and agreed that the stewards will be scheduled their normal hours during such week.

**Section 109. Employees Rights to Union Representation.** When an employee is involved in a disciplinary interview where the probable result of such interview will be the imposition of disciplinary action, the Employer shall have Union Representation of the employee's choice if present.

## ARTICLE 43

### DISPUTE PROCEDURE

**Section 110.** Should any dispute or complaint arise over the interpretation or application of this Agreement, there shall be an earnest effort on the part of the parties to settle such promptly through the following steps, and failure to follow the procedures set forth below shall result in forfeiture of the grievance.

**Section 111. Step 1.** By conference during scheduled working hours between the Steward and/or the Union's Business Representative and/or the aggrieved employees and the Manager of the store.

**Section 112. Step 2.** If the grievance cannot be satisfactorily resolved under Step 1 above, the grievance shall be reduced to writing and submitted to the representative designated by the Employer to handle such matters. Such submission shall be made within twenty (20) days of the date of the occurrence of the event which gives rise to the grievance and shall clearly set forth the issues and contentions of the aggrieved party or parties and must reasonably allege a specific violation of an express provision of this Agreement. (In the case of a discharge the time limits shall be fourteen (14) days.) The Employer designee and the Union Business Representative shall meet within ten (10) days after receipt of written notice of the grievance and attempt to resolve the grievance. In an instance where an employee feels he has not been paid in accordance with the wage progression scales set forth herein, such employee shall have an obligation to bring this to the attention of the Store Manager as soon as the employee first has knowledge of such alleged error. In the event the employee has been improperly paid, said payment error shall be corrected on a retroactive basis, but not beyond ninety (90) days prior to the date on which the grievance is presented in writing. This ninety (90) day retroactive liability shall not be applicable to situations covered by Article 9, Section 22, paragraph 2.

**Section 113. Step 3.** If the grievance is not satisfactorily adjusted in Step 2, either party may, with reasonable promptness, but in no event later than thirty (30) days from the date of the Step 2 meeting, in writing, request arbitration and the other party shall be obligated to proceed with arbitration in the manner hereinafter provided. The parties shall forthwith attempt to agree upon an impartial arbitrator.

**Section 114.** In the event the parties are unable to reach agreement upon the selection of an arbitrator within fifteen (15) days of the written request for arbitration, the party requesting arbitration may, with reasonable promptness, request a panel of seven (7) arbitrators from the Federal Mediation and Conciliation Service. From this panel of seven (7) names, each party shall alternately strike three (3) names, the moving party striking first. The remaining arbitrator from the list shall be the impartial arbitrator. A finding or award of the arbitrator shall be final and conclusive upon the parties hereto.

**Section 115.** The arbitrator shall have all the rights, power, and duties herein given, granted and imposed upon him; but his award shall not change, alter or modify any of the terms and conditions set forth in this Agreement. The expenses of the impartial arbitrator shall be shared equally by the parties. The arbitrator will issue his decision within thirty (30) calendar days after the close of the proceedings. This thirty (30) day calendar time limit may be extended by mutual agreement between both parties.

**Section 116.** In the event either party refuses to arbitrate on demand of the other party, and an order compelling arbitration is obtained in Federal Court on the basis contended by the moving party, the refusing party will pay to the moving party reasonable legal fees incurred, up to two hundred dollars ($200.00). Similarly, if the moving party fails to prevail in such an issue, the moving party will pay reasonable legal fees incurred up to two hundred dollars ($200.00) to the refusing party.

**Section 117. Remedies for Errors:** If an error is made by management in the application of the provisions of this Agreement resulting in a lost work opportunity for the aggrieved employee such as vendor stocking, scheduling and assignment of hours disputes, classification issues, and work jurisdiction matters and the affected employee immediately files a grievance, the employee shall be made whole by being permitted to work the number of hours lost. Such hours shall be above and beyond the posted schedule. The employee shall advise management anytime after the next schedule is finalized for the workweek of their desire to exercise their right to work the hours due during the workweek on the date and time determined by the employee. An aggrieved employee may not demand such remedy on an overtime or premium-pay basis if the alleged violation occurred on what would have been a straight-time day for such employee. The employee must exercise this right to work within four (4) weeks of the settlement of error with the employee or such right shall be forfeited and no further remedy shall be required.

## ARTICLE 44

## NO STRIKE OR LOCKOUT

**Section 118.** During the life of this Agreement, there shall be no lockout, strike, picketing, boycotting, stoppage of work, anti-company publicity or other economic action of whatsoever nature, against the Company.

It is understood that it shall be a violation of this Agreement for the Union or its agents to require its members to observe picket lines set up by any labor organization at the premises of the Employer.

## ARTICLE 45

## STORE CLOSING

**Section 119. Severance Pay Upon Termination When Store is Sold or Closed.** In the event the Employer closes or sells a store and employees are terminated as a result thereof, pay equal to one week's pay for each year of continuous service commencing with the third (3rd) year of continuous service for employees, up to, but not to exceed eight (8) weeks pay at their regular rate. However, those employees who have an incomplete year of continuous service as an employee will receive pro-rata severance pay for that year as follows:

0-3 months equals twenty-five (25) percent of a week's pay.
3-6 months equals fifty (50) percent of a week's pay.
6-9 months equals seventy-five (75) percent of a week's pay.
Over 9 months equals one week's pay.

Severance pay shall be computed based on the average hours worked per week for the fifty-two (52) weeks preceding a voluntary lay-off or termination.

**Section 120.** The Employer shall continue contributions to the Pension and Health and Welfare Trust Funds for three (3) full months following termination on an hourly basis in direct relationship to the severance pay received for those employees who receive severance pay, except those employees who secure employment with a contributing Employer in the Pension and Health and Welfare Trust Funds.

**Section 121.** All moneys due employees, including severance pay, shall be paid in a lump sum upon termination.

**Section 122.** An employee who is terminated and who is eligible for severance pay, and accepts severance pay, forfeits his seniority and has no recall rights. However, an employee may elect to accept a voluntary layoff not to exceed ninety (90) days. At the end of the ninety (90) day period, if he has not been recalled, he will be paid severance pay and forfeit his seniority. Any extensions of this ninety (90) day period must be agreed upon in writing and signed by the employee, a representative of the Union and the Employer. In no case will such extension exceed a total of six (6) months from the date the employee accepted the layoff.

**Section 123.** If an employee is offered a transfer or other employment with the Employer within forty (40) miles of the store in which he was last working and he refuses to accept the transfer or other employment with the Employer he forfeits his rights to severance pay and pensions and health and welfare contributions.

45

**Section 124.** If a store is sold and the successor Employer offers employment to an employee who is otherwise eligible for severance pay under the terms of this Article and the new job is comparable, then no provisions of this Article shall apply.

**Section 125.** The Employer agrees to give to the employees and the Union four (4) weeks' notice in advance of a store closing or sale. When such notice is given, an employee shall remain with the Employer until the plant or store closes, or forfeits his rights under this Article, unless mutually agreed to by the employee, Employer and Union.

**Section 126.** No benefits shall accrue under the terms of this Article unless the Employer makes a business decision to close or sell a store. If a store closing is caused by fire, flood, storm, land condemnation or remodeling then this Article shall not apply.

**Section 127.** It is understood and agreed that employees can exercise their seniority rights under the Layoff Article; however, if they exercise such seniority rights, the provisions of this Article shall be null, void and not applicable. Employees may exercise their seniority rights to bump the least senior employee in their classification in the bargaining unit closest to their home, provided all stores in the affected bargaining unit have closed; however, if they exercise such seniority rights, the provisions of this Article shall be null, void and not applicable.

## ARTICLE 46
## BULLETIN BOARD

**Section 128.** The Employer will provide bulletin board space for the posting of official Union notices.

## ARTICLE 47
## UNION STORE CARDS

**Section 129.** The Union Store Card is the property of the UFCW and is loaned to the Employer for display. Said card may be removed from the store by the Union if the Employer refuses to comply with a final decision of an arbitrator reached under the provisions of this Agreement.

## ARTICLE 48
## LIE DETECTOR TESTS

**Section 130.** The Employer shall not require any employee to submit to a polygraph examination.

## ARTICLE 49

## UNIFORMS/EQUIPMENT

**Section 131.** The Employer agrees to provide all required uniforms and laundry service for all required caps, uniforms, smocks, aprons, towels and rags, except for laundering of drip-dry garments. The employee agrees to exercise care in the use of Company property and equipment.

Notwithstanding the above, the employee shall be required to meet the dress requirements as detailed in the Letter of Understanding, "Dress Requirements," attached to this Agreement.

## ARTICLE 50

## PHARMACY TECHNICIANS

**Section 132.** Effective with the signing of this Agreement the selection of employees to perform as Pharmacy Technicians shall be at the discretion of the Employer. Pharmacy Technicians shall be enrolled in the Employer's Technician training program. The Pharmacy Technician will be on probation during the length of the training program and will be demoted, or terminated in the case of a new hire, during said probationary period if satisfactory progress is not made in the training program.

Employees who are performing as Pharmacy Technicians on the effective date of this Agreement shall be evaluated to determine their skills, abilities and knowledge relative to their position. Employees in need of additional training shall be enrolled in the training program and given the specific training needed to correct the deficiency. In the event the employee is unable to satisfactorily complete the training then he will be demoted.

## ARTICLE 51

## MASTER SAFETY COMMITTEE

**Section 133.** The Employer and the Union will jointly set up a Master Safety Committee to discuss and work towards resolving safety issues in the workplace. The Master Safety Committee shall include at least two (2) Employer officials and at least two (2) Union officials as well as up to five (5) employee participants.

The Employer and the Union agree to seek information relative to ergonomic stresses common in the workplace. The Master Safety Committee will meet periodically to review the information obtained. The parties will discuss and work toward resolving ergonomic safety issues found to be prevalent in the workplace.

The Employer shall pay employee participants their regular hourly rate of pay for all time so spent and mileage for Company authorized joint meetings.

## ARTICLE 52

## JOINT LABOR MANAGEMENT COMMITTEES

**Section 134.** There shall be established in each store a joint Labor Management Committee whose purpose shall be to investigate, study and discuss mutual solutions to problems affecting Labor-Management relations in the store in a sincere attempt to improve the parties' basic relationship. The Committee in each store shall be made up of an equal number of Union and Employer representatives and shall develop its own guidelines as determined by the participants in the store and as approved by the Union and the Employer. The Committee shall not have the authority to modify the terms of this Agreement.

## ARTICLE 53

## SAVING CLAUSE

**Section 135.** If, during the term of this Agreement, or during any renewal or extension of the same, any Federal or State Law is enacted, or any rule or regulation is issued under any Federal or State Law, which would make compliance by the Union, the Employer, employees, or any of them, with the terms, provisions, or condition of this Agreement a violation of any of said laws, rules or regulations, then such terms, provisions or conditions shall become inoperative and of no effect from the effective date of any such decision, law, rule or regulation. The remainder of this Agreement not in conflict with any of said laws, rules or regulations shall continue in full force and effect.

**Section 136.** In the event any such terms, provisions or conditions become inoperative and of no effect, either party to this Agreement may open the same for bargaining only as to substitute provisions, if any, for those provisions made inoperative upon a thirty (30) days written notice to the other party.

It is specifically understood that the no-strike and no-lockout provision set forth elsewhere in this Agreement shall remain in effect throughout the term of this Agreement.

## ARTICLE 54

## APPRENTICE ADVANCEMENT

**Section 137.** When an apprentice employee is due to be advanced on the basis of actual hours of work experience as set forth in this Agreement, and the Employer believes that such employee has not acquired sufficient knowledge, skill, experience, and ability to justify such increases, the Employer may, with written prior consent of the

Union, jointly request an apprentice evaluation committee, as set forth in the next paragraph, to review the employee and make a determination as to whether a period of up to two hundred sixty (260) hours additional training is warranted at the existing classification rate then in effect for such employee to give the employee an opportunity to improve his performance. At the end of such two hundred sixty (260) hour period, the employee must either be advanced to the next higher wage classification, or be terminated, if such termination is justified under the terms of the Agreement.

**Section 138.** Upon request, as set forth in the previous paragraph, an apprentice evaluation committee may be established by the parties as follows: two (2) members appointed by Mountain States Employers Council and two (2) members appointed by UFCW, Local No. 7. The apprentice evaluation committee will meet with and review any apprentice employee who, in the opinion of the Employer, does not have the capabilities to warrant a classification increase.

**Section 139.** The committee shall determine whether additional training is warranted for the employee's classification requirements.

## ARTICLE 55
## TECHNOLOGICAL CHANGES

**Section 140.** The parties recognize that automated equipment and technology is now available for the retail food industry. The Employer recognizes that there is a desire to protect and preserve work opportunities. At the same time, the Union recognizes that the Employer has a right to avail itself of modern technology. With this common objective, the parties agree as follows:

**Section 141.** In the event the Employer introduces major technological changes which, for the purpose of this Article, are defined as price marking and electronic scanners and which would have a direct material impact affecting bargaining unit work, thirty (30) days advance notice of such change will be given the Union.

In addition, the Employer agrees:

1. Any retraining necessary will be furnished by the Employer at no expense to the employees.

2. Where retraining is not applicable the Employer will make every effort to effect a transfer to another store, or other employment.

3. In the event the employee is not retrained or transferred and is permanently displaced as a direct result of major technological changes as defined above, the employee will be eligible for severance pay in accordance with the following provisions:

a) All employees, excluding courtesy clerks, with two (2) or more years of continuous service will be eligible for one (1) week's severance pay for each year of continuous service. Maximum severance pay of ten (10) weeks' pay to be paid on a lump sum basis. Weekly severance pay shall be determined by the average number of hours worked for the four (4) weeks preceding displacement, not to exceed forty (40) hours' straight-time pay.

b) An employee shall be disqualified from severance pay in the event the employee:

(1) Refuses retraining,

(2) Refuses a transfer or other employment within a radius of forty (40) miles

(3) Voluntarily terminates employment.

## ARTICLE 56
### ENTIRE AGREEMENT

**Section 142.** This Agreement contains all of the covenants, stipulations and provisions agreed upon between the parties hereto and no representative of either party has authority to make, and none of the parties shall be bound by, any statement, representation or agreement reached prior to the signing of this Agreement or made during these negotiations not set forth herein.

## ARTICLE 57
### TERM OF AGREEMENT

**Section 143.** The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Agreement.

**Section 144.** This Agreement shall be in full force and effect beginning at 12:01 a.m. on September 12, 2004, and shall remain in full force and effect until midnight on May 9, 2009, and shall be automatically renewed from year to year thereafter, unless

either party desires change or termination at the expiration of said Agreement. In such event, the party desiring such change or termination shall notify the other party in writing sixty (60) days prior to the expiration date, specifying the changes desired. Changes in the Agreement shall be limited to those outlined in writing by either party and the negotiations shall begin within fifteen (15) days after receipt of such notice.

IN WITNESS WHEREOF, the Parties above named have signed their names and/or affixed the signature of their authorized representative this ___6th___ day of _April_ 2006.

UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL 7, DENVER, CO
   Chartered by
UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL      KING SOOPERS, INC.
UNION, AFL-CIO             DENVER, CO

BY: _Kevin R. Schneider_     BY: _John J. McClure_

DATE: ___4-11-06___      DATE: ___4/6/06___


## COST OF LIVING ALLOWANCE

Effective May 18, 1986, for employees other than Courtesy Clerks, there shall be a cost of living allowance based on the increase in the Revised Consumer Price Index for Urban Wage Earners and Clerical Workers of the Bureau of Labor Statistics, US Department of Labor (1967 = 100) between March, 1985 and March, 1986. There shall be a one cent (1¢) per hour adjustment for every full (.4) increase in the Index which exceeds an increase of five point five percent (5.5%) in the Index during the period between March, 1985 and March, 1986.

## KING SOOPERS CLERKS AGREEMENT

The minimum wages for the indicated classifications shall be as set forth below on the dates indicated. The Employer may hire any employee at any rate in the progression schedule at its sole discretion.

### Rate determination

Employees hired before March 6, 2005 who remain in their classification after commencement of this Agreement shall be paid in accordance with the "hired and assigned in the bargaining unit prior to March 6, 2005" wage schedule while they remain in that classification.

**Demotions, Step Downs and layoffs:** An employee who is demoted, steps down, or who is laid off in accordance with this Agreement, shall be placed back into the same wage schedule in which the employee was working immediately prior to their assignment into management or promotion into the classification from which they are being demoted, stepping down or laid off. In determining the proper progression level for an employee demoted, stepping down, or laid off from a classification with a higher "thereafter" hourly rate to a classification with a lower "thereafter" hourly rate, such affected employee shall be placed in the appropriate progression level in the rate schedule referenced in this paragraph based on their experience in the newly assigned classification, regardless of whether such assigned rate results in a reduction in hourly rate. In determining prior experience hereunder, the Employer will give recognition to the verified number of hours of actual work experience in the same classification which said employee may have performed for the Employer and the verified number of hours actual work experience on a comparable job which said employee may have performed within the previous five (5) years for any other employer in a similar retail grocery operation.

**Rate Determination – Promotions, new hires and new entrants into the bargaining unit:** Employees hired into, or assigned to, or promoted to a different classification, the bargaining unit on or after March 5, 2005 shall be assigned to the "EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005" wage scale. Employees who are promoted to a different classification after March 5, 2005 shall not receive a reduction in their hourly rate of pay if when promoted to such classification they are being paid an hourly rate of pay greater than the minimum, unless they are above the "thereafter" hourly rate in which case they will immediately be paid the "thereafter" hourly rate. When such employee is paid less than the "thereafter' hourly rate, prior to receiving an increase in their hourly rate of pay, they must work 1, 040 hours at their current rate before promotion to the hourly rate in the new classification that would give them an increase in their hourly rate of pay.

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | | EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|---|---|
| **ALL PURPOSE /NUTRITION CLERK** | | **ALL PURPOSE /NUTRITION CLERK** | |
| FIRST 960 HOURS OF WORK | $10.13 | 1st 1040 hours worked | $9.13 |
| | | Next 1040 hours worked | $10.13 |
| SECOND 960 HOURS OF WORK | $11.92 | Next 1040 hours worked | $11.03 |
| | | Next 1040 hours worked | $11.80 |
| THIRD 960 HOURS OF WORK | $12.85 | Next 1040 hours worked | $12.55 |
| | | Next 1040 hours worked | $13.25 |
| FOURTH 960 HOURS OF WORK | $13.87 | Next 1040 hours worked | $14.00 |
| | | Next 520 hours worked | $14.80 |
| JOURNEYMAN | $15.66 | Thereafter | $15.66 |
| | | | |
| **CERTIFIED – PHARMACY TECHNICIANS** | | **CERTIFIED – PHARMACY TECHNICIANS** | |
| | | Next 1040 hours worked | $10.13 |
| | | Next 1040 hours worked | $11.03 |
| | | Next 1040 hours worked | $11.80 |
| | | Next 1040 hours worked | $12.55 |
| FIRST 960 HOURS OF WORK | $12.85 | Next 1040 hours worked | $13.25 |
| | | Next 1040 hours worked | $14.00 |
| SECOND 960 HOURS OF WORK | $13.87 | Next 520 hours worked | $14.80 |
| | | Thereafter | $15.66 |
| JOURNEYMAN | $15.66 | | |
| | | | |
| **BAKERY CLERK** | | **BAKERY CLERK** | |
| | | 1st 1040 hours worked | $7.79 |
| | | Next 1040 hours worked | $8.45 |
| | | Next 1040 hours worked | $9.10 |
| | | Next 1040 hours worked | $9.75 |
| | | Next 1040 hours worked | $10.40 |
| FIRST 960 HOURS OF WORK | $9.59 | Next 1040 hours worked | $11.05 |
| SECOND 960 HOURS OF WORK | $10.75 | Next 1040 hours worked | $11.70 |
| THIRD 960 HOURS OF WORK | $11.76 | Next 520 hours worked | $12.35 |
| THEREAFTER | $13.03 | Thereafter | $13.03 |
| | | | |
| **PHARMACY TECHNICIAN** | | **PHARMACY TECHNICIAN** | |
| | | 1st 1040 hours worked | $7.79 |
| | | Next 1040 hours worked | $8.45 |
| | | Next 1040 hours worked | $9.10 |
| | | Next 1040 hours worked | $9.75 |
| | | Next 1040 hours worked | $10.40 |

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | |
|---|---|
| FIRST 960 HOURS OF WORK | $9.28 |
| SECOND 960 HOURS OF WORK | $10.24 |
| THIRD 960 HOURS OF WORK | $11.96 |
| THEREAFTER | $13.03 |

| PLANT/FLORAL CLERK | |
|---|---|
| | |
| | |
| | |
| | |
| FIRST 960 HOURS OF WORK | $9.28 |
| SECOND 960 HOURS OF WORK | $10.24 |
| THEREAFTER | $11.96 |

| PLANT/FLORAL MANAGER | $15.02 |
|---|---|

| NON-FOOD OR GENERAL MERCHANDISE CLERK | |
|---|---|
| (EMPLOYED PRIOR TO MAY 6, 1979. THERE SHALL BE NO FUTURE ASSIGNMENT TO THIS CLASSIFICATION) | |
| THEREAFTER | 11.96 |

| NON-FOOD OR GENERAL MERCHANDISE CLERK | |
|---|---|
| FIRST 960 HOURS OF WORK | $7.79 |
| | |
| SECOND 960 HOURS OF WORK | $8.59 |
| | |
| | |
| THIRD 960 HOURS OF WORK | $9.60 |
| THEREAFTER | $10.13 |

| SANITATION | |
|---|---|
| | |
| | |
| | |
| | |

| EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|
| Next 1040 hours worked | $11.05 |
| Next 1040 hours worked | $11.70 |
| Next 520 hours worked | $12.35 |
| Thereafter | $13.03 |

| PLANT/FLORAL CLERK | |
|---|---|
| 1st 1040 hours worked | $7.79 |
| Next 1040 hours worked | $8.30 |
| Next 1040 hours worked | $8.80 |
| Next 1040 hours worked | $9.30 |
| Next 1040 hours worked | $9.80 |
| Next 1040 hours worked | $10.30 |
| Next 1040 hours worked | $10.80 |
| Next 520 hours worked | $11.50 |
| Thereafter | $11.96 |

| PLANT/FLORAL MANAGER | $15.02 |
|---|---|

| NON-FOOD OR GENERAL MERCHANDISE CLERK | |
|---|---|
| 1st 1040 hours worked | $7.79 |
| Next 1040 hours worked | $8.09 |
| Next 1040 hours worked | $8.39 |
| Next 1040 hours worked | $8.64 |
| Next 1040 hours worked | $8.89 |
| Next 1040 hours worked | $9.14 |
| Next 1040 hours worked | $9.39 |
| Next 520 hours worked | $9.69 |
| Thereafter | $10.13 |

| SANITATION | |
|---|---|
| 1st 1040 hours worked | $7.79 |
| Next 1040 hours worked | $8.09 |
| Next 1040 hours worked | $8.39 |
| Next 1040 hours worked | $8.64 |
| Next 1040 hours worked | $8.89 |

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | |
|---|---|
| FIRST 960 HOURS OF WORK | $10.41 |
| SECOND 960 HOURS OF WORK | $11.57 |
| THIRD 960 HOURS OF WORK | $12.69 |
| THEREAFTER | $13.95 |
| | |
| **COURTESY CLERK** | |
| THIRD 480 HOURS OF WORK | $6.91 |
| THEREAFTER | $7.30 |
| | |
| **SALAD BAR CLERKS** | |
| FIRST 960 HOURS OF WORK | $7.79 |
| SECOND 960 HOURS OF WORK | $8.59 |
| | |
| | |
| | |
| | |
| | |
| THEREAFTER | $9.60 |
| | |
| **DELIVERY DRIVERS** | |
| (EMPLOYED ON OR AFTER 10/21/90) | |
| FIRST 960 HOURS OF WORK | $6.99 |
| SECOND 960 HOURS OF WORK | $7.77 |
| THIRD 960 HOURS OF WORK | $8.59 |
| THEREAFTER | $9.62 |
| | |
| | |
| | |
| | |
| | |
| **HEAD CLERK & NIGHT CREW FOREMAN** | $16.06 |
| | |
| **PRODUCE MANAGER** | $16.74 |
| | |
| **GENERAL MERCHANDISE MANAGER** | |
| (ASSIGNED AFTER 8/1/82) | $16.21 |

| EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|
| Next 1040 hours worked | $9.14 |
| Next 1040 hours worked | $9.39 |
| Next 520 hours worked | $9.69 |
| Thereafter | $10.13 |
| | |
| **COURTESY CLERK** | |
| THIRD 480 HOURS OF WORK | $6.91 |
| THEREAFTER | $7.30 |
| | |
| **SALAD BAR CLERKS** | |
| 1st 1040 hours worked | $7.79 |
| Next 1040 hours worked | $8.09 |
| Next 1040 hours worked | $8.39 |
| Next 1040 hours worked | $8.64 |
| Next 1040 hours worked | $8.89 |
| Next 1040 hours worked | $9.14 |
| Next 1040 hours worked | $9.39 |
| Next 520 hours worked | $9.50 |
| Thereafter | $9.60 |
| | |
| **DELIVERY DRIVERS** | |
| | |
| 1st 1040 hours worked | $7.79 |
| Next 1040 hours worked | $8.09 |
| Next 1040 hours worked | $8.39 |
| Next 1040 hours worked | $8.64 |
| Next 1040 hours worked | $8.89 |
| Next 1040 hours worked | $9.14 |
| Next 1040 hours worked | $9.39 |
| Next 520 hours worked | $9.50 |
| Thereafter | $9.62 |
| | |
| **HEAD CLERK & NIGHT CREW FOREMAN** | $16.06 |
| | |
| **PRODUCE MANAGER** | $16.74 |
| | |
| **GENERAL MERCHANDISE MANAGER** | |
| (ASSIGNED AFTER 8/1/82) | $16.21 |

| EMPLOYEES HIRED AND ASSIGNED IN THE BARGAINING UNIT PRIOR TO MARCH 6, 2005 | | EMPLOYEES HIRED INTO THE BARGAINING UNIT OR ASSIGNED OR PROMOTED ON OR AFTER MARCH 6, 2005 | |
|---|---|---|---|
| **GENERAL MERCHANDISE MANAGER** | | **GENERAL MERCHANDISE MANAGER** | |
| (ASSIGNED PRIOR 5/1/82: | $16.21 | (ASSIGNED PRIOR 5/1/82: | $16.21 |
| NON-EXPANDED STORE) | | NON-EXPANDED STORE) | |
| | | | |
| **\*\*GENERAL MERCHANDISE MANAGER** | | **\*\*GENERAL MERCHANDISE MANAGER** | |
| (ASSIGNED PRIOR 5/1/82: | $16.83 | (ASSIGNED PRIOR 5/1/82: | $16.83 |
| EXPANDED STORE) | | EXPANDED STORE) | |
| | | | |
| **\*\*G.M. DEPT. HEAD TRAINEE** | | **\*\*G.M. DEPT. HEAD TRAINEE** | |
| (ASSIGNED PRIOR 5/1/82: | $15.66 | (ASSIGNED PRIOR 5/1/82: | $15.66 |
| | | | |
| **SANITATION MANAGER** | $14.94 | **SANITATION MANAGER** | $14.94 |
| | | | |
| **IN-STORE FILM LAB MANAGER** | $12.44 | **IN-STORE FILM LAB MANAGER** | $12.44 |
| | | | |
| **ASSISTANT BAKERY MANAGER** | $14.18 | **ASSISTANT BAKERY MANAGER** | $14.18 |
| | | | |
| **BAKERY MANAGER** | $16.41 | **BAKERY MANAGER** | $16.41 |

**Annual Lump Sum Bonus:** Effective the second Sunday following ratification and acceptance of this Agreement and effective the first Sunday of September 2005, respectively, employees who were hired on or before March 5, 2005, except courtesy clerks, who have been continuously employed during the trailing one year period of each of these Sunday effective dates and who are actively employed on each of these effective dates and who are, on the effective date of this bonus, at the top rate for their classification, shall be paid a lump-sum bonus equal to thirty cents ($0.30) per hour times their total paid vacation hours, paid holiday hours, and hours worked during the trailing one year period. Such bonuses shall not be paid to any employee hired on or after March 6, 2005.

Effective September 10, 2006 and September 9, 2007, respectively, only the "Thereafter rates, except courtesy clerks, shall be increased by thirty cents ($0.30).

## LETTER OF UNDERSTANDING

## EMPLOYEE BUYOUT

The Employer, at its discretion, may establish a buyout program as follows:

1. Employees with ten (10) or more years of service who elect his buyout by a date determined by the Employer and who work through their release date.

   - $500 per year of service – Part-time employees

   - $1,000 per year of service – Full-time employees

2. Employer retains the right upon notification to the Union to:

   - Establish offer dates and release dates

   - Terminate or extend the program

   - Require employees to sign a waiver and release

   - Limit the maximum payout under this program to any employee to 20 years of service

3. The employer may limit, by bargaining unit, the number of employees who can take this buyout at each store or facility. If more employees elect than permitted – Go by seniority.

4. Program not subject to Grievance and Arbitration Procedure

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL #7

KING SOOPERS, INC.

BY: _Kevin R. Schneider_

BY: _____

DATE: _4-11-06_

DATE: _4/6/06_

# LETTER OF UNDERSTANDING

## COURTESY CLERKS

King Soopers and UFCW Local No. 7 hereby agree as follows:

The parties have agreed that Courtesy Clerks who have more than three (3) years of continuous service as a Courtesy Clerk with King Soopers shall, during the term of this Agreement, be compensated at a straight-time hourly wage rate fifty-five cents ($0.55) per hour above the "thereafter" Courtesy Clerk wage rate set forth in Appendix "A" of this Agreement.

UNITED FOOD AND COMMERCIAL WORKERS, LOCAL #7

BY: _Kevin R. Schneider_

DATE: _4-11-06_

KING SOOPERS, INC.

BY: _____

DATE: _4/6/06_

# LETTERS OF AGREEMENT

The Letters of Understanding, which are carried over into the new five (5) year Agreement, are as follows; all others are deemed null and void:

1. Extension of thirty-day time limit as set forth in Article 21. Section 49, Step 3. Dated 6/27/80.

2. Settlement of NLRB Case 27-CA-8665, Information/Customer Complaints. Dated 5/4/84

3. Posting Official Notice Arbitration. Dated 5/14/84.

4. Hiring of Journeyman Floral Clerk. Dated 7/17/85.

5. Expedited Arbitration Procedures. Dated 10/2/87.

6. Definitions of "Beverages" in CBA. Dated 11/11/87.

7. Sick Pay Request Forms. Dated 11/17/87.

8. Sick Pay Accumulation. Dated 1/6/88.

9. Grievances Resolved at Store Level by Stewards. Dated 1/6/88.

10. Pharmacy Technician Staffing. Dated 1/11/88.

11. Promotions, Article 30, Section 71. Dated 1/3/88.

12. In-Store Film Processing Labs. Dated 11/3/88.

13. Outdoor Bedding Plant Sales/Holiday Pay. Dated 4/6/89.

14. Demotions and Step Downs. Dated 4/6/89.

15. In-Store Film Processing Labs. (Store #36) Dated 8/31/90.

16. ACTMEDIA, Inc. Dated 9/24/90.

17. Video Sales Snack Items. Dated 10/5/90.

18. Special Order Person. Dated 10/10/90.

19. Delivery Driver Supplemental Agreement. Dated 3/14/91

20. In-Store Film Processing Lab. Dated 5/7/91.

21. Community Ministries Volunteers. Dated 5/13/91.

22. Test of Pharmacy Technicians' Floater Pool. Dated 6/18/91.

23. Reclamation Center/Dry Cleaning. Dated 7/31/91.

24. Travel Agency. Dated 8/5/91.

25. Volunteer Organizations Participating in Coupon Programs. Dated 9/6/91.

26. Arbitrators Decision, Personal Beepers/Pagers. Dated 2/17/92.

27. Teleshopper Selection Center Supplemental Agreement. Dated 12/1/95.

28. Four Ten Hour Days. Dated 8/6/96

29. Dress Requirements. Dated 4/17/97

30. Pharmacy Technicians Agreement. Dated 6/25/98

31. Delivery Drivers. Dated 11/17/00

32. Pharmacy Technicians. Dated 6/27/00

UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL #7

KING SOOPERS, INC.

BY: _Kevin R. Schneider_

BY: _____

DATE: _4-11-06_

DATE: _4/6/06_

# LETTER OF AGREEMENT

## #1

## EXTENSION OF THIRTY DAY TIME LIMIT AS SET FOR IN ARTICLE 21, SEC. 49.

## STEP 3. DATED 6/27/80.


June 27, 1980

Edward Behlke, Vice President
King Soopers, Inc.
65 Tejon Street
Denver. CO 80223

      Re:    Extension of Thirty Day Time Limit as Set Forth in Article 21, Section 49, Step 3

Dear Ed:

      In the newly adopted bylaws of Local 7, there is a provision which will allow a member to appeal the Union's recommendation not to arbitrate a member's particular grievance. This appeal is brought before the Local Union's Executive Board.

      Because of this procedure, the decision to arbitrate a particular grievance could go beyond the thirty (30) day time limit.

While the Union certainly has the right to request arbitration and then cancel such arbitration, the Union feels that it would be in the best interest of both parties and less paperwork if the Company would agree to extend this thirty (30) days provided that the Union notifies the Company of the grievance and the date of the appeal. The Union would further agree that in the event it chose to arbitrate said grievance, the Union must request such arbitration within ten (10) days after the appeal date.

As I recall, I have previously discussed this with you or one of your representatives and you have indicated that this procedure would be agreeable. If for some reason this does not meet with your approval, would you please contact me promptly?

Thanking you in advance, I am


**The original document was signed by Charles E. Mercer and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #2

## SETTLEMENT OF NLRB CASE 27-CA-8665, INFORMATION/CUSTOMER COMPLAINTS. DATED 5/4/84

Letter of Settlement
between
King Soopers. Inc.
and
United Food and Commercial Workers, Local Union No. 7

King Soopers, Inc. (hereinafter the "Employer") and United Food and Commercial Workers, Local Union No. 7 (hereinafter the "Union"), hereby agree to settle the allegations set forth in the Charge Against Employer in Case No. 27-CA-8665 on the following basis:

1.  The Union hereby releases, remises and forever discharges the Employer from all matters asserted in the Charge Against Employer or Complaint and Notice of hearing in Case No. 27-CA-8665 now pending before the National Labor Relations Board, which charge the Union agrees to withdraw with prejudice and the Union agrees to take all procedural steps necessary to accomplish the dismissal of the Complaint therein.

2.  The Employer denies that it has engaged in any unfair labor practices and the Employer's concurrence in this agreement shall not constitute an admission of any unfair labor practice.

3.  If an employee is disciplined or discharged as a result of a customer alleging misconduct and a grievance is filed protesting the discipline or discharge which is presented to arbitration, upon request, the attorney representing the Union will be provided the name and telephone number of the complaining customer. The attorney will contact the customer by telephone, if contact is desired. If the customer agrees to a meeting in person during the telephone conversation, the Employer will provide the Union with the customer's address. If the customer does not have a telephone at home or at work, the Employer will provide the attorney representing the Union with the customer's address.

4.  The Union's attorney shall keep the customer's name, telephone number and/or address confidential to himself or herself, except in the case of the Union's law firm the name, telephone number, and/or address may be provided to a law clerk.

5.  The Union's attorney shall not intimidate, threaten or otherwise harass the customer, but shall conduct themselves in a professional manner.

IN WITNESS WHEREOF, the above named parties affix their names and the signatures of their duly authorized representative this 4th of May, 1984.

**The original document was signed by Charles Mercer and Steven Niven and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #3

## POSTING OFFICIAL NOTICE ARBITRATION.  DATED 5/14/84

May 14, 1984

Michael C. Severns, Esq.
Mountain States Employers Council
1790 Logan Street
Box 539
Denver, Colorado 80201

      Re:      UFCW-7 v. King Soopers (Posting Official Union Notice Arbitration)

Dear Mike:

This letter will confirm that we have orally reached an agreement to settle this case on Thursday, May 10. Enclosed with this letter is a draft of the language which we have discussed over the telephone which is part of the settlement.

      Outside of the settlement, we have made some other agreements or exchanged ideas. First, it is agreed that the August 29, 1983 notice which cased this grievance to be filed, would be considered proper under the attached language. Second, with respect to management reviewing the notice, we have agreed that such a review cannot unreasonable interfere with the timing of the notice, i.e., if it is important that the notice be posted immediately because its content needs to be knows before a date arising in the immediate future, it would not be proper for Kings to unreasonably insist that a particular individual review the notice who is not then available. If, however there is no particular time crunch involved, there is a fair amount of flexibility in terms of who reviews the notice and when.

      Finally, with respect to the word inflammatory which is included in the settlement, we discussed two different sets of circumstances, one of which we would agree is inflammatory and one of which we would agree is not inflammatory. We recognize that there may be a fine line between the two and hope that all parties will act reasonably in interpreting the language in the facts of each case. With respect to what is inflammatory, it would be improper for the union in a notice to encourage members to file numerous and multiple grievances in an effort to harass King Soopers. It would not be inflammatory for the union to explain rights and to inform the employees that if they have problems or beliefs that these rights are being violated to discuss the matter with their steward or business agent.

      I believe that this settlement is fair and reasonable for all sides and that the problem probably arose because of the heat of the moment. To my knowledge, there had never been any problems in the past with posting of notices and it is my firm hope that there will be none in the future. I appreciate your cooperation in helping reach a prompt and reasonable resolution to this matter. If you have any questions about the language, please feel free to call.

**The original document was signed by Thomas Buescher on 5/14/84 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #4

## HIRING OF JOURNEYMAN FLORAL CLERK.  DATED 7/17/85

### SETTLEMENT AGREEMENT

The United Food and Commercial Workers Union, Local No. 7 and King Soopers, Inc., hereby agree to resolve the grievance in Case #230-85 as follows:

1. It is agreed that the word "Journeymen" in Section 84 of the collective bargaining agreement refers to all classifications, having a Journeymen or a "Thereafter" rate.

2. It is agreed that, in the circumstances of this case, the Company did have a specific need to hire a Journeyman Floral Clerk and thus, the above-referenced grievance is hereby withdrawn on a non-precedent setting basis. The Company acknowledges however, that it has an obligation to review such hiring before they occur and will do so in all future cases.

**The original document was signed by Ed Behlke and Charles E. Mercer on 7/17/85 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF UNDERSTANDING

## #5

## EXPEDITED ARBITRATION PROCEDURES.  DATED 10/2/87

Between

King Soopers, Inc. and UFCW Local No. 7

EXPEDITED ARBITRATION PROCEDURES

Effective upon ratification of a collective bargaining agreement, the parties signatory below agree to adopt an expedited arbitration procedure as outlined below. Notwithstanding the provisions of such agreement, the parties recognize that arbitration's already scheduled prior to the effective date of this agreement shall be arbitrated as in the past and not subject to the provisions of this agreement unless the parties mutually agree to do so.

Arbitrators David Goodman and Harry Maclean shall be selected as the arbitrators to hear cases arising under this procedure. The parties will direct the arbitrators to set aside one day per month to hear arbitration's under this procedures. As near as practical, such dates will be during the second and fourth week of each month. If necessary, and the parties mutually agree, the arbitrators will be asked to set aside more days per month.

The parties shall meet biweekly to review cases pending arbitration and to schedule cases for arbitration under this procedure. Should a case scheduled for arbitration be settled prior to the scheduled date, the parties will make an earnest effort to substitute another case for the scheduled date.

Except as otherwise set forth in this agreement, all discipline cases, including discharges, shall be subject to the provisions of this procedure. Contract interpretation cases, upon mutual agreement by both parties, shall also be subject to this procedure.  For discipline cases, other than discharges, both parties agree, where practical, to schedule at least two such cases to be heard on one day, with the understanding that the presentation of such cases shall not exceed four hours, with both sides being allocated two hours for the presentation of their case and cross-examination of witnesses of the opposing side.

For all discipline cases, including discharges, both parties will make closing oral arguments unless mutually agreed otherwise, and the arbitrator will issue a brief written award. Where practical, the parties will direct the arbitrator to issue a written bench decision and summarize his decision in a one-page letter following the arbitration. The arbitrator, at his discretion, may request no more than seven days to deliberate on the issues of a particular case. In this regard, an arbitrator will issue his award within fourteen days following the close of the hearing.

Both parties will direct the arbitrator to issue an abbreviated award, which details only the arbitrator's award and a brief explanation as to the reasons for this award. In the case of contract interpretive matters, both parties recognize the need to file briefs and have the arbitrator write a detailed decision. In this regard, both parties agree to file briefs within two weeks following the close of the hearing and will direct the arbitrator to issue an abbreviated decision which details only the arbitrator's award within two weeks following the receipt of

briefs. The arbitrator will then issue a detailed decision within thirty days following receipt of the briefs by the parties.

Either party may, by notification to the other prior to a case being scheduled, exclude a particular case from the provisions of this agreement. In this case, the arbitration shall be scheduled and handled under the normal procedure.

Provisions of this agreement are hereby entered into by both parties signatory below and in full force and effect, unless either party, through written notification to the other party, gives thirty (30) days written notice of their intent to cancel this agreement. In this regard, the parties agree that cases scheduled for arbitration under this procedure shall proceed to arbitration as provided above.

**The original document was signed by Steve DiCroce and Gary Hakes on 10/2/87 and is on file at the King Soopers Labor Relations Dept.**

## LETTER OF UNDERSTANDING

## #6

## DEFINITIONS OF "BEVERAGES" IN CBA. DATED 11/11/87

### BETWEEN
### KING SOOPERS, INC.
### AND
### UNITED FOOD AND COMMERCIAL WORKERS LOCAL NO. 7

King Soopers, Inc. and United Food and Commercial Workers Local No. 7 are signatory to certain Collective Bargaining Agreements covering employees employed by King Soopers, Inc. in its retail stores. The parties have agreed that the definition of "beverages" as it appears in the bargaining unit work jurisdiction provision of the Collective Bargaining Agreements shall be interpreted as follows:

"Beverages" shall be defined as soda pop, liquid mixes (tonic, soda, Tom Collins, etc.), beer, waters (seltzer, mineral, flavored soda, etc.), wine (where carried), and non-carbonated fruit juices and juice flavored drinks packaged in a manner similar to soda pop items.

**The original document *was* signed by Ed Behlke and Charles E. Mercer on 11/11/87 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF UNDERSTANDING

## #7

## SICK PAY REQUEST FORMS.  DATED 11/17/87

The United Food & Commercial Workers' Local No. 7 (hereinafter "the Union") and King Soopers, Inc. (hereinafter "the Employer") hereby agree to resolve the grievance in Case No. 52-84 as follows:

1. The Employer may require employees to complete its sick pay request forms in accordance with the foil owing:

    a. Part I of the form must be completed for all absences for which the employee is requesting sick pay.
    b. Part IV of the form may be required to be completed for absences of three or more scheduled work days.
    c. Completion of Part IV of the form may be requested prior to three scheduled work days if there are suspicious circumstances indicating malingering by the involved employee. Additionally, the Employer may require completion of Part IV where the employee's absenteeism record is excessive. Under the above circumstances, the employee will be notified by a Company representative, while still absent, that the employee will be required to have Part IV completed.
    d. In lieu of completing Part IV, where necessary, the employee may submit the following, which shall constitute "other authoritative verification", only if dates of disability and diagnosis are indicated.
       (1)   Hospital bill
       (2)   Worker Compensation Information
       (3)   Health and Welfare trust fund information

2. The Employer will make every reasonable effort to insure that payments will be received in a timely manner.

3. The Employer will not refuse to allow employees returning from sick leave to report for work because the employee has not completed the sick pay request form or provided other verification of illness. The only exception would be where the employee does not appear physically capable of performing the work or where the illness could remain contagious and therefore dangerous to either product, customers or employees. Where the request for sick leave is denied, the Union may grieve and pursue the same.

4. For absences of one calendar week or more, employees will be required to request a leave of absence in writing.

5. Completion of the sick pay request form will not be required by employees who are not eligible for, or are not requesting sick pay.

**The original document was signed by Ed Behlke on 11/17/87 and Charles E. Mercer on 12/22/87 and is on file at King Soopers Labor Relations Dept.**

# LETTER OF UNDERSTANDING

## #8

## SICK PAY ACCUMULATION. DATED 1/6/88

### BETWEEN
### KING SOOPERS, INC.
### and
### UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 7

Whereas, during the negotiations for the current contract, the parties agreed that part-time employees would accrue sick pay on a pro-rata bases;

Whereas, a dispute has arisen as to how full time employees would continue to accrue sick pay;

Whereas, resolution of such an issue was not contemplated nor discussed during said negotiations.

Therefore, in order to resolve the dispute, the parties named above hereby agree as follows:

Employees classified as full time shall continue to receive 4 hours sick pay credit per month, provided said employee works the minimum hours set forth in the Meat and Clerks Agreements.

This agreement shall apply to all collective bargaining agreements between the parties, which have the above-described language and shall be in effect during the terms of said Agreements.

**The original document was signed by Steve DiCroce and Gary Hakes on 1/6/88 and is on file at the King Soopers Labor Relations Dept.**

## LETTER OF UNDERSTANDING

## #9

## GRIEVANCES RESOLVED AT STORE LEVEL BY STEWARDS.  DATED 1/6/88

BETWEEN
KING SOOPERS. INC.
and
UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL NO. 7

To encourage prompt and equitable resolution of grievances, the parties set forth above agree to the following:

All grievances resolved at the store level between Management and the Union appointed Shop Steward shall be entered into on a non-precedent setting basis.

**The original document was signed by Steve DiCroce and Gary Hakes on 1/6/88 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #10

## PHARMACY TECHNICIAN STAFFING. DATED 1/11/88

This letter is to confirm the understanding reached with Harley Fujimoto on October 27, 1987, regarding the filling of shifts in the Pharmacy and further reflects the Unions additional points of concern that we discussed in December, 1987.

As we discussed, the Pharmacy Department often has additional scheduling needs that cannot be staffed with current pharmacy technicians. Further, such scheduling needs do not justify the needs to additional staff. Therefore, we agreed as follows:

> That it shall not be a violation of the Collective Bargaining Agreement to temporarily advance a senior qualified general merchandise clerk on a weekly basis to cover pharmacy technicians hours which cannot be assigned at straight time to current technicians. It is further understood that such assignments shall not exceed 16 hours per week or as written.

Please execute this letter and return to me. I've included an extra copy for your records.

*This agreement may be discontinued by either party by written notice 5 days prior to taking effect.

**The original document was signed by Steve DiCroce and Gary Hakes on 1/11/88 and is on file at the King Soopers Labor Relation Dept.**

# LETTER OF AGREEMENT

## #11

### RE: PROMOTIONS (ARTICLE 30, SECTION 71). DATED 11/3/88

The following understanding shall apply to all bargaining units covered by contract with the UFCW Local No. 7:

1.) That in compliance with the standards set forth by the Department of Labor, no employee shall be promoted to the Bakery, Produce, Meat or Deli while under the age of 18. If the affected employee turns 18 years old during the promotion period, he/she shall then become eligible for promotion to the above job assignments in accordance with Article 30 Section 71.

2.) It is understood that age shall not be a factor in all other promotion not covered under #1 above.

**The original document was signed by Steve DiCroce and Gary Hakes on 11/3/88 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #12

## IN STORE FILM PROCESSING.  DATED 11/3/88

King Soopers, Inc. And the United Food and Commercial Workers Union, Local 7, hereby agree to the following understanding relative to the addition of In-store film processing labs:

1.) That the duties of the General Merchandise/Non-Food Clerk be expanded to include the operation of the In-store film processing lab.

2.) That the In-Store film processing lab shall be a separate department and, not-withstanding Sections 70 and 83 of the clerks agreements, when necessary, management shall have the right to hire GM clerks for these primary assignments, due to lack of qualifications of internal candidates, off-the-street whom management determines to be qualified. It is further agreed that prior to hiring an employee off - the-street, that management will post a notice to current employees in the bargaining unit to solicit applicant for the position. Bargaining unit employees shall receive preference, if qualified, before any new employee is hired.

3.) Section 73 (c) (7) shall be modified to include In-store film processing as work excluded from the training requirements of such section. All qualified promotees or new hires will be given to necessary training relative to King Soopers policies, procedures and equipment. In the event management elects to provide basic training (photo experience referenced above) in order to qualify an employee management agrees that such training would be provided to bargaining unit employees first.

4.) Section 90 (b) & (c) shall be modified to include film processing as an inclusion in which an employee must be qualified for before they can displace an employee in these jobs.

5.) GM/Non-food clerk assigned to the Film Processing Department shall not be allowed to perform traditional GM/Non-food duties other than those directly related to the stocking, selling and processing/handling of film.

6.) Nothing in this agreement should be construed to prevent the transfer of work from one department to another. However, in the event management transfers film handling and/or sales from the service center to the processing department, it is agreed that as a result of such transfer of work, no GM/Non-Food Clerk working at the service desk in the store at the time of transfer shall have their hours reduced as a result of such transfer.

7.) GM clerks hired or promoted into the processing department shall be started at the 2nd progression level for general Merchandise/Non-food Clerks hired on or after May 6, 1979. The rate for department managers shall be $8.87 per hour.

8.)   It is understood that the work performed by In-store labs shall be separate and distinct from the work performed by Royal Color and that nothing in this agreement extends this agreement or recognition to Royal Color, nor prevents the transfer back to Royal Color of this work in the event of a layoff, employees of the film lab shall be allowed to exercise their seniority in accordance with the contract.

9.)   Jurisdiction of Local No. 7 extends only to film processing work when performed within a store.

10.)  This agreement shall be in effect until May 1, 1989 and limited to store #26. The Company agrees to review this understanding for modification or permanence with the union prior to May 1, 1989 and failure to reach an agreement shall result in this agreement becoming null and void, and neither the parties shall return to the current contract. This agreement, nor the experimental practice it allows, shall serve to prejudice the rights either party has pursuant to the contract.

**The original document was signed by Steve DiCroce and Gary Hakes on 11/3/88 and is on file in the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #13

## HOLIDAY PAY FOR PART-TIME EMPLOYEES AND

## OUTDOOR BEDDING PLANT SALES. DATED 4/6/89

King Soopers Inc. And the UFCW Local No. 7 agree as follows relative to the disputes regarding payment of holiday pay to part-time employees under the clerks and meat agreements, and the dispute over which classification has jurisdiction over collection of sales during the outdoor bedding plant sale.

1.  The language governing holiday pay for part-time employees under the meat and clerk agreements shall be interpreted as follows:

    Holiday pay shall be based on the actual hours worked, or paid for vacation for the week immediately preceding the week in which the holiday occurs. Other hours paid for, but not worked, such as funeral pay, sick pay, holiday pay, jury pay, etc. shall not be included in determining holiday for part-time employees. It is understood that such holiday pay is subject to the employee meeting the other eligibility requirements of the contract.

    It is further understood, that a part-time employee who does not perform work in the week immediately preceding the holiday and is not on vacation during that week or receiving sick pay or in the first 30 days of an LOA for an on-the-job injury, shall not be entitled to any holiday pay. A part-time employee who does not perform work in the week prior to a holiday and who is not on vacation, but is receiving sick pay or is within the first 30 days of an LOA or an on-the-job injury shall be paid the minimum 3 hours of holiday pay providing they meet the other eligibility requirements of the contract.

2.  All pending grievances filed on the issue in #1 shall be resolved on the basis of this interpretation.

3.  It is understood that the parties have a dispute as to the permissible duties of GM/Non-food clerks with respect to the handling and sales of seasonal bedding plants items outside the plant and floral department. The parties agree to the following interpretation with the understanding that such understanding does not prejudice the parties position on the principal issue stated above.

    The sales of bedding plants and related items outside the store (and Christmas trees during the holiday season) shall be performed by Plant and Floral clerks of the store. In the event that Plant and Floral clerks don't exist in the location or they have their hours maximized, then the company may utilize GM/Non-food clerks to perform the work at the GM/Non-food clerks current rate of pay.

    No other changes are contemplated by the agreement.

**The original document was signed by Steve DiCroce on 4/6/89 and Gary Hakes on 4/3/89 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #14

## RE: DEMOTIONS AND STEP DOWNS.  DATED 4/6/89

Between
UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 7
and
KING SOOPERS, INC.

1. Whenever a member of the bargaining unit, in a lesser classified job than Head Clerk, is demoted, whether voluntary or involuntary, such employee may be returned to the classification and status (i.e., full time/part time) held when he/she accepted the current classification being vacated, or the employee may exercise his/her seniority to claim a position in accordance with the current Full Time or Promotion Request lists.

2. This agreement shall not apply when a bargaining unit employee is affected by a layoff (as opposed to a demotion or step down). Under such circumstances, the provisions of the collective bargaining agreement concerning layoff shall govern.

3. Notwithstanding the foregoing, it is understood that the demotion and step down of bargaining unit employees will be subject to the provisions of the collective bargaining agreement.

4. This agreement shall be in full force and effect from date acceptance until May 6, 1990, and may be continued upon mutual agreement of the parties.

**The original document was signed by Steve DiCroce and Gary Hakes on 4/6/89 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #15

## IN-STORE FILM PROCESSING LABS, (STORE #36). DATED 8/31/90

August 22, 1990

Gary Hakes
Assistant to General Council
UFCW, Local #7
7760 West 38 h Avenue
Wheat Ridge, Co. 80033

      RE:    In -Store Film Processing Lab, Letter of Understanding - Dated 11/3/88
             (continued thru 5/8/93)

Dear Gary:

At our meeting last Thursday, August 16, 1990, we discussed the expansion of the above letter of understanding to include Store #36 as a site for an In-store film processing lab. It was our understanding that you saw no problem in including this additional store in the agreement.

Thus, this letter represents a formal request to modify the above referenced letter of understanding to include Store #36 in addition to Store #26 as sites for In-Store Film Processing Labs.

If this is an acceptable modification to the letter of understanding, please sign below and return a signed copy to me. Thank you.

**The original document was signed by Susan Meader and Gary Hakes on 8/31/90 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #16

## ACTMEDIA, INC.  DATED 9/24/90

between
UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 7
and
KING SOOPERS. INC.

WHEREAS, King Soopers, Inc., has contracted certain services with ACTMEDIA, Inc.; and

WHEREAS, this work would not normally otherwise exist within stores;

NOW, THEREFORE, the parties identified above agree as follows:

1. Representatives form ACTMEDIA, Inc., may maintain advertising pace on aisle vision billboards, shopping carts and the shelf talker instant coupon machine in all stores, with the understanding that such advertising placards are not to include pricing of any kind.

2. It is further understood that this work is strictly limited as set forth above and shall not be expanded further.

3. The Company will provide the Union with a copy of the current work contract with ACTMEDIA, Inc., and this agreement shall expire concurrent with said contract, unless mutually agreed upon by the parties to continue the same.

**The original document was signed by Steve DiCroce on 9/24/90 and Gary Hakes on 9/14/90 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #17

## VIDEO SALES SNACK ITEMS.  DATED 10/5/90

King Soopers and the UFCW Local No. 7 hereby agree to the following understanding regarding the sales of certain snack items in self-contained video departments:

Popcorn, candy, pop, and other snack items that are normally sold in the major theaters can be sold in the video department by non-food clerks at the time the customers rent their video. It is agreed and understood that no other food items may be purchased in the video department.

**The original document was signed by Steve DiCroce and Gary Hakes on 10/5/90 and is on file at the King Soopers Labor Relation Dept.**

# LETTER OF AGREEMENT

## #18

## SPECIAL ORDER PERSON (KS #'S 4 AND 7).  DATED 10/10/90

Case Nos. 475- and 476-90

The parties agree to resolve the above-referenced matters as follows:

1. No later than Oct. 22, 1990, the Company agrees to post a notice in all stores by district, identifying an opening for a "District Special-Order Person", which job is to be performed by an all-purpose clerk.

2. The notice shall remain posted for seven days in an area accessible to all employees.

3. After the seven-day posting requirement has been complied with, the names shall be submitted to a central location and a copy of each store posting shall be provided to the Union.

4. No later than Dec. 2, 1990, the Company will assign this position to the most senior, qualified employee who has signed the list. Qualification required for consideration would include previous ordering experience, as well as stocking experience; and, where qualifications are reasonably equal, seniority shall prevail.

5. As future openings occur within this job assignment resulting from quit, discharge, transfer, promotion or a new-job assignment, the above procedure will again be used in determining who will be assigned to the vacancy.

**The original document was signed by Steve DiCroce on 10/10/90 and Gary Hakes on 9/21/90 and is on file at the King Soopers Labor Relations Dept.**

<u>**LETTER OF AGREEMENT**</u>

<u>**#19**</u>

<u>**DELIVERY DRIVER SUPPLEMENTAL AGREEMENT. DATED 3/14/91**</u>

KING SOOPERS, INC. (Denver, Colorado) A division of DILLON COMPANY, INC., hereinafter referred to as the "Employer" and the UNITED FOOD COMMERCIAL WORKERS UNION, LOCAL #7, AFL-CIO-CLC, hereinafter referred to as the "union" are parties to a Labor Agreement having as its term May 6, 1990 to May 8, 1993. Said Agreement, hereinafter referred to as the "Principal Agreement" covers the retail clerk operations of the Employer's stores in the metropolitan Denver area.

This Supplemental Agreement which has as its term October 21, 1990 to May 8, 1993, amends, modifies, or changes certain identified portions of the Principal Agreement as set forth below. Where there is no reference to an Article or Section then such Article or Section shall be deemed to not have included in this Supplemental Agreement.

<u>**ARTICLE 1**</u>
<u>**RECOGNITION AND EXCLUSIONS**</u>

<u>**Section 1.**</u>    Amend language of the Principal Agreement as follows:
   Addition: Delivery Drivers
   Exclusion additions: temporary/seasonal employees and contract.

   Paragraphs two and three same as Principal Agreement.

<u>**ARTICLE 2**</u>
<u>**BARGAINING UNIT WORK JURISDICTION**</u>

<u>**Section 2.**</u>    Amend language of the Principal Agreement as follows:

All work and services performed in the bargaining unit connected with the delivery of merchandise to the public and the picking up of shopping carts shall be performed by bargaining unit members except as provided below. Supervisors, non bargaining unit employees, contract laborers and temporary/seasonal employees may perform work covered under this Supplemental Agreement, except that the Employer agrees not to hire additional contractors to pick-up shopping carts.

<u>**ARTICLE 3**</u>
<u>**UNION SECURITY AND CONDITIONS**</u>

<u>**All Sections.**</u>  Same as Principal Agreement.

<u>**ARTICLE 4**</u>
<u>**CHECK-OFF**</u>

<u>**All Sections.**</u>  Same as Principal Agreement.

## ARTICLE 5
## NEW EMPLOYEES, TRANSFERRED EMPLOYEES, PROMOTED OR DEMOTED

**All Sections.** Same as Principal Agreement.

## ARTICLE 6
## RIGHTS OF MANAGEMENT

**All Sections.** Same as Principal Agreement.

## ARTICLE 7
## DEFINITIONS OF CLASSIFICATIONS

**Section 19.** Add to Section 19 the following definitions.

f. 4.   DELIVERY DRIVERS. A delivery driver is an employee whose principal job assignment includes the delivery of customer purchases to the customer, picking up of abandoned shopping carts in the vicinity of the store and returning same to store and the necessary maintenance of shopping carts. Delivery drivers may perform all work connected with the selection of customer purchases from the sales floor, including the storage and retrieval thereof. Delivery drivers may also be required to make incidental pick-ups and deliveries of items at the Employer's warehouses or manufacturing facilities and of other items not listed above at the Employers discretion.

f. 5.   TEMPORARY/SEASONAL EMPLOYEES. Temporary Seasonal employees may be hired from 11/15 to 1/6 and 2/1 to 6/15 for periods not to exceed 30 days and may perform any of the work designated in Section 19, f.4, which would not include the selection of customer purchases from the sales floor, including the storage and retrieval thereof.

f. 6.   SHOPPING CART CONTRACT LABORERS. The employer agrees to not contract with any additional contractors for the purpose of shopping cart collection during the life of this agreement.

f. 7.   DELIVERY CONTRACT LABORERS. The employer may employee contract laborers for the purpose of making pick-ups and deliveries as defined in f. 4. above with the understanding that such contractors shall not be allowed to select customer purchases from the sales floor, including the storage and retrieval thereof.

**Section 20.** Same as Principal Agreement.

## ARTICLE 8
## RATES OF PAY

**All Sections.** Same as Principal Agreement.

# ARTICLE 9
## PRIOR EXPERIENCE

**All Sections.** Same as Principal Agreement.

# ARTICLE 10
## TEMPORARY ASSIGNMENTS

**All Sections.** Same as Principal Agreement.

# ARTICLE 11
## NO REDUCTION IN PAY

**All Sections.** Same as Principal Agreement.

# ARTICLE 12
## WORKWEEK

**All Sections.** Same as Principal Agreement.

# ARTICLE 13
## OVERTIME

**All Sections.** Same as Principal Agreement.

# ARTICLE 14
## SUNDAY PREMIUM

**All Sections.** Same as Principal Agreement.

# ARTICLE 15
## TRAVEL BETWEEN STORES

**All Sections.** Same as Principal Agreement, except add new sections to read:

"A premium of $0.30 cents per hour for all hours worked in the collection of shopping carts by an employee using his personal vehicle."

"Any employee whose driving record shows a pattern of continuous and repetitive disregard for traffic laws, public safety and the employers interest, may be subject to progressive discipline."

# ARTICLE 16
## NIGHT PREMIUM

**All Sections.** Same as Principal Agreement.

## ARTICLE 17
## HOLIDAYS AND HOLIDAY PAY

**All Sections.** Same as Principal Agreement.

## ARTICLE 18
## VACATIONS

**All Sections.** Same as Principal Agreement.

## ARTICLE 19
## SCHEDULE POSTING

**All Sections.** Same as Principal Agreement.

## ARTICLE 20
## MINIMUM DAILY SCHEDULE

**Section 63.** Amend language of Principal Agreement as follows:

Delivery Drivers shall not be scheduled for less than two (2) hours per day, or 16 hours per week, provided they are available for work.

## ARTICLE 21
## MINIMUM WEEKLY SCHEDULE

**All Sections.** Same as Principal Agreement.

## ARTICLE 22
## NO FREE WORK

**All Sections.** Same as Principal Agreement.

## ARTICLE 23
## TIME CARDS

**All Sections.** Same as Principal Agreement.

## ARTICLE 24
## SPILT SHIFTS

**All Sections.** Same as Principal Agreement.

## ARTICLE 25
## STORE MEETINGS

**All Sections.** Same as Principal Agreement.

## ARTICLE 26
## REPORTING PAY

**Sections 69.** Amend Principal Agreement as follows:

Any employee able to render required services shall, if called for work, be guaranteed an amount equal to two (2) hours' pay at his straight-time rate of pay. Employees working in two (2) stores of the Employer in any one (1) day shall receive a full days pay for such work.

## ARTICLE 27
## LUNCH BREAKS

**All Sections.** Same as Principal Agreement.

## ARTICLE 28
## RELIEF PERIODS

**All Sections.** Same as Principal Agreement.

## ARTICLE 29
## PROBATIONARY PERIOD

**All Sections.** Same as Principal Agreement.

## ARTICLE 30
## SENIORITY

**Section 73.** Add new paragraph to language in Principal Agreement- "Delivery Drivers shall have separate seniority for all applications of the collective bargaining agreement. It is understood that drivers may be based at an individual store, be assigned to a HUB store or the floral design center and that for purposes on the seniority provisions of this agreement that such assignment shall be considered as a store. Further, employees may be dispatched from their base store to deliver an order from another store and that such assignment shall not be considered a breech of this agreement."

**Section 74-80.** Same as Principal Agreement.

**Section 81.** Add to language of Principal Agreement:

8. Notwithstanding the above, an employee classified as a Delivery Driver shall be eligible for promotion to a higher classification provided the employee has worked a minimum of 2 years in the delivery driver classification.

9. It is understood and agreed that the position of delivery driver is not subject to bid under the provisions of Section 81.

**Section 82.** Same as Principal Agreement.

## ARTICLE 31
## AVAILABLE HOURS

**Section 88-96.** Same as Principal Agreement.

**Section 97.** Amend language of Principal agreement as follows:

> The Employer retains the right to hire Delivery Driver personnel directly off-the-street. It is further understood that the Employer retains the right to select current employees at its desecration for delivery positions.

## ARTICLE 32
## PREFERRED SHIFTS

**Section 98.** Same as Principal Agreement

## ARTICLE 33
## UNSCHEDULED OVERTIME

**Section 99.** Amend paragraph two to provide "Overtime assignments of two (2) hours..."

## ARTICLE 34
## REDUCTION IN HOURS

**All Sections.** Same as Principal Agreement.

## ARTICLE 35
## LAYOFFS

**Section 105.** Add new last paragraph to current language to read:

> It is understood and agreed that higher classified employees of the bargaining unit shall not have the right to displace Delivery Drivers in the event of a layoff.

**Section 106-107.** Same as Principal Agreement.

## ARTICLE 36
## TRANSFER FROM STORE TO STORE

**All Sections.** Same as Principal Agreement.

## ARTICLE 37
## NEW STORE LANGUAGE

**All Sections.** Same as Principal Agreement.

## ARTICLE 38
## LEAVE OF ABSENCE

**All Sections.** Same as Principal Agreement.

## ARTICLE 39
## FUNERAL LEAVE

**All Sections.** Same as Principal Agreement.

## ARTICLE 40
## JURY DUTY

**All Sections.** Same as Principal Agreement.

## ARTICLE 41
## SICK LEAVE

**All Sections.** Same as Principal Agreement.

## ARTICLE 42
## INJURY ON JOB

**All Sections.** Same as Principal Agreement.

## ARTICLE 43
## HEALTH AND WELFARE COVERAGE

**All Sections.** Same as Principal Agreement.

## ARTICLE 44
## NON-DUPLICATION OF BENEFITS

**All Sections.** Same as Principal Agreement.

## ARTICLE 45
## PENSION

**All Sections.** Effective January 1, 1993 employees under this agreement shall cease to participate in the employers retirement program and shall begin participation in the pension program as defined in the Principal agreement.

## ARTICLE 46
## DISCHARGE AND NO DISCRIMINATION

**All Sections.** Same as Principal Agreement.

## ARTICLE 47
## UNION REPRESENTATIVE VISITATION

**All Sections.** Same as Principal Agreement.

## ARTICLE 49
## DISPUTE PROCEDURE

**All Sections.** Same as Principal Agreement.

## ARTICLE 50
## NO STRIKE OR LOCKOUT

**All Sections.** Same as Principal Agreement.

## ARTICLE 51
## STORE CLOSING

**All Sections.** Same as Principal Agreement.

## ARTICLE 52
## BULLETIN BOARD

**All Sections.** Same as Principal Agreement.

## ARTICLE 53
## UNION STORE CARDS

**All Sections.** Same as Principal Agreement.

## ARTICLE 54
## LIE DETECTOR TESTS

**All Sections.** Same as Principal Agreement.

## ARTICLE 55
## UNIFORMS/EQUIPMENT

**All Sections.** Same as Principal Agreement.

## ARTICLE 57
## MASTER SAFETY COMMITTEE

**All Sections.** Same as Principal Agreement.

## ARTICLE 58
## JOINT LABOR MANAGEMENT COOPERATION

**All Sections.** Same as Principal Agreement.

## ARTICLE 59
## SAVINGS CLAUSE

**All Sections.** Same as Principal Agreement.

## ARTICLE 61
## TECHNOLOGICAL CHANGES

**All Sections.** Same as Principal Agreement.

## ARTICLE 62
## ENTIRE AGREEMENT

**All Sections.** Same as Principal Agreement.

## ARTICLE 63
## TERM OF AGREEMENT

**All Sections.** Modify dates as agreed in the Principal Agreement.

## COST OF LIVING ALLOWANCE/ LETTERS OF UNDERSTANDING

Same as Principal Agreement as is applicable.

# LETTER OF AGREEMENT

## #20

## IN-STORE FILM PROCESSING LAB.  DATED 5/7/91

August 22, 1990

Gary Hakes
Assistant to the General Council
UFCW, Local #7
7760 West 38th Avenue
Wheat Ridge, Co. 80033

Re:    In-Store Film Processing Lab, Letter of Understanding Dated 11/3/88 (continued thru 5/8/93)

Dear Gary:

This letter represents a formal request to expand the above referenced Letter of Understanding to include Store #50 and Store #40 as sites of In-Store Processing Labs.  With the addition of these Stores the Letter of Understanding will allow us to have such Labs in Stores #26, #36, #40 and #50.

The addition of Store #40 and #50 to the sites of In-Store Film Processing Labs corresponds with their scheduled remodels during this calendar year.  The placement of In-Store Film Processing Labs allows us to expand the services provided to our customers at these locations.

If this is an acceptable modification to the Letter of Understanding, please sign below and return a signed copy to me.

Should you have any questions, feel free to give me a call.

**The original document was signed by Susan Meader on 4/24/91 and Gary Hakes on 5/7/91 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #21

## COMMUNITY MINISTRIES COUPON PROGRAM.  DATED 5/13/91

May 10, 1991

Gary Hakes
Assistant to the General Counsel
7760 West 38th Avenue
Wheat Ridge, Co. 8033

   RE: Community Ministries Coupon Program
Dear Mr. Hakes:

In our May 7, 1991 phone conversation we discussed and agreed to the implementation of a coupon program here at King Soopers by the organization, Community Ministries, which would operate under the same conditions as the Chum Coupon Program.  Below is the revision of the Chum Coupon Program to reflect Community Ministries involvement at this time.

The Union agrees to the following:

1. Community Ministries Volunteers may:

  a. Take inventory at the affected store, numbering aisles and listing categories of item in each aisle for the program's internal use.

  b. Place coupon on certain products in the stores using cellophane tape.

  c. The counting and sorting of these coupons shall he performed by bargaining unit members.

  d. Either party may discontinue said program by fourteen (14) days written notice to the other party.

  e. This program shall be limited to a six-month trial period from the date said program is begun.

  f. This program will be implemented at KS #19 and, upon mutual agreement between the parties, be expanded to additional stores in the Denver metro area.

  g. This agreement will become effective as of May 7, 1991.

Please sign and return one copy to the company.

**The original document was signed by Susan Meader on 5/13/91 and Gary Hakes on 5/15/91 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #22

## TEST OF PHARMACY TECHNICIANS' FLOATER POOL.  DATED 6/18/91

*between*
KING SOOPERS, INC.
and
U. F. C. W., LOCAL #7

Effective the first Sunday following the signing of this Letter of Agreement King Soopers, Inc., and U. F. C. W., Local #7 hereby agree to a sixty (60) day trial of a Pharmacy Technicians' Floater Pool in the District Defined as the geographic area covered by the Company's District Manager, Mike Fitzgerald.

1.  Management shall determine the number of Pharmacy Technicians in the District's Pharmacy Technician Floater Pool.

2.  Management shall schedule the Pharmacy Technician Floaters ("Floaters" herein) on the basis of seniority and ability up to eight (8) hours per day or forty hours (40) per week to hours not scheduled or claimed by based Pharmacy Floater in more than one store per day to maximize his/her schedule.  The seniority of Floaters shall be honored based on the hours made available from the stores in the weekly scheduling of Floaters so the fewest number of stores as practical. The employee being assigned hours shall not have the right to accept such hours in part, but shall be obligated to accept the entire schedule as written.

3.  Hours of work assigned to Floaters shall be those of Pharmacy Technician hours in the District which can not be covered by Technician hours in the District which can not be covered by Technicians in their own locations, to include hours of work needed which were not on a posted schedule or hours on a posted schedule which have become available and Company has elected to fill some or all of those hours and has been unable to do so through the use of employees at the store where the need arises.  Such requests for hours shall be turned into the Management person in the District assigned to scheduling the Pharmacy Technician Floaters.

4.  Floaters shall have a right to full or part time vacancies which become available in individual stores, before hiring off the street.

5.  Either party reserves the right to cancel this Agreement during the sixty (60) day test period in writing to the other party.  It is understood and agreed that if this program is not terminated within 30 days following the expiration of the effective date of this Agreement, then such Agreement shall be extended and may be expanded to other districts until and unless either party gives 30 days advance written notice of its intent to cancel this agreement.

**The original document was signed by Susan Meader on 6/18/91 and Charles Mercer on 6/23/91 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #23

## RECLAMATION/ DRY CLEANING.  DATED 7/31/91

July 31, 1991

Mr. Gary Hakes
UFCW Local No. 7
7760 West 38th Avenue, Suite 400
Wheat Ridge, Co. 80033

     RE: Reclamation

Dear Gary:

To follow up our discussion of the Steward's Conference, the Company will be operating a reclamation center that will allow King Soopers to obtain credit from manufacturers on damaged and unsalable products.

This will change the method in which damaged product is handled at the store level, instead of marking down product and placing it on the markdown rack, the APC will box all damaged products and ship them to the reclamation center. The reclamation center will work with the manufacturers to obtain credit for the merchandise.

We are hopeful that this program will reduce shrink expense and increase employee bonuses. Also, as we discussed we will be developing a new dry cleaning service in the stores. Non-food/GM clerks will accept and handle items to be cleaned.  These items will be sent to a dry cleaner, who will clean the garments and return them to the stores.  The clerks will store the cleaned garments and complete the transaction with the customer.

Thank you for your cooperation.

**The original document was signed by Steve DiCroce on 7/31/91 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## # 24

## TRAVEL AGENCY.  DATED 8/5/91

August 5, 1991

Mr. Gary Hakes
UFCW Local No. 7
7760 West 38th Avenue, Suite 400
Wheat Ridge, CO  80033

    RE:  Travel Agency

Dear Gary:

We have previously agreed to allow the establishment of a travel agency at store #38.  It is our intent to allow Travel Cartel to expand into other stores.

As I indicated previously, due to the technical and licensing nature of this business, this is an area that we would not operate.  Consequently, this is work that would not be done by bargaining unit employee's.

Please let me know as soon as possible, if the Union objects to this expansion.

**The original document was signed by Steve DiCroce on 8/5/91 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #25

## REQUESTS OF VOLUNTEER ORGANIZATIONS TO PARTICIPATE IN COUPON PROGRAMS IN VARIOUS KING SOOPERS LOCATIONS. DATED 9/6/91

Gary Hakes
Assistant to the General Counsel
UFCW, Local #7
7760 West 38th Avenue
Wheat Ridge, Co. 80033

RE: Request of Volunteer Organizations to participate in Coupon Programs in various King Soopers locations.

Dear Gary:

On Friday August 23, 1991 I spoke with you over the phone regarding the above referenced issue. Currently, we have specific letters with your Union over the CHUM and Community Ministries organizations having coupon programs in our locations. We would like to extend these letters to include other organizations which approach us to do like coupon programs.

The same conditions which have been applied to the CHUM and Community Ministries Organizations would apply to these forthcoming group. Under these conditions volunteers may:

1) Take inventory at the affected store, numbering aisles and listing categories of item in each aisle for the program's internal use.

2) Place coupons on certain products in the store using cellophane tape.

3) The counting and sorting of these coupons shall be performed by bargaining unit members.

The Company will notify you of the specific organization and store location where a coupon program is placed as they are added to the coupon program. As before either party may discontinue said program with fourteen (14) day written notice to the other party.

Should you have any questions regarding the above referenced Coupon Program expansion to include additional volunteer organizations and store locations, please let me know. Otherwise, as this is an expansion of a previous agreement, please sign below and return a copy to me.

**The original document was signed by Susan Meader 9/6/91 and Gary Hakes on 9/9/91 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #26

## PERSONAL BEEPERS/PAGERS; UNION CASE NO. 858-91. DATED 2/17/92

February 17, 1992

Ms. Susan Meader
Labor Relations Department
King Soopers, Inc.
P.O. Box 5567
Denver, Colorado 80217

-and-

Mr. John Bowen
Associate General Counsel
UFCW, Local #7
7760 West 38th Avenue
Wheat Ridge Colorado 80033

RE:  Personal Beepers/Pagers; Union Case No. 858-91

Dear Ms. Meader and Mr. Bowen:

This letter sets forth the terms of the settlement which was agreed to between the parties in relation to the above referenced grievance during the Med/Arb session conducted on February 13, 1992, at Mountain States Employers Council.

The parties agree that bargaining unit employees may carry beepers/pagers on their persons on Company premises: during working hours, but only if all of the following conditions are met:

1. The employee notifies the Store Manager in writing that they have a personal beeper/pager and that they may be carrying it with them on Company premises during working hours.

2. The beeper/pager must be set so that it does not emit any audible signal. In other words, it must not "beep". It may be set so that is signals the owner of an incoming call by vibrating.

3. The beeper/pager must remain hidden from the view of customers at all times. In other words, it should be kept in a pocket out of sight or worn under a smock or other covering garment whenever an employee is in an area where any customers are.

4. Service to customers is not to be interrupted. The employee may not look at the beeper/pager at any time while they are on the sales floor and they may only return calls while they are on authorized break periods.

The parties also agree that any violation of the above conditions by any employee may result in progressive discipline up to and including possible discharge in appropriate cases.

Finally, it is expressly understood that the Company may apply different rules in the case of any employee that it wants to wear a beeper/pager during working hours for its own business reasons. In other words, the four conditions set forth above apply only to bargaining unit employees who carry beepers/pagers for their own personal reasons.

As usual, it was a pleasure to work with the parties on this case and, if I can be of any further assistance in the future, please feel free to give me a call.

**The original document was ordered by arbitrator John F. Sass on 2/17/92 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #27

## TELESHOPPER SELECTION CENTER SUPPLEMENTAL AGREEMENT.

## DATED 12/1/95

King Soopers and the UFCW Local No. 7 agree to the creation of a central selection center for teleshopper (hereinafter referred to as the "Center"), under the Denver clerks' agreement on the following basis:

1. The UFCW shall be granted jurisdiction over the work traditionally performed under the Denver Clerk and Meat agreements at the Center and such Center shall be accreted to the Denver Clerks Bargaining unit. All terms and conditions of Denver Clerks and Meat Agreements shall apply except as modified below.

2. The Company shall post a job vacancy notice in each store for employees interested in transferring to job assignments at the Center. Delivery Drivers at HUB stores being consolidated to the Center shall be transferred to the Center. Any employee accepting employment at the Center shall be paid the appropriate Teleshopper Order Selector rate. For all purposes under the collective bargaining agreement the Center shall be considered a store. Employees accepting the position of Teleshopper Order Selector must hold such position for two years before exercising their seniority to claim another position.

3. Non-management, bargaining unit employees covered under the collective bargaining agreement and working at the center shall be classified and employed in the classification of "Teleshopper Order Selector" and paid at the following rates:

Teleshopper Order Selector

| | |
|---|---|
| 1st 960 hours | $ 6.59 |
| 2nd 960 hours | $ 7.28 |
| 3rd 960 hours | $8.14 |
| 4th 960 hours | $ 8.91 |
| Thereafter | $ 9.67 |

The classification of Teleshopper Order Selector shall not be applicable in any other store of the Company. None of the classifications of the collective bargaining agreement shall be applicable to the Center except for the positions of Delivery Driver and Head Clerk. Delivery Drivers and Head Clerks may perform any of the bargaining unit work at the Center.

Any All Purpose Clerks signing the initial job posting and hired at the Center between December 1, 1995 and December 15, 1995, shall be grand-fathered as a Teleshopper Order Selector at their current rate. In any event, the Employer may limit the initial hiring of All Purpose Clerks at the Center to no more than 25% of the initial staffing of Order Selectors hired at the center. It is further understood, that any employee hired at the Center after December 15, 1995, shall be placed at the entry rate for Teleshopper Order

Selector regardless of the rate they are transferring from.

4) It is understood that the Company's non-bargaining unit Teleshopper Order Coordinators shall be excluded from this Agreement and shall not perform bargaining unit work.

5) The Company may fill temporary Order Selector vacancies of less than thirty days at its discretion may include the temporary assignment of employees (including Courtesy Clerks) from other stores (however, nothing in this Agreement shall be construed to require the Company to make such temporary assignments on the basis of seniority).

6) In accordance with the current collective bargaining agreement vendors and non-bargaining unit management employees assigned to the Center may perform any of the bargaining unit work at the Center. The Company retains the right to have sanitation work performed by employees of store #65 in lieu of assigning Teleshopper Order Selectors to perform the work.

7) Customers may pick-up teleshopper orders from the Center.

8) It is agreed that pre-packaged meat and deli products, including meat and/or Deli products processed at the Meat Plant or a store, may be stocked and handled under this agreement by meat wrappers at the Center, or from store #65, however, in the event the Company elects to establish a fresh meat processing department and/or full service deli, at the Center, the parties agree to meet to negotiate provisions under the Meat Agreement for such operations at the Center.

9) The Company reserves the right to teleshop orders at each store and/or to transfer product and merchandise (such as floral arrangements, Rx, shopped orders, etc.) from stores to the Center, for delivery to customers. It is understood that Teleshopper Order Selectors may enter, and shop for product in any department, at store #65 for the purpose of completing a customer order processed at the Center under this Agreement.

10) The Center may allow bargaining unit employees to perform certain non-bargaining unit functions at the Center. In this event, it is understood that such work shall not accreted to the bargaining unit and that management retains the right to hire non-bargaining unit employees to perform excluded work.

11) Management retains the right to close the Center upon 30 days advance written notice to the Union. In this event, Teleshopper Order Selectors shall be given layoff rights pursuant to the Principal Agreement.

12) This agreement shall be in effect through May 11, 1996 and thereafter unless either party desires to seek change in the agreement during the 1996 negotiation of the principal agreement.

**The original document was signed by Steve DiCroce and Gary Hakes on 12/1/95 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #28

## SCHEDULING OF SHIFTS.  DATED 8/6/96

King Soopers and U.F.CW. Local No. 7 hereby agree to the following understanding relative to the scheduling and selection of shifts under Article 10 of the collective bargaining agreement.

Upon mutual agreement between the Union and the Company, management may establish a fixed number of 4, ten hour work schedules for full-time employees.  Such schedules shall be listed on the schedule of shifts and may be selected by any qualified employee during the selection process.  It is understood that a full-time employee electing to select a ten hour shift shall be obligated to select an entire schedule of four, ten hour shifts.  In the event no full-time employee selects the four, ten hour schedule, then management shall retain the right to assign such schedule to the least senior, qualified full-time employee within the department and classification.

The provisions of the collective bargaining agreement shall be modified as follows to accommodate the scheduling of four, ten hour workshifts:

- Overtime shall be paid for all worked in excess often (10) hours in any scheduled workday.
- Payment for funeral pay shall not exceed the straight-time hour scheduled per day missed up to a maximum of twenty-four (24) hours of pay.
- After eight (8) hours of work, the employee shall be entitled to a third fifteen *(15)* minute break.
- Payment for jury duty shall not exceed eight (8) hours pay per day missed less what the employee is paid for serving on the jury.  Pursuant to section 93, the Employer may reschedule employees required to serve on jury duty, including but not limited to, restricting such employee from selecting a four, ten hour work schedule.
- Sick leave pay will be paid, if eligible and following the full work day absence if such applies, not to exceed the number of hours scheduled on the day missed.

**The original document was signed by Stephanie Bouknight on 8/1/96 and Gary Hake on 8/6/96 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #29

## DRESS REQUIREMENT.  DATED 4/17/97

Effective October 1, 1996, in addition to published grooming requirements, employees shall be expected to report to work as follows:  White oxford (long or short sleeved) shirt. Sweatshirts are not permitted (except King Soopers employees may wear King Soopers Logo sweatshirts), but black or navy cardigan style sweaters are permitted as are cardigan vests. Undershirts with printing, logos or designs that show through are not permitted.  The Company provided name badge must be worn while on duty.  Black (and/or Khaki at King Soopers) dress type pants of dress wool, cotton, knit, or black non-faded denim material in good condition and repair, which shall be provided by the employee.  "Dockers" type pants are acceptable, sweats, stirrup pants, stretch pants, spandex, etc. are prohibited.  Shoes must be black or white, clean and in good condition.  Open toe or open heel shoes are not permitted.  Laces must be black. Socks or nylon hose must be worn with the shoes.  Courtesy Clerks may wear shorts between May 1 through September 30 provided they are of the same material allowed above.  The Company will provide one (1) necktie and two (2) aprons, which will be replaced by the company if worn out or damaged as a consequence of normal wear and tear.  Employees will be required to replace at their cost lost ties and aprons.  Meat cutters and wrappers shall be provided smocks/coats in lieu of aprons or vests.

**The original document was signed by Steve DiCroce on 4/1/97 and Gary Hakes on 4/17/97 and is on file at the King Soopers Labor Relations Dept.**

# LETTER OF AGREEMENT

## #30

## PHARMACY TECHNICIANS.  DATED 6/25/98

King Soopers and UFCW Local No. 7 hereby agree as follows relative to the creation of the new classification of certified Pharmacy Technician.

1.  Effective immediately, a new classification of Certified Pharmacy Technician shall be established. Certified Pharmacy Technicians shall be hired or assigned as provided in Article 50 of the collective bargaining agreement. A Certified Pharmacy Technician shall be allowed to perform all duties in the pharmacy permitted by law. Any employee hired or assigned, as a Certified Pharmacy Technician must hold certification from a testing organization approved by the Employer prior to hire or assignment as a Certified Pharmacy Technician. Rates of pay for Certified Technicians shall be as follows:

| Certified Pharmacy Technicians | 5/17/98 | 7/5/98 |
|---|---|---|
| 1st 960 hours | $10.58 | $10.81 |
| 2nd 960 hours | $11.53 | $11.78 |
| Thereafter | $12.53 | $12.80 |

Any employee classified as a Pharmacy Technician who obtains certification as provided herein shall be re-classified as a Certified Pharmacy Technician on the first Sunday following receipt of such certification. In such event the employee shall be placed in the Certified Pharmacy Technician progression at the rate that equals their current rate, or the entry rate, whichever is greater.

For technicians certified on or before the effective date of this agreement, the Company agrees to research the number of hours worked by technicians, at the former top certified technician rate, after becoming a certified technician, and credit those hours worked toward advancement to the new top certified technician rate.

2.  The Company agrees to provide a pre-certification test training course of at least eight (8) hours and a self-study text book for all employees classified as Pharmacy Technicians on the effective date of this Letter of Agreement.

3.  All Pharmacy Technicians shall be required to take a company authorized certification exam not later than the last exam offered for calendar year 1997. The Company agrees to pay the cost of the initial exam.

4.  A Pharmacy Technician who fails the initial certification exam as provided above, shall be allowed to re-take the test at the next Denver exam date. The Company agrees to provide an additional eight (8) hours of training to prepare the employee for the re-test. The Company will provide training for and pay for only one such re-test.

5. It is understood that any employee assigned as a Certified Pharmacy Technician, shall be required to maintain certification as a condition of assignment as a Certified Pharmacy Technician. It is further understood that, in the event an employee fails to maintain certification as required by the Company, such employee shall be demoted in accordance with the step down language of the collective bargaining agreement.

The original document was signed by Steve DiCroce and Ernest L. Duran, Jr. on 6/25/98 and is on file at the King Soopers Labor Relations Dept.

# LETTER OF AGREEMENT

## #31

## DELIVERY DRIVERS.  DATED 11/17/00

Between
UFCW LOCAL NO. 7
and

KING SOOPERS, INC.

The above-named parties maintain a collective bargaining agreement for the Delivery Drivers.

Article 30, Section 81, paragraph 8, is hereby modified to substitute "one (1) year" for "two (2) years."

**The original document was signed by Steve DiCroce on 11/17/00 and Ernest L Duran on 11/16/00 and is on file at the King Soopers Labor Relations Department.**

# LETTER OF AGREEMENT

## #32

### PHARMACY TECHNICIANS.  DATED 6/27/00

Effective July 9, 2000, King Soopers and UFCW Local No. 7 hereby agree to the following modification to all Clerk collective bargaining agreements in Colorado.  It is understood and agreed that this Letter of Agreement supercedes and replaces the existing Letter of Agreement contained in the current collective bargaining agreement(s) between the parties.

1.  The Certified Pharmacy Technician rates shall be increased as follows:

|                                   | 7/9/00  | 7/8/01  | 7/14/02 | 7/13/03 |
|-----------------------------------|---------|---------|---------|---------|
| 1st 960 hours of work        | $ 9.55  | $ 9.74  | $ 9.94  | $10.13  |
| 2nd 960 hours of work        | 11.24   | 11.47   | 11.69   | 11.92   |
| 3rd 960 hours of work        | 12.11   | 12.36   | 12.60   | 12.85   |
| 4th 960 hours of work        | 13.07   | 13.34   | 13.60   | 13.87   |
| Thereafter                        | 14.76   | 15.06   | 15.36   | 15.66   |

Current Certified Pharmacy Technicians will be placed into the new wage rates as follows. Upon transfer to the new rates, the Certified Technician must work 960 hours at that new progression level before advancing to the next rate.

| CURRENT RATE |          | NEW RATE 7/9/00 |          |
|--------------|----------|-----------------|----------|
| P101 -       | $11.04   | PTC3 -          | $12.11   |
| PTC2 -       | 12.03    | P104 -          | 13.07    |
| PTC9 -       | 13.07    | P109 -          | 14.76    |

2.  Non-certified pharmacy technicians will continue to be paid the current rate for Pharmacy Technicians. Upon certification, these technicians will be promoted to the classification of Certified Pharmacy Technician effective the first Sunday following notice of certification, by the Technician, to the King Soopers Director of Pharmacy.

3.  Any employee hired into, or assigned to, the classification of Pharmacy Technician must take the first company authorized pharmacy technician certification exam following their 8th month of hire or assignment as a pharmacy technician. If the technician fails this certification exam, then the technician must take the next scheduled certification exam following notification of the failure of the first exam. If the technician fails the retest, then the technician may be demoted to another position in accordance with the demotion and step-down procedures of the collective bargaining agreement.

4.  Any pharmacy technician, who is currently classified as a Pharmacy Technician and has been employed, as a pharmacy technician in excess of eight months, must take the next scheduled company authorized certification exam. If the technician fails this certification exam, then the technician must take the next scheduled certification exam following notification of the failure of the first test. If the technician fails to take the initial exam or fails the re-test, then the technician may be demoted to another position in accordance with the demotion and step-down procedures of the collective bargaining agreement.

5. Any technician, who on the effective date of this amendment, has taken and failed two or more certification exams, will be allowed at their expense, to take the next scheduled certification exam. If the technician fails this exam, then the technician may be demoted to another position in accordance with the demotion and step-down procedures of the collective bargaining agreement.

6. Upon certification, all certified pharmacy technicians must maintain certification. The certified technician must present an updated copy of their renewed certification to the Director of Pharmacy not later than 90 days following the expiration of their most recent certification. In the event that a certified pharmacy technician fails to maintain certification, then the employee may be demoted to another position in accordance with the demotion and step-down procedures of the collective bargaining agreement.

7. The Company provides a pre-certification training course of at least eight (8) hours and a study manual for all employees classified as Pharmacy Technicians and who are within their eight months of assignment as a Pharmacy Technician. If a pharmacy technician fails their first exam as described above, the Company provides an additional eight (8) hours of training to prepare the employee for the re-test.

8. The Company pays for the initial certification exam, if taken immediately following the technicians eighth month of employment or assignment as a technician, and the subsequent re-test exam, if necessary. Any technician desiring to take the exam prior to their eighth month may do so at their own expense, however, if the technician passes this exam, then the Company will reimburse them for the cost of the exam.

The original document was signed by Steve DiCroce on 6/27/00 and Ernest L Duran on 7/20/00 and is on file at the King Soopers Labor Relations Department.